JAMES V. FITZGERALD, III (State Bar No. 55632)
NOAH G. BLECHMAN (State Bar No. 197167)
McNAMARA, NEY, BEATTY, SLATTERY,
BORGES & AMBACHER LLP
1211 Newell Avenue
Walnut Creek, CA 94596
Telephone: (925) 939-5330
Facsimile: (925) 939-0203

Attorneys for Defendant
CITY OF ANTIOCH

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
1211 NEWELL AVENUE, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ANDREA GONZALES, THE ESTATE OF DENNY GONZALES, MICHELLE MAYERS, as Guardian Ad Litem for SAKARIE DENNI-NISHELE GONZALES,

Plaintiffs,

vs.

CITY OF ANTIOCH; and DOES 1 through 50, inclusive;,

Defendants.

Case No. C14-04728 KAW

**DEFENDANT CITY OF ANTIOCH'S NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT**

Date: October 15, 2015
Time: 11:00 a.m.
Dept: Courtroom 4 (Oak.)
Judge: Hon. Kandis A. Westmore

Trial Date: January 11, 2016

///

# TABLE OF CONTENTS


MEMORANDUM OF POINTS AND AUTHORITIES ........ 1

I. SUMMARY OF ARGUMENTS AND ISSUES PRESENTED ........ 1

II. RELEVANT PROCEDURAL HISTORY ........ 2

III. RELEVANT FACTS ........ 2

A. Communications with Decedent ........ 2

B. Tactical Response to Developing Situation ........ 7

C. Shooting Incident ........ 11

1. Ofc. Hynes ........ 11

2. Ofc. Fortner ........ 13

3. Det. Bittner ........ 15

4. Sgt. Morefield ........ 17

5. Eye Witness Testimony ........ 18

6. Video of Incident ........ 19

D. Relevant Collected/Analyzed Evidence ........ 19

1. Autopsy and Toxicology ........ 19

2. Decedent's Ruger Gun and Matching Ballistic Evidence ........ 20

IV. LEGAL ARGUMENTS ........ 22

A. Summary Judgment Standards ........ 22

B. Plaintiffs Cannot Set Forth Any Viable Constitutional Claim Against Defendant City of Antioch ........ 23

1. Plaintiffs' Failure to Name and Serve Any Individual Officer Defendants is Fatal to Any Constitutional Claim Per § 1983 ........ 23

2. Plaintiffs Cannot Satisfy the High Burdens of Proof for a *Monell* Claim to Defeat this Motion ........ 24

a. Plaintiffs Have Not Demonstrated an Underlying Violation of Constitutional Rights ........ 24


McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
1211 NEWELL AVENUE, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

b. Plaintiff Has Not Presented Evidence to Support a Viable *Monell* Claim .......... 24

C. Plaintiffs Cannot Set Forth Any Viable Claim of Negligence / Battery Against Defendant City of Antioch .......... 26

D. Plaintiffs Cannot Seek Punitive Damages Against Defendant City .......... 29

V. CONCLUSION .......... 30

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
1211 NEWELL AVENUE, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
1211 NEWELL AVENUE, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

## TABLE OF AUTHORITIES

**Cases**

*Addisu v. Fred Meyer Inc., 198 F.3d 1130, 1134 (9th Cir. 2000)* ..... 23

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68 (1970) ..... 25

*Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)* ..... 22, 23

*Bhan v. NME Hospitals, Inc., 929 F.2d 1404, 1409 (9th Cir. 1991)* ..... 22, 23

*Board of County Comm'rs v. Brown*, 520 U.S. 397, 403 (1997) ..... 25

*Brown v. Ransweiler,* 171 Cal.App.4th 516, 537–38 (2009) ..... 27

*Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)* ..... 22, 23

*City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981) ..... 30

*City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-824 (1985) ..... 26

*Committee for Immigrant Rights of Sonoma County v. County of Sonoma*, 644 F.Supp.2d 1177, 1208 (N.D.Cal. 2009) ..... 30

*Edson v. City of Anaheim,* 63 Cal.App.4th 1269, 1272 (1998) ..... 26

*Foy v. Vallejo Police Dept.*, 2012 WL 394399 at *1-2 (E.D. Cal. 2012) ..... 23

*Fuller v. City of Oakland*, 47 F.3d 1522, 1534 (9th Cir. 1995) ..... 25

*Garcia v. City of Santa Clara*, 2010 WL 3447666 at *1-2 (N.D. Cal. 2010) ..... 23

*George v. Morris*, 736 F.3d 829, 839 (9th Cir. 2013) ..... 28

*Gillette v. Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 1992) ..... 25

*Graham v. Connor,* 490 U.S. 386, 396 (1989) ..... 27, 28

*Hamilton v. Rogers*, 791 F.2d 439, 443 (5th Cir. 1986) ..... 26

*Hayes v. County of San Diego*, 57 Cal.4th 622, 629 (2013) ..... 26, 27

*Hood v. Citrus Heights Police Dept.*, 2013 WL 269090 at *1-2 (E.D. Cal. 2013) ..... 23

*Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 166 (1993) ..... 25

*Long v. City and County of Honolulu*, 511 F.3d 901, 907 (9th Cir. 2007) ..... 24, 28

*Lynn v. Sheet Metal Workers Int'l Ass'n, 804 F.2d 1472, 1478 (9th Cir. 1986)* ..... 22

*McCullough v. Fresno Police Dept.*, 2011 WL 1134449 *4 (E.D. Cal. 2011) ..... 24

*Menuel v. City of Atlanta*, 25 F.3d 990, 995 (11th Cir. 1994) ..... 28

*Monell v. NewYork City Dept. of Social Services*, 436 U.S. 658, 690 (1978) .. 1, 23, 24, 25, 26, 30

*Monroe v. City of Phoenix*, 248 F.3d 851, 862 (9th Cir. 2001) .......... 29

*Munoz v. City of Union City* (2004) 120 Cal.App.4th 1077, 1109 .......... 27

*Nally v. Grace Community Church, 47 Cal.3d 278, 292 (1988)* .......... 26

*Plumeau v. School Dist. #40 County of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997) .......... 25

*Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008) .......... 23

*Scott v. Henrich*, 39 F.3d 912, 916 (9th Cir. 1994).......... 24, 28

*Smith v. City of Hemet*, 394 F.3d 689, 704 (9th Cir. 2005) .......... 28

*Tennessee v. Garner*, 471 U.S. 1, 3 (1985) .......... 28

*Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) .......... 26

*T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987)*.......... 22

*Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002)* .......... 22

**Statutes**

42 U.S.C. § 1983 .......... 1, 23, 24, 25, 26, 30

Civil Code 3294(a).......... 30

Gov't Code 818 .......... 29

**Rules**

Federal Rule of Civil Procedure ("FRCP") 56.......... 1, 22

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
1211 NEWELL AVENUE, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
1211 NEWELL AVENUE, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

## NOTICE

TO PLAINTIFFS AND ATTORNEYS OF RECORD, PLEASE TAKE NOTICE that on October 15, 2015, at 11:00 a.m., in Courtroom 4 in U.S.D.C. in Oakland, or as soon thereafter as this matter can be heard, Defendant City of Antioch moves this Court for an order for Summary Judgment and/or Partial Summary Judgment in relation to Plaintiffs' Second Amended Complaint (SAC) on file herein.

This motion is made pursuant to FRCP 56 on the grounds that there are no genuine issues of material fact and Defendant City of Antioch[1] (City) is entitled to judgment as a matter of law as to Plaintiffs' various claims. This Motion is based on this Notice, Memorandum of Points and Authorities, the supporting Declaration of Noah G. Blechman and attached exhibits and such further evidence and oral argument as may be presented on this matter.

## MEMORANDUM OF POINTS AND AUTHORITIES

This civil action arises out of the lawful shooting of Decedent Denny Gonzales ("Decedent") on June 28, 2012, when Decedent, highly intoxicated and despondent, pointed a firearm and shot at police officers forcing Antioch Police Department (APD) officers to shoot at Decedent to stop the deadly threat he posed, killing Decedent. **Video of the incident, submitted herein, confirms the lawfulness of the officers' actions in light of Decedent's deadly threat.**

### I. SUMMARY OF ARGUMENTS AND ISSUES PRESENTED

1) Plaintiffs cannot set forth any viable constitutional claims against the City, namely no viable Fourth or Fourteenth Amendment claims (Third and Fourth Causes of Action) or *Monell* claim.

2) Plaintiffs cannot set forth any viable claim for negligence (First Cause of Action) or battery (Second Cause of Action) against the City.

3) Plaintiffs cannot set forth any viable claim for punitive damages against the City (Claim for Punitive Damages).

---

[1] The City of Antioch is the only named Defendant in this action other than the nominal Defendant, Didra Barnes-Gonzales, the estranged daughter of Decedent. No individual City of Antioch police officers have ever been named in this matter. **As such, Plaintiffs have no viable § 1983 claims against any individual police officers.**

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
1211 NEWELL AVENUE, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

## II. RELEVANT PROCEDURAL HISTORY

Plaintiff Andrea Gonzales (Plaintiff Gonzales) initially filed a complaint in this case versus the City of Antioch in Contra Costa County Superior Court (CCCSC) on July 29, 2013. On September 13, 2013, Defendant City filed an answer to the initial complaint. On September 19, 2014, after obtaining leave of the CCCSC, Plaintiff Gonzales filed a First Amended Complaint in CCCSC, adding in federal claims as well as adding Plaintiff Sakarie Gonzales (daughter of Decedent). On October 24, 2014, Defendant City removed this action to federal court. (ECF 1). On October 30, 2014, Defendant City filed an answer to the First Amended Complaint. (ECF 5). On January 20, 2015, at the Case Management Conference, trial and other deadlines were set by Your Honor. At the April 21, 2015, Further Case Management Conference, the Court allowed Plaintiffs leave to file a Second Amended Complaint, solely to name the nominal Defendant, Didra-Barnes Gonzales, if she was not going to be part of this litigation as a Plaintiff. (ECF 26). After several extensions (ECF 28 and 30), Plaintiffs filed a Second Amended Complaint (SAC) on July 17, 2015 (ECF 32), the operative complaint, adding the nominal Defendant. (See **Exh. A**, Second Amended Complaint). Defendant now proceeds with this dispositive Motion.

## III. RELEVANT FACTS

### A. Communications with Decedent

Det. Eric McManus (Det. McManus) is a detective and police officer of the APD. (**Exh. B**, Depo. of Det. McManus, pgs. 8:8-9:13). He has been a police officer since 1995, starting with Chico in 1995, then moving to the APD in 2006. *Id.* Decedent was the barber of Det. McManus since about 2007-2008, and he considered them friends. (*Id.* pgs. 20:23-21:14; 22:4-6).

On the afternoon of June 28, 2012, Det. McManus was with fellow APD Det. Robert Green performing surveillance work in the City of Pinole. (*Id.*, pgs. 26:25-28:11). While on surveillance, Det. McManus received the first telephone call from the Decedent where Decedent initially mentioned that he did not "want to be here anymore." (*Id.*, pg. 32:2-21). Det. McManus then questioned Decedent to find out what he meant and Decedent repeated that he did not "want to be here." (*Id.*, pgs. 32:22-33:11). From this conversation, Det. McManus interpreted that

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
1211 NEWELL AVENUE, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

Decedent was depressed, sad and despondent as the statements Decedent made were vague suicide threats, comments Decedent had not made before. (*Id.*, pgs. 33:12-34:1). This conversation lasted 20-25 minutes. Det. McManus tried to get Decedent to tell him what was bothering him and to give Det. McManus time to get back to the City of Antioch from the City of Pinole. (*Id.*, pgs. 34:2-11; 35:10-17). After the call ended, the two detectives immediately started driving from Pinole back to Antioch so they could help Decedent. (*Id.*, pgs. 35:18-36:3).

On their way to the freeway, Det. McManus received a <u>second telephone call</u> from Decedent. (*Id.*, pg. 36:4-7). The nature of second conversation was much more angrier and <u>homicidal</u>. Because of the nature of this conversation, Det. McManus had Det. Green pull out his cell phone and record most of the conversation. (*Id.*, pg. 36:8-12, 38:17-19; **<u>Exh. C</u>**, Audio File Voice 005 (Second Call) and Transcript). Decedent expressed that he was angry towards someone, indicated he was watching this person, a person that did something to his brother, but would not elaborate on what this person did to his brother. (Exh. B, pg. 36:13-20; Exh. C). Decedent asked what Det. McManus would do if someone harmed Det. McManus' family. Det. McManus was trying to find out why Decedent was so angry, who he was angry at and see if he could help him through it. (*Id.*, pgs. 36:20-37:8; Exh. C). Decedent continued to ask Det. McManus if Det. McManus could protect this person and then said something like what would Det. McManus do if someone was in front of Det. McManus' house, which caused fear in Det. McManus' mind as his wife and daughter were home. Decedent then clarified that he was not at Det. McManus' house. (*Id.*, pgs. 37:9-38:3; Exh. C).

Once Det. McManus confirmed Decedent was not at Det. McManus' house, Det. McManus tried to figure out where Decedent was located, who he was after and who the Decedent's threats were directed towards. Decedent mentioned that a police car had driven by and that if he got stopped, there would be casualties. (*Id.*, pg. 38:4-11; Exh. C). Det. McManus asked Decedent if he intended on harming an innocent person and Decedent told him that <u>Decedent was after one of Det. McManus' own</u>. When asked to clarify, Decedent said he was <u>preparing to kill a police officer</u>. (*Id.*, pg. 38:11-16; Exh. C). Decedent also mentioned that someone did something to his brother, but would not provide more details or identify where he

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
1211 NEWELL AVENUE, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

was located. (*Id.*, pg. 39:14-24; Exh. C). In addition, during that second telephone call, Det. McManus heard the very distinct sound that Det. McManus relates to Decedent chambering a round into a gun, a sound of metal slamming against metal. (*Id.*, pgs. 39:25-40:14).

While Det. McManus formed the impression during the first call that Decedent was depressed, despondent and suicidal, the second call indicted to Det. McManus that Decedent was **homicidal** as Decedent made angry statements that Decedent was watching someone, someone he later indicated was a police officer and was asking about what Det. McManus would do if someone harmed Det. McManus' family. (*Id.*, pgs. 41:11-42:6; Exh. C). Det. McManus kept on asking Decedent not to do anything until Det. McManus got back to Antioch and Decedent agreed to give Det. McManus time then ended the call. (*Id.*, pgs. 42:7-43:9; Exh. C). The clear indication to Det. McManus was that Decedent was planning to harm a police officer and was potentially in front of that officer's house. (*Id.*, pg. 43:10-44:19).

After the second call, Det. McManus immediately called his wife to check on her welfare, told her to grab the extra gun and their daughter and go to her dad's house (a retired law enforcement officer). (*Id.*, pgs. 45:25-46:6). Det. McManus also called APD Det. Wisecarver, who he knew was home nursing a work related injury, to check on his welfare and to ensure that Decedent's yellow Corvette was not in front of his house. (*Id.*, pg. 46:6-13). Det. McManus also called his immediate supervisor, Sgt. Bias, to let him know about the nature of the first two conversations with Decedent and information about Decedent, including the fact that he was aware Decedent owned a firearm, perhaps a Ruger firearm. (*Id.*, pg. 46:14-22; 49:4-18; 54:15-55:7). Det. McManus also requested that APD dispatch start doing a welfare check on all off duty officers, and roll call for officers on the street, and he believes that Det. Green was asking dispatch to put out a BOLO (Be On the Lookout), a informational teletype sent to all neighboring jurisdictions due to the officer safety issues raised by Decedent. (*Id.*, pg. 46:23-47:8; 52:17-53:6).

Instead of responding to the APD, the two detectives drove directly to the barber shop where Decedent worked, International Barber Shop, and found Decedent's last name and home address on Decedent's cosmetology license. (*Id.*, pgs. 47:9-16; 53:21-54:4). They then drove immediately to the APD Chief of Police's house who lives in that immediate area to make sure

Decedent's car was not in front of their Chief's house. (*Id.*, pg. 47:17-20). After that, Det. Green and Det. McManus drove to Decedent's neighborhood on Lefebvre Way in Antioch, in their unmarked vehicle, drove by and saw Decedent's car in the driveway of 4849 Lefebvre Way and saw Decedent near his car. (*Id.*, pgs. 47:21-48:5). Det. Green and Det. Manus stopped their car at the far north end of Lefebvre Way, put their tactical vests on and waited for other officers to respond. *Id.* When they parked, they maintained contact with dispatch and kept in contact with Sgt. Morefield as to where they were located and what they were observing. (*Id.*, and pgs. 58:23-59:5). Sgt. Morefield was the patrol Sergeant, the street supervisor at that time, and he was also the ranking officer on the S.W.A.T. (Special Weapons and Tactics) team, meaning he had tactical command at the scene initially unless he was relieved. (*Id.*, pgs. 64:7-65:3; 71:24-72:6). At that time, Det. McManus' intentions were to keep an eye on the residence, after verifying Decedent was at home, monitor the situation if Decedent left and provide intelligence to responding officers. (*Id.*, pg. 60:8-17).

At one point, as they parked their vehicle down the street to provide some concealment, Det. McManus and Det. Green got out on foot and moved south towards the direction of Decedent's home to make additional observations. (*Id.*, pgs. 60:21-62:1). When other officers started to arrive, Det. McManus would go back and forth from the area where he was on foot to the area back towards his car to speak with officers that arrived such as Sgt. Bias, then Det. Krenz and Det. McMurray. (*Id.*, pg. 62:13-24).

Det. McManus spoke to Sgt. Morefield on the telephone and also spoke to him in person at the scene. (*Id.*, pgs. 65:15-66:3). During the face to face conversation, he informed Sgt. Morefield that he was with Det. Green, pointed out Decedent's home, provided information about Decedent's residence, Decedent's descriptions and Denny's vehicle description. *Id.* While he was at the scene, Det. McManus received a <u>third telephone call</u> from Decedent, which was a short conversation, where **<u>Decedent indicated that he was "going to kill a police officer.")</u>** (*Id.*, pgs. 66:19-68:2). Like the second telephone call, this telephone call was recorded by Det. Green. (*Id.*, pg. 75:11-16; **<u>Exh. D</u>**, Audio File Voice 005 (Third Call) and Transcript). Decedent then hung up the call. (Exh. B, pgs. 116:22-117:2). After this telephone call, Det. McManus advised over the

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
1211 NEWELL AVENUE, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

radio that he had received another call from Decedent and, though he was not going to put out the nature of it, it was not good. (*Id.*, pgs. 68:3-6).

Det. McManus then received a fourth telephone call from Decedent which only lasted a couple of minutes. (*Id.*, pgs. 74:17-19; 75:22-76:16). During this telephone call, Decedent kept on asking Det. McManus where he was located and Det. McManus kept stating that he was still driving back from Pinole to try to buy additional time for officers to get in place at the scene. *Id.* Decedent wanted Det. McManus to come to his house and Det. McManus asked Decedent if he came to Decedent's house, would Decedent harm him and Decedent answered that he would have to come find out. *Id.* Decedent then hung up the call. (*Id.*, pg. 117:5-7).

Det. McManus then received a fifth telephone call from Decedent. (*Id.*, pgs. 76:20-78:4). During this fifth conversation, Decedent said something to the effect of "it was done," indicating to Det. McManus that he had killed a police officer and/or that he had acted upon his threat to harm someone. *Id.* Decedent then hung up the call. (*Id.*, pg. 117:10-12). After that fifth telephone call, Det. McManus provided that information to other officers either via the radio or via face to face interactions at the scene. (*Id.*, pg. 78:5-12). During one of the conversations with Decedent, Decedent told Det. McManus that there would be a need for body bags. (*Id.*, pg. 107:12-24). Det. McManus then provided this information out to officers. *Id.*

It should be noted that at the scene, at some point in time, Det. McManus had discussions with Sgt. Morefield about remaining in communication with Decedent and to work with the APD's hostage negotiators at the scene, Det. Krenz and Det. McMurray, for continuing contacts with Decedent. (*Id.*, pg. 79:12-24). Det. McManus then had conversations with Det. Krenz and Det. McMurray. (*Id.*, pgs. 80:13-82:20). Both are members of the APD's Hostage Negotiation Team (HNT). When he spoke to these two HNT detectives, they told him to remain the key person to speak with Decedent as Det. McManus had the relationship and rapport with Decedent which is very important in these types of situations. *Id.* Det. McManus then continued to try to do what he was doing in his communications with Decedent, which was to try to calm down Decedent and buy time for officers to get in place in the area. (*Id.*, pg. 83:8-15). Sgt. Morefield instructed Det. McManus to not get involved in any of the tactical operation. (*Id.*, pg. 72:7-11).

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
1211 NEWELL AVENUE, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

Overall, Det. McManus felt that the first telephone call from Decedent was some type of cry for help, which was potentially suicidal in nature, but the rest of the conversations were angrier and indicated that Decedent was posing a threat to others. (*Id.*, pgs. 109:16-110:19). Det. McManus wanted a peaceful resolution to this situation, but he had to remain safe and make sure other officers were safe as well. (*Id.*, pgs. 114:21-115:7). Decedent's threatening comments could constitute a crime so Det. McManus notified his superiors so officers could respond out to the location to either take care of the person who may have been suicidal or take the person into custody that may be homicidal. (*Id.*, pgs. 115:8-20).

**B. Tactical Response to Developing Situation**

Sgt. Morefield is a police Sergeant for the APD, a position he has held since 2007. (**Exh. E**, Depo. of Sgt. Morefield, pg. 8:10-21). He has been with the APD since 2001. (*Id.*, pg. 9:1-9). On the date of the incident, Sgt. Morefield was a supervisor in charge of a street patrol crew and was also the APD S.W.A.T. team leader, a position he held since 2007. A team leader is in charge of overall S.W.A.T. training and operations of the team. (*Id.*, pgs. 10:17-21; 12:14-13:1; 13:9-15). Both Det. Krenz and Det. McMurray were part of the APD HNT as of June of 2012. (*Id.*, pgs. 15:20-16:1). Typically, the S.W.A.T. team can be deployed in situations involving hostage rescues, barricaded subjects, high risk warrant service, high risk arrests, basically high risk operations that would fall outside of the norm for a regular patrol team to handle due to the tactical challenges and high risks involved. (*Id.*, pg. 20:3-21:5).

In terms of the incident of June 28, 2012, Sgt. Morefield was working that date in the field as a patrol supervisor. (*Id.*, pgs. 24:2-25:9). On that date, he became aware of the situation involving Decedent when he received a computer e-mail to his patrol car that afternoon that there was a person who made specific threats to an APD detective that the person was intent on killing a police officer. (*Id.*, pgs. 25:18-26:11). This e-mail was sent from the APD dispatch center as a BOLO (Be on the Lookout), an officer safety bulletin. (*Id.*, pg. 27:5-8). In response to this e-mail alert, which was a developing situation and one in which somebody could be in imminent danger, Sgt. Morefield responded back to the APD to assist. (*Id.*, pg. 27:9-18).

At the APD, Sgt. Morefield received additional information regarding the threats, namely

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
1211 NEWELL AVENUE, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
1211 NEWELL AVENUE, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

that Det. McManus was in phone contact with the person, who he knew, that the person was making specific threats on police officers, that the person may be in front of an officer's house, was going to kill that officer and if any marked police cars came by, that the person could possibly take action against the marked police cars. (*Id.*, pg. 28:4-15). While at the APD, he received information that Det. McManus had located the person at the person's home on Lefebvre Way in Antioch. (*Id.*, pgs. 29:25-30:11). He was told that the person was despondent and was intent on killing a police officer so Sgt. Morefield considered this a highly dangerous situation. (*Id.*, pg. 30:12-22). After he received this information, it was decided that Sgt. Morefield would respond to the location with all patrol team members that were available. (*Id.*, pgs. 30:23-31:5).

After he arrived near Lefebvre Way, Sgt. Morefield gathered all the available officers, briefed them on their approach and made a slow, methodical and covert approach towards the Decedent's residence as he did not want officers to be seen in case the suspect was lying in wait for officers. (*Id.*, pgs. 33:3-7; 35:4-23). Officers were going to move slowly on either side of the street to approach the house in case the Decedent was somewhere in between his house and where officers were located. (*Id.*, pg. 36:2-12). The plan was for containment of the residence as Sgt. Morefield was concerned with public safety and officer safety so needed to surround the house covertly. (*Id.*, pgs. 36:13-21). Due to the nature of the Decedent's threats, there was a fear that Decedent would harm an officer or someone else so they wanted to get resources to the scene to protect the public, the officers and the Decedent and make contact with Decedent if he came out of his house in this rapidly evolving situation. (*Id.*, pg. 68:20-69:15).

As part of the covert approach towards the Decedent's residence, Sgt. Morefield tried to put his resources (officers) in place a few houses north of Decedent's residence and also put officers across the street on Vinewood Way, a cross-street with houses almost directly across the street from Decedent's residence, so those officers could have a good visual of the Decedent's home. (*Id.*, pgs. 38:5-23; 41:19-42:13). The officers he placed a few houses down from Decedent's residence were the <u>Arrest-Contact team</u>. (*Id.*, pgs. 38:24-39:9). He instructed the Arrest-Contact team to take cover behind what was available to them. (*Id.*, pg. 41:8-13). Once additional resources started to arrive on scene, he moved the Arrest-Contact team closer to the

Decedent's house. (*Id.*, pg. 41:14-18). He also positioned officers so that they could block off the nearby streets that accessed the street of Decedent. (*Id.*, pg. 43:1-15).

Sgt. Morefield continued to direct resources as they arrived in the area, including staging fire, ambulance and medical personnel nearby and continuing the direct officers to block roadways to prevent vehicle traffic. (*Id.*, pg. 45:7-24). He also directed police personnel, Brentwood Police Department officers, to the street in the back of the Decedent's house. (*Id.*, pgs. 45:25-46:5). A rough command post was also set up where some of the key individuals involved, including command staff personnel, Sgt. Bias and the two HNT personnel, Det. Krenz and Det. McMurray, would congregate. (*Id.*, pgs. 46:9-21; 50:18-21). Sgt. Morefield had discussions with HNT members Det. Krenz and Det. McMurray that Det. McManus had been having phone conversations with Decedent, that they wanted Det. McManus to continue that with Decedent and were working with Det. McManus in that regard. (*Id.*, pg. 101:5-23; 120:4-22).

APD Captain McConnell arrived at the scene at some point and Sgt. Morefield would confer with Cpt. McConnell, who then had overall incident command, to put resources into place. (*Id.*, pgs. 54:6-55:4). Sgt. Morefield was trying to get all the key resources at the scene, including additional S.W.A.T. resources and officers, to deal with the evolving situation. (*Id.*, pgs. 55:5-56:9). At some point during this tactical preparation stage, Cpt. McConnell made the decision to "call out" the rest of the S.W.A.T. team as S.W.A.T. is an ancillary duty team so that a "call out" would mean S.W.A.T. officers are called from home, from the APD or from other parts of the area and other assignments to respond to the scene to assist. (*Id.*, pg. 56:10-22).

As S.W.A.T. officers arrived on the scene, Sgt. Morefield replaced the patrol members of the Arrest-Contact team with the arriving S.W.A.T. officers and positioned the Arrest-Contact team behind a vehicle in the neighboring driveway north of Decedent's residence. (*Id.*, pgs. 59:1-60:4). The Arrest-Contact team then consisted of Det. Bittner, Det. Vincelet, Ofc. Fortner, Det. Koch and Det. Mortimer, all S.W.A.T team members. (*Id.*, pg. 60:5-25; 63:9-11). He wanted S.W.A.T. officers to replace the patrol officers on that Arrest-Contact team as S.W.A.T. officers are specifically equipped, trained and experienced in high threat level situations, such as this developing situation. (*Id.*, pg. 61:4-10). The members of the Arrest-Contact team had a variety

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
1211 NEWELL AVENUE, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

of weapons at their disposal, including handguns, long guns (assault rifles) and less lethal options like Tasers. (*Id.*, pg. 61:11-62:1).

Sgt. Morefield instructed the Arrest-Contact team that if Decedent were to show himself out of the house, to use available cover, to announce police presence and give commands to Decedent to try to gain his compliance. If Decedent left in a vehicle, he instructed the officers not to block his vehicle in any way. (*Id.*, pg. 65:5-16). If Decedent came outside in a vehicle, he instructed his team to fan out (disperse) around the vehicle that was parked on the street (the covered vehicle), using that as cover, and then give Decedent verbal commands to announce their presence and gain compliance, and they could use a flash bang device (light-sound diversionary device) if need be. (*Id.*, pgs. 76:14-77:19; 78:24-79:7). The plan for the Arrest-Contact team if Decedent came out on foot was very similar to if he came out in a vehicle, to make contact, announce their presence and try to gain compliance. (*Id.*, pgs. 79:8-22; 84:17-23). He discussed different scenarios with the Arrest-Contact team and was concerned that Decedent could come out of the garage or house at any time while they were mobilizing at the scene. (*Id.*, pgs. 74:13-24; 75:9-13). Det. Bittner was the Arrest-Contact team leader for this incident. (*Id.*, pg. 96:8-24).

Sgt. Morefield was aware that Decedent was either armed or possibly armed and was operating under that assumption. (*Id.*, pg. 75:14-76:9). Knowing that the Decedent was potentially armed, there was a discussion with the Arrest-Contact team about the rules of engagement and that the APD Use of Force policy would control in terms of the use of deadly force. (*Id.*, pgs. 85:16-86:14; 115:13-18). Per the APD Use of Force Policy, an officer has a right to use deadly force to defend himself if his life is threatened or to defend another officer's life if they are threatened. (*Id.*, pg. 91:13-22).

As to the perimeter team, which consisted of patrol officers Hynes, McElroy, Dee and Andelin, Sgt. Morefield instructed them to keep eyes on the subject residence and to advise on the radio what they could see from their direct vantage point across the street. (*Id.*, pgs. 62:2-17; 65:17-22). The intention was not necessarily to arrest Decedent, but they had to get resources in place to intervene in the event that Decedent made an effort to hurt himself or others and also to make contact with Decedent to find out his intentions. (*Id.*, pg. 70:1-18).

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
1211 NEWELL AVENUE, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
1211 NEWELL AVENUE, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

There was not sufficient time to develop a specific detailed plan of contact with Decedent, though Sgt. Morefield knew that Det. McManus had been in phone contact with Decedent from time to time. (*Id.*, pgs. 70:19-71:1). The HNT members that were present at the scene are the best equipped to communicate and assist with a situation and suspect like this situation as they go through specific training on how to communicate with people that are despondent, possibly suicidal, may have hostages, may be barricaded or may have committed serious crimes. (*Id.*, pgs. 73:12-74:9). He considered that this situation may have been a hostage situation. *Id.* There were also other scenarios that endangered public safety, such as a suicide by cop situation, hostage situation in the home, criminal suspect inside who had already committed a serious crime and other potentialities. (*Id.*, pg. 113:13-25). Sgt. Morefield was concerned that the suspect was going to harm someone or had already harmed someone. (*Id.*, pg. 114:16-24).

At some point when Sgt. Morefield was back at the command post area, he heard gunshots being fired. (*Id.*, pg. 102:16-23). From the time Sgt. Morefield arrived on scene to the time when gunshots were fired, <u>approximately 45 minutes went by</u>. (*Id.*, pg. 69:21-25). Initially when they arrived, their vehicles were quite a distance away from the Decedent's house and 45 minutes was not a significant amount of time to get to the Decedent's neighborhood, set up and put resources into place and for their slow methodical approach to the Decedent's residence. (*Id.*, pg. 120:23-121:15). While at the scene, this situation was still developing, was developing quickly and Sgt. Morefield was trying his best to get resources into place to deal with the situation. (*Id.*, pg. 102:4-11; 121:21-122:16).

## C. Shooting Incident

### 1. Ofc. Hynes

Ofc. Hynes was a police officer with the APD on the date of the incident, where he has been since September of 2006. (**Exh. F**, Coroner's Inquest Transcript, pgs. 43:5-44:20). On June 28, 2012, he was working as a patrol officer for APD, wearing a uniform and driving a marked patrol car. (*Id.*, pgs. 44:21-45:9). At some point, while in his patrol car, he saw an e-mail message sent out from dispatch regarding an officer safety issue, namely an individual that was speaking to an APD detective had made some threats to kill a police officer and could possibly be

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
1211 NEWELL AVENUE, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

parked outside of an officer's residence. Shortly after that, Ofc. Hynes was dispatched to the scene where officers located the individual, Decedent. (*Id.*, pgs. 45:10-46:2). At the scene, Sgt. Morefield briefed him and other officers on the situation and the plan. They then began to approach Decedent's home on either side of the street in attempt to notify or evacuate residents, and to see if they could get into a position to clearly see Decedent's house. (*Id.*, pg. 46:6-19).

As officers approached the house, Sgt. Morefield decided that he wanted the S.W.A.T. team members closest to the house so Sgt. Morefield asked other patrol officers to go around the block and try to take up a position directly across from the house where they would have a clear view into the garage. (*Id.*, pg. 46:20-47:6). Therefore, himself and Officers Andelin and McElroy then entered the backyard of a residence that was directly across the street from Decedent's residence (Vinewood Way) and then positioned themselves behind some trees and a fence to keep watch on the residence and garage. (*Id.*, pg. 47:7-14). Once in that position, they could see that the Decedent's garage door was partially open, could see a yellow Corvette in the garage and saw the lower legs of a person moving around in the garage. (*Id.*, pg. 47:15-48:6).

Ultimately, the garage door opened and closed several times. At one point, when the garage was fully opened, Decedent walked out of the garage onto the driveway. <u>In Decedent's right hand was a handgun</u>. Ofc. Hynes then informed all offices via the radio that Decedent was coming out of the garage and he had a gun in his right hand. (*Id.*, pg. 48:7-15). Decedent looked left and right, with the gun in his right hand, as he walked down the driveway. Initially the gun was visible, then Decedent put it in his pocket and then he removed it from his pocket. (*Id.*, pg. 48:16-25). When Decedent removed the gun from his pocket, he began to turn to his right, which is where S.W.A.T. team members were located. (*Id.*, pg. 49:1-4). Ofc. Hynes was not fully concealed across the street, even though he was behind a fence. (*Id.*, pg. 49:5-11; 53:13-18). <u>When Decedent brought the gun out of his pocket and turned towards the S.W.A.T. team members, Decedent also raised the gun up and once the Decedent's gun began to move in the S.W.A.T. officers' direction, Ofc. Hynes fired at Decedent with his long rifle</u>. (*Id.*, pgs. 49:23-51:5). Ofc. Hynes fired his rifle at Decedent as he saw Decedent had a gun, Decedent previously expressed a desire to shoot and kill a police officer and then saw him turn towards APD officers

with his gun so he shot at Decedent to protect the lives of other officers who were exposed at that point. (*Id.*, pg. 52:2-22). Decedent then continued to turn and began to move back towards the garage and then Ofc. Hynes saw S.W.A.T. team members had began to move up the driveway towards Decedent. (*Id.*, pg. 51:15-23). Ofc. Hynes continued to shoot at Decedent as he moved up the driveway and then saw Decedent go down. (*Id.*, pg. 53:23-54:12).

2. Ofc. Fortner

Ofc. Fortner is a police officer for the APD and has worked for the APD as a patrol officer since 2001. (*Id.*, pgs. 56:4-57:6). Ofc. Fortner has been assigned to the S.W.A.T. team for APD since 2003. (*Id.*, pg. 58:10-15). On June 28, 2012, he was dispatched to the scene after receiving an officer safety bulletin on his car computer and then hearing Sgt. Morefield request all available units to respond to Lefebvre Way. (*Id.*, pgs. 59:3-60:1). When he got to the scene, he responded north of the residence and saw other officers setting up a perimeter to contain the situation, evacuate civilians in the neighborhood or prepare for other necessary tasks. (*Id.*, pg. 60:2-10). Ofc. Fortner then grabbed his ballistic helmet and S.W.A.T. issued rifle. (*Id.*, pg. 60:11-15).

Ofc. Fortner then obtained additional information from Det. McManus and Det. Green. Sgt. Morefield was putting people and resources into place, initially setting up an outer perimeter and then tasking Ofc. Fortner take other officers to try to approach the residence for an inner perimeter. (*Id.*, pgs. 60:16-61:7). Officers had quickly established traffic blocks with their patrol cars and then they wanted to establish an inner perimeter, to get officers closer to the area they are concentrating on to get observations of what was happening, who was involved, were children or civilians involved or in harms way, to provide intelligence, to contain the scene and react to any threats of violence or danger to anyone in the area. (*Id.*, pg. 61:8-23).

Once officers started to approach the residence, they made contact with other neighbors and told them to either shelter in place or evacuate. As they got closer to the Decedent's residence, Sgt. Morefield tasked Officers Hynes, McElroy and Andelin to an observation center so they could provide officers with information about Decedent and the residence. (*Id.*, pgs. 61:24-62:19). Ofc. Fortner, in the Arrest-Contact team, moved house to house with several officers while other officers across the street did the same so they could get into a safe position of

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
1211 NEWELL AVENUE, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
1211 NEWELL AVENUE, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

cover. (*Id.*, pgs. 62:20-63:5). The Arrest-Contact team got into a position of cover in the driveway of the house next door to Decedent's house, behind an old Suburban vehicle, saw the garage of Decedent's house and got a physical description of the Decedent. (*Id.*, pg. 63:6-21).

Ofc. Fortner had his weapon at the ready. (*Id.*, pg. 63:22-64:4). There were some high bushes or trees somewhat obstructing their view to Decedent's house. (*Id.*, pg. 64:18-24). Initially when they were there, the garage door went up a few feet and they could hear someone moving around in the garage, could see the yellow Corvette, and then it closed. In that position for some period of time, other S.W.A.T. officers had switched places with patrol officers in the Arrest-Contact team. (*Id.*, pgs. 64:25-65:22). He witnessed the garage go partially up again, heard music played loudly, then turned off and then loudly on again, plus he heard the car start, then shut off, then car start and then it was shut off. They were concerned Decedent could leave in his car and that was discussed. He also heard a glass bottle get thrown or broken so he informed officers to get ready as it seemed things were escalating. (*Id.*, pgs. 66:11- 67:18).

At that point, the garage door opened all the way up which Ofc. Fortner reported to officers. Ofc. Fortner then saw Decedent exit the garage and walk down the driveway. As he walked, Decedent had his right hand pinned to his right hip and his hand appeared to be wrapped around something similar to a firearm. (*Id.*, pgs. 67:19-68:12). Decedent was looking left and right as he walked down the driveway. After Decedent cleared the bushes, Ofc. Fortner could clearly see that <u>Decedent had his right hand on the black handle of a gun with the barrel running down his leg</u>. (*Id.*, pg. 68:13-20). As Decedent walked with a gun in his right hand, Decedent appeared to be peering across the street like he was looking for something or someone. *Id.*

At that point in time, Decedent would be able to see Ofc. Fortner and the officers of the Arrest-Contact team hiding behind the Suburban so Ofc. Fortner informed the team that he was going to challenge the Decedent so Ofc. Fortner stepped out a bit. (*Id.*, pg. 68:21-69:18). Ofc. Fortner then pointed his rifle at Decedent and shouted loudly "I see the gun. Take your hand off the gun. Put your hands up," which he yelled at Decedent several times as he approached Decedent. Ofc. Fortner wanted Decedent to know that he saw Decedent's gun and wanted Decedent's hands off the gun. (*Id.*, pg. 69:18-70:1). Decedent looked to his right, which was in

Ofc. Fortner's direction and as Ofc. Fortner started to approach Decedent, Decedent started to back pedal and that is when Decedent's hand came off his hip with the gun and pointed the gun at Ofc. Fortner. As the gun was pointed at Ofc. Fortner, and potentially his fellow S.W.A.T. officers, Ofc. Fortner fired his rifle several times at Decedent as he believed Decedent was going to shoot him. (*Id.*, pgs. 70:1-71:3). Decedent continued the back pedal away with the gun pointed at Ofc. Fortner so Ofc. Fortner continued to shoot at Decedent until Decedent went down near Decedent's yellow Corvette in the garage. (*Id.*, pg. 71:9-20). Ofc. Fortner heard some additional shots being fired near him and across the street where Ofc. Hynes, Andelin and McElroy were located. *Id.* From the time Ofc. Fortner first started giving commands to Decedent to drop the gun to the time when Decedent turned and aimed his weapon at him was only a period of seconds, it happened very rapidly. (*Id.*, pg. 77:10-18).

After some smoke cleared in the garage from the flash bang device, Ofc. Fortner and other officers announced that they were going to approach and contact Decedent. As they approached, Decedent was face down in the garage with the gun near his right hand so Ofc. Fortner kicked the gun away and then handcuffed Decedent, standard procedure in this situation. They then called in that shots had been fired and requested emergency treatment. (*Id.*, pg. 71:21-73:10).

3. Det. Bittner

Det. Bittner is a police officer and detective for the APD where he has worked since December of 2002. In addition to being a police officer, he is also a member of the APD S.W.A.T. team and has been since 2004. (**Exh. G**, Declaration of Det. Bittner, ¶¶ 1-2). On June 28, 2012, while on duty, he was summoned to the area of 4849 Lefebvre Way in the City of Antioch, due to a high risk and evolving situation where a person, determined to be Decedent and located at that address, had made threats that he was going to kill a police officer. (*Id.* at ¶ 3). Det. Bittner put on some of his S.W.A.T. gear and a helmet, but was still clearly identifiable as a police officer. (*Id.* at ¶ 4). At some point, all available units were requested to respond to the area due to the high risk situation that was developing. (*Id.* at ¶ 5).

At the scene, Det. Bittner, as well as other S.W.A.T. team members Officers Koch, Vincelet, Mortimer and Fortner, met up with their patrol sergeant, Sgt. Morefield, the S.W.A.T.

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
1211 NEWELL AVENUE, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
1211 NEWELL AVENUE, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

Team Leader, and they were assigned to be the Arrest-Contact team. Their duties were to move up as close as they could to Decedent's residence and get into a position to be available in case they were needed for immediate action, such as to arrest a suspect, to react if the suspect came out firing or to take other immediate actions as they would be assembled and ready to go. (*Id.* at ¶ 6). Det. Bittner was assigned by Sgt. Morefield as the team leader of the Arrest-Contact team. (*Id.* at ¶ 7). They were informed that suspect may have a firearm and further information was developed that Decedent had either one or two firearms registered in his name. (*Id.* at ¶ 8).

Sgt. Morefield then directed Det. Bittner as to the various plans that they were going to confront the Decedent if he attempted to leave the house via car or on foot, including the use of a flash bang device and Det. Bittner then informed the other Arrest-Contact team members as to these discussions and plans. (*Id.* at ¶ 9). The Arrest/Contact team was then staged behind a SUV in the driveway next door and north of the Decedent's house so officers could observe what was occurring at the Decedent's house and be prepared to make contact with and/or confront the Decedent. (*Id.* at ¶ 10). During this time period, officers were getting updates from other officers via radio as to their view of the Decedent's house, including the Decedent's car turning on and off in the garage, the garage door going up and down and Det. Bittner also heard glass breaking sounds from the residence. (*Id.* at ¶ 11).

Officers did not know if there was anyone else inside of the Decedent's house that could be in danger or could be taken hostage. (*Id.* at ¶ 12). The garage door then came all the way up and Det. Bittner saw the Decedent walk out onto his driveway. Det. Bittner then heard an officer(s) advise several times that the Decedent had a gun with him. (*Id.* at ¶ 13). Det. Bittner and the Arrest/Contact team started to move over towards the nearby covered car in the street to confront the Decedent and Det. Bittner saw that the Decedent had a black handgun in his right hand. (*Id.* at ¶ 14). Officers were yelling commands at Decedent to "drop the gun" numerous times. (*Id.* at ¶ 15). Decedent got eye contact with the officers and Det. Bittner believes Decedent knew they were police officers. (*Id.* at ¶ 16). Decedent then raised the handgun up and pointed it at Det. Bittner and his fellow officers and Ofc. Bittner believed Decedent fired at him and the officers so Det. Bittner fired at Decedent approximately two times to stop his deadly

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
1211 NEWELL AVENUE, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

threat towards himself and fellow officers. Det. Bittner heard other gunfire as well at that time which he believed to be other officers firing at Decedent as well. (*Id.* at ¶ 17).

At the time he fired his weapon at Decedent, Det. Bittner believed Decedent was a deadly threat to himself and other officers in the vicinity. Decedent did not drop the firearm when commanded to do so, instead he pointed it at officers. (*Id.* at ¶ 18). From the time Det. Bittner saw Decedent with the gun to the time when shots were fired was only an estimated period of three to five seconds. This was a rapidly dynamic situation when Decedent came out of the house with the firearm and Det. Bittner and other officers had to make a split-second decision in terms of the use of deadly force to preserve their lives and safety. (*Id.* at ¶ 19).

Officers then tactically approached the garage area and Det. Bittner then saw the Decedent on the ground in the garage with a black handgun laying next to him. Ofc. Fortner kicked the handgun away from Decedent and handcuffed him. (*Id.* at ¶ 20). Officers then cleared the residence of any other persons, suspects and/or victims and then Det. Bittner was sequestered along with other police officers. (*Id.* at ¶ 21). Det. Bittner confirmed that photographs of the scene and area that are submitted with this motion (**Exh. H**, Photos of Scene/Area (Depo. Exh. 17) fairly and accurately represent the scene of the incident. The Suburban SUV in the driveway north of 4849 Lefebvre Way was the initial location of the Arrest-Contact team and when Decedent came out with a gun, they moved over towards the street side of the covered car in the photographs to confront Decedent. (*Id.* at ¶ 22).

4. Sgt. Morefield

After hearing gunshots fired, Sgt. Morefield rushed towards the Arrest-Contact team, heard verbal commands being given, heard reports of gunfire and saw the Arrest-Contact team fanned out in the driveway yelling commands into the garage. (Exh. E, pgs. 102:24-103:25). There was a large amount of steam coming from the garage and the Decedent was face down in the garage. *Id.* In the garage, there was a handgun next to the Decedent and an officer kicked the gun away from the Decedent. Sgt. Morefield directed someone to detain the Decedent and then assembled a team to do a security sweep of the home which was then completed. (*Id.*, pg. 105:8-16, Exh. F, pgs. 73:11-25). After the security sweep of the home, medical personnel tended to the

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
1211 NEWELL AVENUE, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

Decedent in the garage. (Exh. E, pg. 106:7-13, Exh. F, pgs. 73:11-25 ). Sgt. Morefield then sequestered the officers who fired their weapons. (Exh. E, pg. 106:7-13).

5. <u>Eye Witness Testimony</u>

There are two neighbors who lived next door to Decedent that witnessed portions of this incident. Earnest Quinonez (Earnest) lived next door to Decedent, at 4845 Lefebvre Way, with his wife (Frances Quinonez (Frances)) and other relatives. (**<u>Exh. I</u>**, Depo. of Earnest Quinonez, pgs. 10:11-11:20). On June 28, 2012, he was made aware police were by his house and then his wife told him that police told them to go inside. (*Id.*, pg. 20:5-25). Earnest looked outside his window and saw police officers stooping down by the driver's side of his Suburban vehicle. (*Id.*, pgs. 21:10-22:2). Earnest then saw <u>Decedent walk out of his driveway with a gun in his right hand and then Decedent raised the gun as if he was going to fire</u> while at the same he turned his body like he was going to run into the garage. (*Id.*, pgs. 23:22-25:22). Decedent's gun in his right hand was pointed towards the street area, away from the direction to which he was attempting to move, and was pointed towards the area of the covered car and/or across the street towards his neighbor's yard. (*Id.*, pgs. 26:1-19, 27:18-24, 28:3-30:8, 32:18-33:18). <u>Earnest testified that if there were officers on the other side of the covered car or on the other side of the red fence across the street, those officers were in danger based upon where Decedent was pointing the gun</u>. (*Id.*, pgs. 37:15-38:3). <u>Earnest then believes that Decedent fired the first shot at officers</u> as he heard the first gunshot, which had a lower caliber sound, then heard a burst of higher caliber gunshots which he believes were gunshots from the police. (*Id.*, pgs. 30:12-32:2, 35:15-36:1). It was clear to Earnest that when Decedent came out with the gun in his right hand, <u>he was challenging officers</u> and Earnest thought he would be killed. (*Id.*, pgs. 41:24-42:12). Earnest testified as to the foundational requirements of several photographs of the area. (*Id.*, pgs. 38:10-39:19; **<u>Exh. J</u>**, Photographs of Scene/Area (Depo. Exh. 19)).

Frances lived next door to Decedent with her husband Earnest. (**<u>Exh. K</u>**, Depo. of Frances Quinonez, pgs. 10:5-11:5). She came outside on the afternoon of June 28, 2012, and saw police officers in S.W.A.T. gear by her Suburban, initially two of them and then two others, and the officers told her to go back inside. (*Id.*, pgs. 19:12-22:14, 24:7-25:22). She then saw that officers

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
1211 NEWELL AVENUE, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

moved from the Suburban to the covered car area, on the street side of the covered car. (*Id.*, pgs. 25:2-26:15). When officers were over by the covered car, she heard officers yell "drop the gun" two to three times. (*Id.*, pgs. 27:7-28:14). After hearing the "drop the gun" commands, Frances heard one gunshot, then a burst of additional gunshots which were different than the sound of the first gunshot. (*Id.*, pgs. 29:3-31:23, 32:19-33:2). She also testified as to the foundational requirements of several photographs of the area. (*Id.*, pgs. 37:8-38:5; Exh. J).

6. Video of Incident

The investigation of the incident revealed a video of the shooting incident taken by a CHP fixed wing plane which captured the key moments of the shooting incident. (**Exh. L**, Declaration of Det. Stenger, ¶¶ 2-4; **Exh. M**, Declaration of Michael Schott, including Exh.'s M1-M5, Curriculum Vitae (M-1), CHP Video of Incident (Real Time) (M-2), Schott Video of Incident (Slow Motion Portion) (M-3) and two PDF Demonstrative Exhibits (M-4 and M-5). Michael Schott, a video expert, prepared a slow motion video of the key moments, as well as two PDF demonstratives from the video to assist the Court. **The slow motion video extract of the real time video shows Decedent walking onto the driveway with a gun in his right hand, start to turn and then point a firearm towards the street area and officers**. (Exh. M (Slow Motion Video (M-3)). In addition, the two PDF demonstratives show that, in fact, Decedent was pointing a gun and was pointing it in the general direction of officers by the covered car/Suburban area, along with the fact that officers were behind a fence across the street. (Exh.'s M-4 and M-5).

**D. Relevant Collected/Analyzed Evidence**

1. Autopsy and Toxicology

Dr. Josselson was the forensic pathologist that performed the autopsy on Decedent who died on June 28, 2012. (Exh. F, pgs. 17:8-19:18). The autopsy showed that Decedent died of two fatal gunshot wounds with the entry wounds on the left side of the upper back. (*Id.*, pgs. 19:19-21:18). Blood taken at autopsy for toxicological purposes was tested and showed a very high blood alcohol level of Decedent of 0.24% at the time of his death, more than three times the legal driving limit. (*Id.*, pgs. 21:19-22:10).

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
1211 NEWELL AVENUE, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

2. Decedent's Ruger Gun and Matching Ballistic Evidence

The post-incident investigation revealed that the gun purportedly pointed at officers, Decedent's Ruger gun, was found in the garage near Decedent as well as a bullet casing. (Exh. L, ¶ 5). In addition, a bullet was found across the street from Decedent's house, a bullet that pierced two fences and broke the water fountain of the second house across the street from Decedent's residence on Vinewood Way. (Id. ¶ 6). Det. Stenger performed a rough trajectory analysis of the direction of the bullet found two houses away that had broken the water fountain on Vinewood Way and determined that it came from the direction of Decedent's house/driveway area. (Id. ¶ 7; **Exh. N**, Trajectory Diagram to Neighbor's Yard). The Ruger gun that was found in the garage was found to be registered to Decedent. (Id. ¶ 8). In addition, as part of the investigation, Decedent's hands were swabbed for gunshot residue. (Id. ¶ 9).

Per his training and experience, criminalist Eric Collins of the Contra Costa County Forensic Services Laboratory performed testing of the Ruger firearm found and associated with Decedent, as well as the bullet cartridge casing found in the Decedent's garage and the bullet recovered in a yard across the street from Decedent's residence. (**Exh. O**, Decl. of Collins, ¶ 2-3). On June 28, 2012, criminalist Collins was summoned to the Decedent's house due to the shooting incident. (*Id.*, ¶ 4). Criminalist Collins assisted in the collection of a Ruger pistol, model SR40, .40 S&W caliber firearm (Ruger Firearm), Serial No. 342-25400, that was found in the garage and associated with the Decdent and also assisted with the collection of a fired cartridge case (Cartridge Case) headstamped "Federal 40 S&W" that was located in the garage as well. (*Id.*, ¶ 5). In addition, at a nearby home at 4862 Vinewood Way, he assisted with the collection of a bullet (Bullet) found in the backyard of that location, a location a few houses away from the house at 4849 Lefebvre Way. (*Id.*, ¶ 6). Forensic analysis and testing of these collected items was performed. (*Id.*, ¶ 7).

Per his testing and experience, criminalist Collins determined that the Cartridge Case found in the garage was identified as having been fired in the Ruger Firearm, to the practical, not absolute, exclusion of all other firearms and the likelihood another firearm could have made the questioned mark is so remote as to be considered a practical impossibility. This Cartridge Case

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
1211 NEWELL AVENUE, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

was headstamped "Federal 40 S&W" which was the same headstamp as the unfired cartridges remaining in the chamber and magazine of the recovered Ruger Firearm. (*Id.*, ¶ 8). In addition, the Bullet found at 4862 Vinewood Way was very likely fired by the Ruger Firearm found at the scene, but it could not be identified. Due to the agreement of pervasive subclass characteristics present on both the Ruger Firearm's barrel rifling and the Bullet, criminalist Collins determined that if this bullet was not fired from this particular Ruger Firearm, then it was fired from another firearm barrel that was rifled using the same tool in the same approximate state of wear as the one that produced the examined Ruger Firearm's rifling. Although this means that the Bullet could only have been fired from a pistol that belongs to the same limited group of firearms that includes the Ruger Firearm, it is unknown how many firearms belong to this group. From a practical standpoint, however, even though such a conclusion cannot be determined from a firearms comparison, <u>when it is further considered that this was the only Ruger-type firearm known to be involved in this incident, then the Bullet could only have been fired in the Ruger Firearm</u>. This Bullet was the same type of bullet found to be loaded in the unfired cartridges remaining in the chamber and magazine of the Ruger Firearm. (*Id.*, ¶ 9).

In addition, the swabs taken of Decedent's hands were analyzed for gunshot residue using the standard testing and a report of that was prepared. (<u>**Exh. P**</u>, Decl. of Margaret Kaleuati ¶¶ 2-10; <u>**Exh. Q**</u>, Gunshot Residue Report). The analysis revealed several characteristic particles of gunshot residue on both the right hand and the left hand adhesive lift samples taken from Decedent. (Exh. P, ¶ 11; Exh. Q). The conclusion of the analysis is that Decedent may have discharged a firearm or had his hands otherwise in an environment of gunshot residue. (Exh. P, ¶ 12; Exh. Q). A report of these findings was prepared for Det. Stenger of the APD. (Exh. P, ¶¶ 13-15; Exh. Q). In short, video evidence, forensic evidence and eye witness testimony reveal that Decedent pointed and firearm at officers and may have fired at them as well, necessitating the use of deadly force by officers to preserve their lives.

In their discovery responses, Plaintiffs admit that toxicological testing indicated that Decedent had a BAC of 0.24% at or around the time of the shooting. (<u>**Exh. R**</u>, Plaintiffs' Responses to City's Request for Admission, Set One, Request No. 4). Plaintiffs also admit that

the firearm found in the garage was Decedent's firearm and that both of Decedent's hands tested positive for gunshot residue. (*Id.* at Request No's 8 and 10). In addition, Plaintiffs' responses to contention interrogatories do not demonstrate any evidence of a material dispute about this incident, nor contradict with any evidence the fact that the involved officers used deadly force in a reasonable manner when faced with the threat posed by Decedent. (**Exh. S**, Plaintiff's Amended Responses to City's Request for Special Interrogatories, Set One, Request No.'s 19 and 21). All in all, the use of deadly force to protect the lives of officers and the public was lawful.

## IV. LEGAL ARGUMENTS

### A. Summary Judgment Standards

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law. FRCP 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A "genuine" issue of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it is relevant to an element of a claim or a defense, the existence of which may affect the outcome of the suit. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Disputes as to immaterial issues of fact do "not preclude summary judgment." *Lynn v. Sheet Metal Workers Int'l Ass'n*, 804 F.2d 1472, 1478 (9th Cir. 1986). Nor will uncorroborated allegations and "self-serving testimony" create a genuine issue of material fact. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002). The non-moving party must instead set forth "**significant probative evidence** tending to support the complaint." *T.W. Elec.*, 809 F.2d at 630-31 (emphasis added).

Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden showing that no genuine issue of material fact remains by demonstrating that "there is an absence of evidence to support the non-moving party's case." *Celotex*, 477 U.S. at 325. The moving party is not required to produce evidence showing the absence of a material fact on such issues, nor must the moving party support its motion with evidence negating the non-moving party's claim. *Id.*; *Bhan v. NME Hospitals, Inc.*, 929 F.2d

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
1211 NEWELL AVENUE, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
1211 NEWELL AVENUE, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

1404, 1409 (9th Cir. 1991). If the moving party shows an absence of evidence to support the non-moving party's case, the burden shifts to the opposing party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." *Bhan*, 929 F.2d at 1409. This requires more than the "mere existence of a scintilla of evidence in support of the plaintiff's position," there must be "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. "The more implausible the claim or defense asserted by the non-moving party, the more persuasive its evidence must be to avoid summary judgment." Id. "A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact" precluding summary judgment. *Addisu v. Fred Meyer Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000). A complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. *Celotex*, 477 U.S. at 323.

## B. Plaintiffs Cannot Set Forth Any Viable Constitutional Claim Against Defendant City of Antioch

### 1. Plaintiffs' Failure to Name and Serve Any Individual Officer Defendants is Fatal to Any Constitutional Claim Per § 1983

The City is the only named Defendant in this action, an action filed in July of 2013, more than two years ago. Therefore, Plaintiffs can only try to argue a *Monell* claim against the City to try to preserve their constitutional claims in this case per the Fourth and Fourteenth Amendments, as discussed below, though no such viable *Monell* claim can be stated.

With an excessive force claim under 42 U.S.C. § 1983,[2] to the extent Plaintiffs seek to impose liability on the individual APD officers alleged to have used excessive force, Plaintiffs must name those individuals. *Hood v. Citrus Heights Police Dept.*, 2013 WL 269090 at *1-2 (E.D. Cal. 2013); *Foy v. Vallejo Police Dept.*, 2012 WL 394399 at *1-2 (E.D. Cal. 2012); *Garcia v. City of Santa Clara*, 2010 WL 3447666 at *1-2 (N.D. Cal. 2010) (emphasis added). In order to

[2] Plaintiffs claims per the Fourth and Fourteenth Amendments are essentially one for excessive (unreasonable) force. The Fourteenth Amendment is a claim for a violation of familial rights if, as in this situation where deliberation was not possible, the officers acted with a purpose to harm unrelated to legitimate law enforcement objectives. *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008). As Plaintiffs failed to sue any individual officers, Plaintiffs cannot even make out a Fourteenth Amendment (or Fourth Amendment) claim as a City cannot be found to have acted with a purpose to harm per the Fourteenth Amendment. In that vein, both constitutional claims fail.

state a claim for relief under § 1983, Plaintiffs must name as defendants the officers that personally acted (or failed to act) in a manner that violated their constitutional rights. *McCullough v. Fresno Police Dept.*, 2011 WL 1134449 *4 (E.D. Cal. 2011) (emphasis added).

Despite the fact that Plaintiffs are seeking damages for claimed constitutional violations per the Fourth and Fourteenth Amendments (Third Cause of Action), Plaintiffs failed to name (and serve) any individual APD officer(s) who Plaintiffs' claim are responsible for causing the Decedent's death. Plaintiffs must name the individual officers as defendants who they claim violated Decedent's and their constitutional rights. Plaintiffs have not done that despite the fact that this case has been pending for more than two years and Plaintiffs have had several opportunities to amend their original complaint. The lack of named individual officer defendants is fatal to Plaintiffs' claims per § 1983. *McCullough v. Fresno Police Dept.*, 2011 WL 1134449 *4 (E.D. Cal. 2011). Therefore, Plaintiffs' Third Cause of Action in the SAC is subject to summary judgment, unless Plaintiffs can prove a viable *Monell* claim against the City.

2. Plaintiffs Cannot Satisfy the High Burdens of Proof for a *Monell* Claim to Defeat this Motion

a. Plaintiffs Have Not Demonstrated an Underlying Violation of Constitutional Rights

As a threshold matter, liability of a municipality is contingent on a violation of constitutional rights, meaning without an underlying constitutional violation, there can be no municipal liability. *Scott v. Henrich*, 39 F.3d 912, 916 (9th Cir. 1994); *Long v. City and County of Honolulu*, 511 F.3d 901, 907 (9th Cir. 2007). As briefed above, there is no basis upon which Plaintiffs can show any constitutional violation by the involved (though not named) APD officers. As no individual APD officers have been named, and it is clear that APD officers acted lawfully in their use of deadly force, there is no municipal liability for the City of Antioch. *Scott*, 39 F.3d at 916. Without any evidence to meet this initial threshold issue, Plaintiffs' *Monell* claim fails.

b. Plaintiff Has Not Presented Evidence to Support a Viable *Monell* Claim

Plaintiffs cannot show that the City of Antioch is liable for this incident per *Monell*. Local governments are "persons" subject to liability under 42 U.S.C. § 1983 where official policy or

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
1211 NEWELL AVENUE, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
1211 NEWELL AVENUE, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

custom causes a constitutional tort. *Monell v. NewYork City Dept. of Social Services*, 436 U.S. 658, 690 (1978). However, a city or county may not be held vicariously liable for the unconstitutional acts of its employees under the theory of *respondeat superior*. *Board of County Comm'rs v. Brown*, 520 U.S. 397, 403 (1997); *Monell*, 436 U.S. at 691; *Fuller v. City of Oakland*, 47 F.3d 1522, 1534 (9th Cir. 1995). To impose municipal liability under § 1983 for a violation of constitutional rights, a plaintiff must show: (1) that the plaintiff possessed a constitutional right of which he or she was deprived; (2) that the municipality had a policy; (3) that this policy amounts to a deliberate indifference to the plaintiff's constitutional rights; and (4) that the policy is the moving force behind the constitutional violation. *Plumeau v. School Dist. #40 County of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997).

Generally, liability based on a municipal policy may be satisfied in several ways, though the only one that can be attempted to be argued here is trying to show that a City employee committed the alleged constitutional violation under a formal governmental policy or longstanding practice or custom that is the customary operating procedure of the City. *Fuller*, 47 F.3d at 1534; *Gillette v. Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 1992). If Plaintiffs cannot point to a specific policy that was the moving force, which they cannot, they must show that the practices are "persistent and widespread…permanent and well-settled." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68 (1970). An unconstitutional policy need not be formal or written to create liability under § 1983; however, it must be so permanent and well settled as to constitute a custom or usage with the force of law. *Id.* Absent competent evidence demonstrating that the City had a policy, practice, or custom that **caused** a constitutional injury, the City cannot be liable for monetary damages in a § 1983 suit. *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 166 (1993) ("a municipality ... cannot be held liable [under § 1983] unless a municipal policy or custom caused the constitutional injury").

Plaintiffs have not provided any evidence that would amount to "express policy of the entity" or by a practice of the entity which is "so permanent and well-settled as to constitute a 'custom or usage' with the force of law." *Monell*, 436 U.S. at 691. Neither are Plaintiffs able to provide any evidence that shows that what the officers did in response to Decedent's death threat

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
1211 NEWELL AVENUE, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

was improper and so common in the department that it would constitute a custom or usage.

Under *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-824 (1985), the Supreme Court held that a § 1983 plaintiff cannot recover under a practice theory by simply producing evidence of isolated incidents or alleged misconduct directed towards him—rather, the plaintiff must produce **substantial evidence** of misconduct so common and well-settle as to constitute a custom that fairly represents municipal policy. (*Id.*) (emphasis added). In light of *Tuttle*, courts across the nation have unanimously required a § 1983 plaintiff to support his "custom and practice" allegations with admissible evidence of multiple, similar past incidents. *See Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (noting that two incidents are not sufficient to establish custom and practice); *Hamilton v. Rogers*, 791 F.2d 439, 443 (5th Cir. 1986) (citing that twelve racial employment incidents in two-and-a-half years at fire departments not sufficient to constitute practice for purposes of civil rights law). Plaintiffs have no evidence to support a *Monell* claim based upon an improper practice or procedure, nor any viable claim of a violation due to the City's policy, so Plaintiffs' Third Cause of Action fails in full.

### C. **Plaintiffs Cannot Set Forth Any Viable Claim of Negligence / Battery Against Defendant City of Antioch**

Even though Plaintiffs have not named any individual officers in this case, Plaintiffs can attempt to argue that the City is vicariously liable for negligence and/or battery[3] (shooting) towards Decedent by the involved APD officers. This is essentially a claim for unreasonable force. However, Plaintiffs cannot prove that the use of deadly force was unreasonable at all.

"[I]n order to prove facts sufficient to support a finding of negligence, a plaintiff must show that [the] defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury." *Hayes v. County of San Diego*, 57 Cal.4th 622, 629 (2013), citing *Nally v. Grace Community Church*, 47 Cal.3d 278, 292 (1988). The California Supreme Court "has long recognized that peace officers have a duty to act reasonably when using deadly force." *Hayes* at 629. The cause of action is grounded in the tort

[3] Similar to the negligence claim, a plaintiff bringing a battery action against a police officer has the burden of proving **unreasonable force** as an element of the tort. *Edson v. City of Anaheim*, 63 Cal.App.4th 1269, 1272 (1998); CACI 1305 (Battery By a Peace Officer) (emphasis added).

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
1211 NEWELL AVENUE, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

of negligence and the corresponding duty of police officers to act reasonably when using deadly force. *Id.* As the Court explained, "[t]he reasonableness of an officer's conduct is determined in light of the totality of circumstances." *Id.* at 629-630. Officers are afforded discretion in performing their duties. As the Court explained:

> [A]s long as an officer's conduct falls within the range of conduct that is reasonable under the circumstances, there is no requirement that he or she choose the 'most reasonable' action or the conduct that is the least likely to cause harm and at the same time the most likely to result in the successful apprehension of a violent suspect, in order to avoid liability for negligence.

*Hayes*, 57 Cal.4th at 632 (quoting *Brown v. Ransweiler,* 171 Cal.App.4th 516, 537–38 (2009)). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor,* 490 U.S. 386, 396 (1989). "Summary judgment is appropriate when the trial court determines that, viewing the facts most favorably to the plaintiff, no reasonable juror could find negligence." *Id.*

Police officers act under color of law to protect the public interest and are charged with acting affirmatively and using force as part of their duties, because "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Munoz v. City of Union City* (2004) 120 Cal.App.4th 1077, 1109. " '[Police officers] are, in short, not similarly situated to the ordinary battery defendant and need not be treated the same. In these cases, then, "... the defendant police officer is in the exercise of the privilege of protecting the public peace and order [and] he is entitled to the even greater use of force than might be in the same circumstances required for self-defense." *Id.*

A state law negligence claim or intentional tort (battery) claim is a counterpart to a federal claim of excessive use of force. In such cases, a plaintiff must prove that the peace officer's use of force was unreasonable. *Id.* at 1102. "Claims that police officers used excessive force in the course of an arrest, investigatory stop or other 'seizure' of a free citizen are analyzed under the reasonableness standard of the Fourth Amendment to the United States Constitution." *Id.*, citing *Graham v. Connor*, 490 U.S. 386, 395 (1989). The question is whether a peace officer's actions

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
1211 NEWELL AVENUE, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

were objectively reasonable based on the facts and circumstances confronting the peace officer. *Id.* The test is " 'highly deferential to the police officer's need to protect himself and others.' " *Id.* Where potential danger, emergency conditions, or other exigent circumstances exist, " '[t]he Supreme Court's definition of reasonableness is ... "comparatively generous to the police...." ' *Id.* at 1103. " 'Thus, "an officer may reasonably use deadly force when he or she confronts an armed suspect in close proximity whose actions indicate an intent to attack." ' *Id.*

It cannot be underscored enough that "[T]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving about the amount of force that is necessary in a particular situation." *Graham*, at 396–97. (emphasis added). Furthermore, "from the viewpoint of an officer confronting a dangerous suspect, "a potential arrestee who is neither physically subdued nor compliantly yielding remains capable of generating surprise, aggression, and death." *Menuel v. City of Atlanta*, 25 F.3d 990, 995 (11th Cir. 1994).

The use of deadly force is "reasonable only if the officer has probable cause to believe that the suspect poses a significant threat of death or physical injury to the officer or others." *Scott v. Henrich*, 39 F.3d 912, 914 (9th Cir. 1994) (quoting *Tennessee v. Garner*, 471 U.S. 1, 3 (1985). When an individual points his gun "in the officers' direction," the Constitution undoubtedly entitles the officer to respond with deadly force. *Long v. City and Cnty. Of Honolulu*, 511 F.3d 901, 906 (9th Cir. 2007). It is well-established that "where a suspect threatens an officer with a weapon such as a gun or a knife, the officer is justified in using deadly force." *Smith v. City of Hemet*, 394 F.3d 689, 704 (9th Cir. 2005) (en banc). Furthermore, in Scott, the Ninth Circuit recognized that officers firing their weapons at a defendant who "held a 'long gun' and pointed it at them" had not been constitutionally excessive. *Scott*, 39 F.3d at 914.

Officers do not need to wait until they face the maximum threat or a suspect is about to pull the trigger. If a person is armed, or reasonably suspected of being armed, a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat. *George v. Morris*, 736 F.3d 829, 839 (9th Cir. 2013). Officers are not required to delay using deadly force until the moment that a suspect poses the maximum threat. "Surely [an officer is] not required to

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
1211 NEWELL AVENUE, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

wait and be seriously injured or killed before exercising his judgment and bringing the situation under control." *Monroe v. City of Phoenix*, 248 F.3d 851, 862 (9th Cir. 2001).

Here, the evidence shows clearly that Decedent walked out onto his driveway with a gun and when commands were given to him to drop the gun, he moved his body and also pointed his gun at officers and/or fired one shot at officers. This is confirmed in the testimony submitted herein by officers and Ernest Quinones, as well as the video evidence submitted (Exh. M), including the highly important slow motion video. Where a suspect threatens an officer with a gun, deadly force is justified. Officers do not need to wait for the Decedent to aim or to get off several rounds at officers. Plaintiffs cannot demonstrate the improper use of deadly force against Decedent when he walked outside with a firearm, disobeyed commands, and pointed his weapon at officers, possibly firing at them. It should be noted that whether or not Decedent actually fired at officers is **not material** to this motion as the fact that Decedent pointed / started to point his weapon at officers justified the use of deadly force to protect officer lives and the public. Plaintiffs have no evidence contrary to the officers' accounts and the video evidence.

As indicated in detail above, the officers acted appropriately in getting in a position to provide surveillance and intelligence to their superiors and to be able to make contact with Decedent if he tried to leave the house on foot or in a car. When Decedent came out as officers were mobilizing and preparing in the area, Decedent had a firearm in his right hand and pointed it at officers so they fired at him to protect themselves and their fellow officers. Plaintiffs cannot prove negligence or battery as Plaintiffs cannot prove that the use of deadly force was unreasonable in any way, shape or form. These claims are also subject to summary judgment.

### D. Plaintiffs Cannot Seek Punitive Damages Against Defendant City

Plaintiffs have alleged a claim for punitive damages against the City. However, such a claim against a municipal entity is barred per California Government Code (GC) § 818 (entitled "Exemplary Damages"). GC § 818 states:

> Notwithstanding any other provision of law, a public entity is not liable for damages awarded under Section 3294 of the Civil Code or other damages imposed primarily for the sake of example and by way of punishing the defendant.

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
1211 NEWELL AVENUE, WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

Punitive damages are referenced in Civil Code § 3294(a), which states:

> In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant.

Under California law, punitive damages cannot be recovered against a public entity. *Committee for Immigrant Rights of Sonoma County v. County of Sonoma*, 644 F.Supp.2d 1177, 1208 (N.D.Cal. 2009). The Supreme Court has also held that, with respect to federal claims brought under § 1983, municipalities are immune from punitive damages. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981). Therefore, Plaintiffs are statutorily and legally precluded from obtaining punitive damages against the City in this action under any theory of liability. As such, any claim for punitive damages is subject to summary judgment.

## V. <u>CONCLUSION</u>

Plaintiffs cannot prove any constitutional claim as they did not name and serve any individual officers, nor can they prove any viable *Monell* theory against the City. Further, when Decedent came outside with a gun, failed to abide by commands to put it down and then raised it up at officers, potentially even firing at officers, the use of deadly force by involved officers was reasonable and appropriate to preserve their lives, their fellow officer's lives and protect the nearby public. Plaintiffs cannot demonstrate any negligent conduct on the part of the involved officers. Finally, Plaintiffs cannot prove punitive damages as the City is immune from such damages. As all of Plaintiffs' contentions in this case are not viable, the City of Antioch is entitled to summary judgment as a matter of law and is entitled to an award of costs against Plaintiffs as the prevailing party.

Dated: September 10, 2015

MCNAMARA, NEY, BEATTY, SLATTERY,
BORGES & AMBACHER LLP

By: ______________________
James V. Fitzgerald, III / Noah G. Blechman
Attorneys for Defendant CITY OF ANTIOCH

McNAMARA, NEY, BEATTY, SLATTERY, BORGES & AMBACHER LLP
ATTORNEYS AT LAW
1211 NEWELL AVENUE WALNUT CREEK, CA 94596
TELEPHONE: (925) 939-5330

PROOF OF SERVICE BY OVERNIGHT DELIVERY

I hereby declare that I am a citizen of the United States, am over the age of eighteen years, and not a party to the within action; my business address is 1211 Newell Avenue, Walnut Creek, California 94596.

On this date I served the foregoing **DEFENDANT CITY OF ANTIOCH'S NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT** by placing a true copy thereof in a sealed envelope, and transmitting said documents via UPS Next Day Air, guaranteed overnight delivery, addressed as follows:

**Attorneys For Plaintiff:**

Robert E. Cartwright, Jr., Esq.
David G. Yen, Esq.
The Cartwright Law Firm
222 Front Street, 5th Floor
San Francisco, CA 94111

Phone: 415-433-0444
Fax: 415-433-0449

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed on September 10, 2015 at Walnut Creek, California.

SABRINA AHIA