ROBERT E. CARTWRIGHT, JR. (SBN: 104284)
DAVID G. YEN (SBN: 234550)
NICHOLAS R. RUIZ (SBN: 300419)
The Cartwright Law Firm, Inc.
222 Front Street, Fifth Floor
San Francisco, CA 94111
Phone: (415) 433-0444
Facsimile:      (415) 433-0449

Attorneys for Plaintiff ANDREA GONZALES, THE
ESTATE OF DENNY GONZALES, MICHELLE MAYERS,
AS GUARDIAN AD LITEM FOR SAKARIE DENNI-
NISHELE GONZALES,

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREA GONZALES, THE ESTATE OF DENNY GONZALES, MICHELLE MAYERS, AS GUARDIAN AD LITEM FOR SAKARIE DENNI-NISHELE GONZALES, | Case No. C14-04728 |
| | **PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| Plaintiff(s) | Date:      October 15, 2015 |
| v. | Time:     11:00 a.m. |
| | Dept:     Courtroom 4 (Oak.) |
| CITY OF ANTIOCH; AND DOES 1 THROUGH 50, INCLUSIVE | Judge:    Honorable Kandis A. Westmore |
| Defendant(s) | Trial Date:   January 11, 2016 |

Plaintiffs Andrea Gonzales, The Estate of Denny Gonzales, and Michelle Mayers, as Guardian Ad Litem for Sakarie Denni-Nishele Gonzales, respectfully submit this Opposition to Defendant City of Antioch's Motion for Summary Judgment. Plaintiff's Opposition is based on this Memorandum of Points and Authorities in support thereto, the Declaration of David G. Yen and attached exhibits, attached hereto, the Declaration of Philip P. Hayden, attached hereto, the Declaration of Rajeev Kelkar, attached hereto, the pleadings in this action, and any other evidence and argument considered by this Court prior to and during the hearing on this matter.

## TABLE OF AUTHORITIES

**Federal Cases**

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................... 9, 10

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................... 9, 10

*Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918 (7th Cir. 1994) ........................................ 10

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970) .......................................................... 10

*Sartor v. Ark. Nat. Gas Corp.*, 321 U.S. 620 (1944) ....................................................... 10

*Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731 (1983) ............................................... 10

*First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253 (1968) .............................. 11, 13

**Federal Statutes**

42 U.S.C. § 1983 (2012) ..................................................................................................... 30

**State Cases**

*Silver Land & Dev. Co. v. Cal. Land Title Co.*, 248 Cal. App. 2d 241 (1967) .................... 9

**Other**

Anderson, 477 U.S. 242, 251-252 (1986)(Supreme Court in Anderson quoting Improvement Co. v. Munson, 14 Wall. 442, 448 (1872) ............................................................................... 10

Section 1983 ....................................................................................................................... 30

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

# I.  **INTRODUCTION**

This case essentially comes down to whether or not Plaintiff Decedent Denny Gonzales pointed a handgun at officers of the Antioch Police Department, thereby justifying their use of deadly force against him. The evidence clearly shows that at no time did Mr. Gonzales ever point the handgun. This is illustrated in a CHP helicopter video which captures the incident. On the video, it is shown that Mr. Gonzales is startled by something and turns to run back into his garage. The video never shows him pointing the weapon. Furthermore, the only independent witness, Mr. Ernest Quinonez, gave a statement the day after the shooting that he never saw Mr. Gonzales point his weapon.

For obvious reasons, Defendant City of Antioch disputes the fact that Mr. Gonzales never pointed his weapon. Virtually every officer that fired shots at Mr. Gonzales claims that he pointed his weapon. However, the descriptions of the various officers, who fired a total of over 50 shots at Mr. Gonzales, contradict what is depicted on the video. Defendant also alleges that Mr. Gonzales may have fired a shot at officers, prompting them to return fire. This assertion is completely false. The evidence in this case shows that the safety to Mr. Gonzales' gun was on. It was not feasible for him to have fired a shot with the safety on. The video also shows no indication of him having fired a shot.

There is a genuine dispute of fact as to whether or not Mr. Gonzales pointed his weapon at officers on the day of the incident. There is more than sufficient evidence, based on the admissible video, based on the officers' statements, based on the eyewitness statement, and the attached expert analysis of the evidence in this case, to conclude that Mr. Gonzales never pointed or fired his weapon at Antioch police officers. Aside from this, there are also genuine disputes of material fact as to when shots were first fired at Mr. Gonzales, as to whether or not commands were given to Mr. Gonzales before shots were fired at him, as to whether or not the amount of shots fired at him was reasonable, and as to whether the entire police/SWAT operation prior to the shooting was handled appropriately given the circumstances.

Therefore, Defendant's Summary Judgment Motion should be denied.

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

1

2

## II.   **STATEMENT OF FACTS**

Indeed on June 28, 2012, Denny Gonzales was despondent, potentially suicidal, and made statements that were threatening to police officers. Mr. Gonzales made a series of five telephone calls to Antioch Police Officer Eric McManus, an individual who he considered a friend. Mr. Gonzales started off by saying to Detective McManus that he didn't want to be here anymore. (Exh. F, Deposition of Eric McManus, pg. 32 ) Subsequently, he suggested that he was outside of an individual's house watching him and implied that this individual was "one of your own," as in a police officer.  (Exh. F, Deposition of Eric McManus, pg. 38 ) Mr. Gonzales also made the statement that "whoever came across him today there was going to be casualties." (Exh. F, Deposition of Eric McManus, pg. 38)  At one point, he did say that he was going to kill a police officer and hung up.  Later on, he asked Detective McManus where he was and told him he needed to come get him. He said the words "come get me" several times. (Exh. F, Deposition of Eric McManus, pg. 76 )

In response to receiving these calls from Mr. Gonzales, Detective McManus reported the matter to his supervisor Sgt. Bias of the Antioch Department and the SWAT team was deployed. (Exh. F, Deposition of Eric McManus, pg. 48) Sgt. Anthony Morefield was placed in charge of the SWAT team. Detective McManus testified that he believed Denny Gonzales to be "homicidal." He stated that he felt Mr. Gonzales was initially suicidal, but then became homicidal. (Exh. F, Deposition of Eric McManus, pg. 42) Sgt. Anthony Morefield, when asked what his understanding was of the situation, testified that there was an individual who had made threats against police officers. (Exh. E, Deposition of Anthony Morefield, pg. 26) Various other officers, including Officers Hynes, Bittner, and Fortner all stated that they were on high alert since they were dealing with a suspect who intended to harm police officers.

Once arriving on scene, Sgt. Morefield instructed Detective McManus to continue communications with Mr. Gonzales. This was despite the fact that Detective McManus indicated he did not feel comfortable doing so. Detective McManus testified that he had no training when it came to Hostage/Negotiations. There were actually two officers with Hostage/Negotiation training on site, Detectives McMurray and Krenz.  (Exh. F, Deposition of Eric McManus, pg. 81-82 ) Neither of these

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

officers was ever given an opportunity to communicate with Mr. Gonzales.

Detective McManus had two short phone conversations with Mr. Gonzales once Sgt. Morefield and the SWAT team were on scene and getting into position. During these conversations, Mr. Gonzales repeatedly said "come get me." Mr. Gonzales terminated each of the phone calls. Detective McManus testified that he never called Mr. Gonzales back after any of the five phone calls and never tried to keep Mr. Gonzales on the phone. (Exh. F, Deposition of Eric McManus, pg. 115-116) He also testified that he never once told Mr. Gonzales that he was a suspect, that the police had arrived at his house, or that he needed to come out and surrender. (Exh. F, Deposition of Eric McManus, pg. 116 ) Sgt. Morefield confirms that no member of the Antioch Police Department made any attempt to communicate with Mr. Gonzales prior to him coming out of his garage right before he was shot and killed. (Exh. E, Deposition of Anthony Morefield, pg. 70)

Sgt. Morefield set up two teams outside of Mr. Gonzales' house. First was the Perimeter team, which was stationed behind a fence in a neighbor's yard. (Exh. E, Deposition of Anthony Morefield, pg. 42)  This team, which consisted of Officers Hynes, Andelin and McElroy, had a view directly facing Mr. Gonzales' driveway and garage. The second team was the Arrest/Contact team. This team consisted of Officers Bittner, Fortner, Mortimer, Koch, and Vincelet. The Arrest/Contact team was positioned behind a SUV in the driveway of the Quinonez residence. (Exh. E, Deposition of Anthony Morefield, pg. 58) The Quinonezs were the neighbors adjacent to Mr. Gonzales' house on the left.

Sgt. Morefield instructed that if Mr. Gonzales were to come out of the garage, they would engage him. He instructed that they would use a flash-bang device, which was meant to stun and disorient the suspect. Detective Vincelet was the officer in charge of the flash-bang device. As Defendant states in their Statement of Facts, Sgt. Morefield was aware that Mr. Gonzales was armed or potentially armed.  (Exh. E, Deposition of Anthony Morefield, pg. 75 ) He was also concerned that Mr. Gonzales could come out at any time while they were mobilizing at the scene. (Exh. E, Deposition of Anthony Morefield, pg. 75)

Sgt. Morefield then decided to leave the scene and go back to the command post. One of the

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

reasons he gave for doing this was to retrieve his tactical vest. (Exh. E, Deposition of Anthony Morefield, pg. 99-100) He put Detective Bittner in charge of the Arrest/Contact team while he was gone. Sgt. Morefield testified that he was the one in charge of coordination between the Perimeter team and the Arrest/Contact team.

At approximately, 4:42 pm, the garage door opened completely and Denny Gonzales walked out. (Exh A, CHP video of the incident) He was carrying a handgun in his right hand. The handgun was at his side, pointed to the ground. (Exh. A) Officer Hynes calls out on the radio that Gonzales is coming out and he has a gun. The Arrest/Contact team, led by Detective Bittner, start to move out from behind the SUV in order to engage Mr. Gonzales. Mr. Gonzales walks about halfway down the driveway when he appears to notice something to his right and turns his head to face that direction. (Exh. A) At this point, Officer Hynes fires the first shot at Mr. Gonzales. (Exh. I, Transcript of Marty Hynes' testimony from Coroner's Inquest hearing, pg. 50) He fires this shot because he believes that Mr. Gonzales may be threatening the officers on the Arrest/Contact team. In response to hearing this first shot, the officers on the Arrest/Contact team, including Officers Bittner, Fortner, Koch, Mortimer, and Vincelet open fire at Gonzales. According to several officers on the Arrest/Contact team, Mr. Gonzales appears startled for a second. (Exh. J, Transcript of John Fortner's testimony from Coroner's Inquest hearing , pg. 70)   He then turns and runs back in the direction of the garage. (Exh. A) A flash bang device is thrown by Detective Vincelet subsequent to the shots being fired at Mr. Gonzales. (Exh. A)

At the same time this was happening, Ernest Quinonez was standing at the window in a second story bedroom of his house. (Exh. C, Audio recording of APD interview with Ernest Quinonez) He was able to see Mr. Gonzales walk out of the garage and down the driveway. Mr. Quinonez stated to the police that he then saw Mr. Gonzales suddenly turn and run back into the garage. When asked if Mr. Gonzales had raised his weapon, Mr. Quinonez said emphatically that Mr. Gonzales did not raise the weapon. (Exh. C)

The video of the incident indicates that it was less than two seconds from when Mr. Gonzales first stopped and noticed something to his right to when he turned and started to run back into the

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

garage. (Exh. A) The video also shows that Mr. Gonzales never pointed the weapon at any time while he was retreating to the garage. (Exh. A)

Over fifty shots were fired at Mr. Gonzales. (Exh. D, Defendant City of Antioch's Responses to Plaintiffs' Special Interrogatories, Set No. One) Mr. Gonzales was struck in the back twice and killed. Autopsy reports showed that Mr. Gonzales died from two fatal gunshot wounds to the left side of his upper back.

A Ruger handgun belonging to Mr. Gonzales was found in the garage. Forensic examination of the handgun indicated that the safety was on. (Exh. B, Report of Field Services, #12-4923-1, Contra Costa Office of the Sheriff – Forensic Science Division) Additional examination of the gun indicated that it had been fired and there was a cartridge case recovered from inside the garage. No cartridge case matching Mr. Gonzales' handgun was ever recovered from the driveway. A bullet was recovered from the backyard of a neighbor's house against the street. Forensic lab reports indicate a strong possibility that the bullet matched Mr. Gonzales' gun. The lab report, however, could not determine when this shot was fired.

## II.  LEGAL ARGUMENT

### A.  Standard For Summary Judgment

Summary judgment is a drastic remedy and should be granted only sparingly and with great caution. *Silver Land & Dev. Co. v. Cal. Land Title Co.*, 248 Cal. App. 2d 241 (1967). Summary judgment should be granted **only when** there is " *'no genuine issue as to any material fact,'* since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-22 (1986) (Supreme Court quoting FRCP 56) (emphasis added). Summary Judgement should not be granted where a dispute of a fact is "genuine," meaning "the evidence  is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The non-movant need not match the movant witness for witness, nor persuade the court that her case is convincing, she need only come forward with appropriate evidence demonstrating that there is a pending dispute of

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

fact." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994).

The movant also has the burden of showing it is "entitled to judgment as a matter of law." (FRCP 56). At the summary judgment stage the judge's role is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970). A federal trial judge is not required to make findings of fact at this stage. *Anderson*, 477 U.S. at 250. The Court has said that summary judgment should be granted where the evidence is such that it "would require a directed verdict for the moving party." *Sartor v. Ark. Nat. Gas Corp.*, 321 U.S. 620, 624 (1944). The Supreme Court has indicated that the "genuine issue" summary judgment standard is "very close" to the "reasonable jury" directed verdict standard. *Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731, 745 (1983). The inquiry for either a summary judgment motion or a directed verdict is the same; the judge must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. I.e., whether a jury could find "by a preponderance of evidence that plaintiff is entitled to a verdict -- 'whether there is [evidence] upon which the jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." *Anderson*, 477 U.S. 242, 251-252 (1986)(Supreme Court in *Anderson* quoting *Improvement Co. v. Munson*, 14 Wall. 442, 448 (1872).

Unlike in California State Court, The Supreme Court has specifically indicated that under Federal Rules of Procedure, the "nonmoving party need not produce evidence in a form that would be admissible at trial in order to avoid summary judgment." *Celotex Corp.*, 477 U.S. 317. FRCP 56(e) allows a proper summary judgment motion to be opposed by "any of the kinds of evidentiary materials listed in Rule 56(c)[1]". *Id.* at 324. Rule 56(c)'s requirement of a material fact to be present, in order for the nonmoving party to survive a summary judgment motion and proceed to trial, does not necessitate the disputed fact being "resolved conclusively in favor of the party asserting its existence; rather, all that

---

[1] FRCP 56(c): A party asserting that a fact is genuinely disputed can support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; **or** (B) **showing that the materials cited do not establish the absence of a genuine dispute.**

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968).

### B. <u>There Is Significant Probative Evidence To Create A Genuine Dispute As To Numerous Material Facts To Support Plaintiffs' Negligence And Battery Causes Of Actions</u>

Plaintiffs have demonstrated the existence of significant probative evidence to show the use of unreasonable force on the part of officers of the Antioch Police Department, thereby substantiating their claims for Negligence and Battery. This evidence includes, but is not limited to The California Highway Patrol helicopter video, the depositions of Detective Eric McManus and Sergeant Anthony Morefield, the transcripts of Officers Marty Hynes and John Fortner from the Coroner's Inquest Hearing, and evidence taken directly from the Antioch Police Department Case #12-6253 report, which was produced and relied upon by Defendant. There is substantial evidence to support Plaintiffs' position on the *the following **genuinely disputed material facts***: **(1)** whether Mr. Gonzales pointed his weapon; **(2)** the timing of APD officer's first gunshots targeted at Mr. Gonzales in relation to when he allegedly pointed the weapon; **(3)** whether the number of shots fired upon Mr. Gonzales was reasonable; **(4)** whether APD officers gave commands to Mr. Gonzales before shots were fired and whether he had sufficient time to comply with said commands; and **(5)** whether the actions and tactics employed by APD officers leading up to the fatal shooting were reasonable and warranted given the circumstances known to APD.

### 1. <u>The Evidence Supports the Fact That Gonzales Never Pointed or Raised the Weapon</u>

There exists a genuine issue of disputed fact as to whether Mr. Gonzales ever actually pointed or raised his weapon in the direction of Antioch Police officers on June 28, 2012. Plaintiffs believe the evidence weighs strongly, if not overwhelmingly in their favor.

### a. <u>The CHP video</u>

The helicopter video taken by the California Highway Patrol shows Mr. Gonzales exiting his garage, walking halfway down the driveway, stopping and appearing surprised by something to his right, and then turning and running back into the garage. It never shows him pointing or raising the

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

weapon. It never shows him discharging the weapon. (Exh. A, Decl. of David G. Yen)

Defendant has submitted a "highly important" slow motion version of the video referenced above. They claim that there is a particular moment during the slow motion video when Gonzales points the weapon. This is not a fact, but an opinion. In addition, the slow motion version of the video is inherently misleading and prejudicial. Events occurred in real time. Reducing a video to slow motion and attempting to extract a fragment of the video to draw a conclusion lacks foundation.

Defendant's opinion is misplaced. Mr. Gonzales was not pointing or raising the weapon. Instead, he was in the process of turning his body so that he could run back into his garage. This is supported by Rajeev Kelkar, an accident reconstruction and biomechanics expert, who reviewed the video and the complete police report in this case.

Mr. Kelkar begins his analysis by stating that Mr. Gonzales' entire forward motion took approximately 6 ¾ seconds from the time he stepped onto the driveway out from his garage, and into view of the APD officers that were on the scene. (See Decl. of Rajeev Kelkar, ¶ 6). The video clearly shows that "[a]s Mr. Gonzales completed his 9th step outside the garage, he can be seen rotating his shoulders slightly clockwise and start a drop-step motion, followed by two sideways shuffle-steps/jumps, while continuing to rotate his shoulders clockwise to turn his chest to face the garage and run forward to retreat into it." (See Decl. of Rajeev Kelkar, ¶ 6). Kelkar goes on to say that after Mr. Gonzales' forward motion ceases, as captured on CHP Video timestamp 16:42:11, "Mr. Gonzales' gait pattern and movements of his arms, head, and chest rotation demonstrate that Mr. Gonzales was in the process of actively changing directions to turn back towards the garage, and was not actively "pointing" or "aiming" his gun at the officers approaching from 4845 Lefebvre Way." (See Decl. (See Decl. of Rajeev Kelkar, ¶ 7). Kelkar further opines that Mr. Gonzales' elbows and the abduction of his shoulders during his sideways shuffle-steps/jumps were a function of Mr. Gonzales' changing direction and moving rapidly towards the garage. (See Decl. of Rajeev Kelkar, ¶ 8).

Kelkar states that the swinging arm motion of Mr. Gonzales relative to the trunk of his body, are movements commonly used to "improve performance in explosive movement activities, such as initiating a sprint or vertical jump, which are typically observed during sideways shuffle and crossover-step movements." (See Decl. of Rajeev Kelkar, ¶ 9). Kelkar's analysis of the video also indicates that at the moment Mr. Gonzales' rotated his body from a forwards direction back towards the garage, both his

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

knees were flexed, his left leg was loaded, and his right arm raised slightly, which all occurred within approximately a quarter of a second (CHP Video time stamp 16:42:12), and are all related to the initiation of a drop-step and sideways shuffle-step/jump. (*See* Decl. of Rajeev Kelkar, ¶ 12). Moreover, Mr. Gonzales' right arm does not stay raised but instead raises and lowers in less than half a second, abducts away from his body towards the garage and adducts across his body in two roughly continuous arced movements as Mr. Gonzales proceeds through the sequence of sideways shuffle steps/jumps. *Id.*

Kelkar's analysis is critical because he offers a scientific explanation for what is seen of Mr. Gonzales' movements on the CHP video. His analysis concludes that Mr. Gonzales did not ever point the weapon. What Mr. Gonzales did do, basically, was a natural function of him turning and moving back into the garage.

Defendant may argue that regardless of whether or not Mr. Gonzales intended to point the weapon, it could have been perceived that the weapon was being pointed in the direction of Antioch police officers. This argument fails due to Kelkar's timing analysis as well as the analysis of Phil Hayden, a SWAT and police policies and procedures expert, who also reviewed the CHP video and the complete Antioch police report in this case. Hayden states that the alleged arm movement of Gonzales as referenced by Defendant would not even be perceivable to an officer.

Hayden states that he "personally viewed, in regular speed and slow motion, the video taken from the helicopter numerous times and never once saw Mr. Gonzales raise his handgun toward any officer. When he turned to run back into the garage Mr. Gonzales was turning away from the officers, so when his handgun did rise up it could **not** have been pointed at any officer. Mr. Gonzales walked out of the garage carrying a handgun, but made no aggressive move toward the officers. When he was surprised by the SWAT team, he turned as fast as he could and ran back toward the garage. From the time he began his turn until he ran back into the garage was approximately 1 1/2 seconds." (*See* Decl. of Philip F. Hayden, ¶ 4).

In studies conducted by implementing the FBI's program, "Law Enforcement Training for Safety and Survival" and by a law enforcement research organization known as Force Science, it has been determined that it takes an individual approximately 1/4 (.25) of a second to turn and run and would take a law enforcement officer, who is confronted with an armed subject, approximately 1/3 (.33) seconds to

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

register a threat and respond by firing his/her weapon. Based on these studies, Hayden states that "an officer confronted with the circumstances of the subject incident would not have had time to register a threat of harm between the time Mr. Gonzales began his motion of turning around, consistent with the timing officers allege his weapon was raised (CHP Video timestamp 16:42:11), to the time the first bullet struck Mr. Gonzales (CHP Video timestamp 16:42:12)." "When Mr. Gonzales' arm comes up it is approximately 1/2 of a second after his turn and by that time he is almost in the garage and no immediate threat to any officer. His weapon was never raised toward any officer." (*See* Decl. of Philip F. Hayden, ¶ 5).

### b. Eyewitness testimony of Ernest Quinonez

At the time of the incident, Mr. Quinonez was looking out a second story bedroom window in the house adjacent to Mr. Gonzales. Mr. Quinonez observed Mr. Gonzales walk out of his garage carrying a handgun in his right hand. He then says Mr. Gonzales suddenly turned and started to run back into the garage and that's when the officers all started firing their weapons at him. Officers were walking fast past his front yard on the sidewalk towards Denny's house firing. According to Mr. Quinonez, he heard at least 15 shots, and he neither saw Mr. Gonzales fire any shots at APD officers, nor raise his weapon. (Exhibit C, Decl. of David G. Yen)

Defendant will argue that in his deposition, Mr. Quinonez says that he observed Mr. Gonzales raise the weapon. Indeed, it appears that Mr. Quinonez changed his story for his deposition. Given Mr. Quinonez's prior inconsistent statement, which is admissible as impeachment evidence at trial under *Federal Rules of Evidence Rule 613*, Mr. Quiononez's deposition testimony will not be found credible.

Furthermore, Mr. Quinonez stated the following in his deposition:

Q. I'm assuming you would agree that the statement you gave to the police on the day of the incident you were being accurate and truthful when you were talking to the police about some of the questions they had, is that correct?

A. Yes.

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Q. And the statements you were giving them, you would agree, were probably better in your memory three years ago or so when you gave them than they are today. Would you agree with that?

A. Yes.

[Exh. G, Deposition of Ernest Quinonez, pg. 14-15, lines 21-6]

While Plaintiffs do not know for certain why Mr. Quinonez changed his testimony, one reason might be illustrated by the following inconsistency between his deposition testimony and that of his wife, Frances Quinonez. Under questioning, Mr. Quinonez states the following:

Q. Okay. All right. After that day when you were interviewed by an officer of the Antioch Police Department, when was the next time you had contact with anyone from the Antioch Police Department regarding the incident?

A. I don't think I talked to anybody from the Antioch Police Department after that.

[Exh. G, Deposition of Ernest Quinonez, pg. 55, lines 16-22]

However, Frances Quinonez had a different recollection of events when asked about the same subject as illustrated in her deposition testimony. She states the following:

Q. All right. And after that day when you and your family were interviewed by the police, did the police then follow up with any of you regarding the incident in the days –

A. Yes.

Q. Okay. Tell me about that.

A. I don't know. My husband could tell you more than I could. I mean, I really didn't see much. I just heard. I didn't see very much, just the officers there. I didn't see a pointed gun. I didn't see them shoot. I just heard everything.

Q. But you remember that they did follow up with you?

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

A. Yes.

Q. Okay. Was it a few days later?

A. I don't know. No I don't know if it was a few days, a week later.

Q. Do you know why they followed up with you?

A. I don't know. I don't know why they followed up with us.

Q. Was it a phone call?

A. No.

Q. Somebody came to your house?

A. Um-hum.

Q. And your husband talked to these people that came to the house?

A. Yes.

[Exh. F, Deposition of Frances Quinonez, pg. 53-54, lines 11-25, 1-12]


The evidence shows that Mrs. Quinonez recalls Antioch Police Officers coming to her house to talk with her husband Mr. Quinonez a short time after the incident. When asked the same question, Mr. Quinonez denies he had contact with the Antioch Police Department. Subsequent to that, he changes his story in his deposition. Mr. Quinonez's testimony that he saw Mr. Gonzales raise the weapon over three years after the incident will not be found credible. There exists a genuine dispute of fact as to this issue.

Courts have held that Summary Judgment should be denied where an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility. *SEC v. M & A West, Inc.* (9th Cir. 2008) 538 F 3d 1043. The Court in that opinion stated that "(S)ummary judgment is singularly inappropriate where credibility is at issue." *Id at 1054-1055.*

Thus, there is clear evidence from a multitude of sources to present a genuine dispute of fact as to whether Mr. Gonzales ever pointed his weapon at law enforcement officers.

### 2. There is Significant Evidence To Support The Fact That Antioch Police Officers Fired Upon Gonzales Before the Moment When They Allege He Pointed The Weapon

Mr. Gonzales did not point or raise the weapon at any point during the encounter. However, even

if it is somehow established that he did, or that the officers perceived that he did, the evidence suggests that Antioch Police officers had already begun shooting at Mr. Gonzales prior to that moment.

Defendant attempts to simply things by stating that Mr. Gonzales pointed the weapon and that officers responded by firing shots at Mr. Gonzales. The facts are not nearly as simple. Seven different officers fired shots at Mr. Gonzales. Each officer, in his statement, perceives Mr. Gonzales "pointing the weapon" at a different point in time. Therefore, it is imperative to analyze each officer's statement in light with the uncontroverted video evidence in this case. This is precisely what Mr. Kelkar does.

Kelkar states that shots were being fired  at Mr. Gonzales while he was still facing forward, with his hands at his hips, **posing no direct threat to the Antioch officers** who were surrounding him with their guns drawn. (*See* Decl. of Kelkar ¶ 15)(*See also* Decl. of Philip F. Hayden, ¶ 6 and ¶ 8) Mr. Kelkar substantiates this assertion with the following facts, including statements contained within the Antioch Police Department Case #12-6253 report:

- Officer Andelin stated that he fired his AR-15 when he saw that Mr. Gonzales "kind of crouched, started to raise the gun."
- Officer Hynes believes he was the first one to fire at Mr. Gonzales, suggesting he shot at a slightly earlier point in time than Officer Andelin.
- Officer Hynes describes firing three separate volleys of bullets, with three of four rounds each, and states that he stopped firing because SWAT officers were crossing into his field of fire.
- Detective Vincelet's description of the SWAT team being out in the middle of the driveway at that time Mr. Gonzales was turning back towards the garage, and the fact that he (Det. Vincelet) fired two shots when Mr. Gonzales was 2-3 feet from the Garage.
- It took Mr. Gonzales approximately 1½ seconds from the time he started moving back towards the garage to the time he re-entered the garage (*See* CHP Video, timestamp 16:42:10 - 16:42:13)(*See also* Decl. of Philip F. Hayden, ¶ 6).

Mr. Kelkar further opines that at CHP Video timestamp 16:42:12 shows Mr. Gonzales was in his second sideways shuffle-step/jump, with his shoulders continuing to rotate towards the garage, and at this very point he flinched, consistent with being shot in the upper portion of the left side of his back/shoulder. (*See* Decl. of Rajeev Kelkar, ¶ 8). Based on statements of all the officers and witnesses and Mr. Kelkar's analysis of the CHP Video, Mr. Gonzales walked out of the garage at a pace much slower than regular walking speed, consistent with APD Officers' descriptions of Mr. Gonzales not knowing where the police officers were located prior to the fatal shooting; as Mr. Gonzales walked

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

"nonchalantly" out of his garage. (*See* Decl. of Rajeev Kelkar, ¶ 5). It took approximately 2 seconds from the moment Mr. Gonzales started to retreat towards the garage to the time he re-enters the garage (*See* CHP Video, at 16:42:10 - 16:42:13)(*See also* Decl. of Rajeev Kelkar, ¶ 6).

After analyzing the evidence in the APD Report and events captured on the CHP Video, Mr. Kelkar's professional opinion is that "the first gunshots were shot at Mr. Gonzales when he was still walking forward, while his arms remained at his side, potentially initiating Mr. Gonzales' decision to change direction and **retreat** into his garage." (*See* Decl. of Rajeev Kelkar, ¶ 4). "During Mr. Gonzales' forward movement, his right hand is extended down by his right side and he is observed to be **not 'pointing' or 'aiming' his gun in any particular direction**." (*See* Decl. of Rajeev Kelkar, ¶ 6).

The correlation between the video and statements of various Antioch police officers also calls into question when shots were first fired. For example, the alleged "pointing the weapon" motion Defendant alludes to occurs when Mr. Gonzales is already retreating from police and running back into the garage (See Declaration of Michael G. Schott, ¶7 Defendant's Exhibit M). However, Officer Marty Hynes, states in his testimony before the Coroner's Inquest hearing that he fired at Mr. Gonzales as Mr. Gonzales was turning toward the officers positioned to his right and before he began his retreat (Exh. I, Declaration of David G. Yen, pg. 50)

Furthermore, Mr. Quinonez's testimony illustrates a dispute of fact on this issue. As an eyewitness to the event, he testifies that he cannot tell if shots had been fired at Mr. Gonzales prior to him allegedly raising his weapon. He states in his deposition as follows:

> Q. Did you hear any gunfire prior to him raising the weapon up as if he was going to fire?
> A. I can't say. I don't know.
>
> [Exh. G, Deposition of Ernest Quinonez, pg. 25, lines 23-25]

There is a genuine dispute of fact as to when officers first started firing at Mr. Gonzales. This is a material fact because if officers fired at Mr. Gonzales before he allegedly "pointed the weapon," it

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

1    directly questions whether or not the officers' actions were reasonable. Summary Judgment should also

2    be denied on this basis.

3                **3. There Is A Genuine Dispute Of Fact As To Whether The Number of Gunshots**
                 **Fired At Mr. Gonzales Was A Use of Excessive Force Under The Circumstances**
4

5        Another issue in the case is whether or not the amount of force used against Mr. Gonzales was

6    reasonable under the circumstances. Defendant never addresses this in their Motion and probably with

7    good reason. On June 28, 2012, by Defendant's own admission in their discovery responses, over 50

8    shots were fired at Mr. Gonzales by Antioch Police Officers.

9        The evidence will demonstrate that the deadly force used to "detain" Mr. Gonzales was grossly

10   excessive and not justified for any officer of the Antioch Police Department. Mr. Gonzales made no

11   assertive move toward any law enforcement officer. (*See* Decl. of Philip F. Hayden, ¶ 6. Mr. Gonzales

12   was simply surprised by the presence of the SWAT team, turned as fast as he could and retreated into

13   his garage as a deadly barrage of bullets, over 50 in total, were targeted at him. (*See* City of Antioch's

14   Responses to Plaintiff's Special Interrogatories, Set one, Response No. 18: "[W]e (Defendant) believe

15   there were approximately 50-52 gunshots fired in the direction of Decedent (Mr. Gonzales)." True and

16   correct copy attached to Declaration of David G. Yen, as Exhibit D)(*See also* Decl. of Philip F. Hayden,

17   ¶ 6).

18       One reason that so many shots were fired at Mr. Gonzales was because the Antioch SWAT

19   officers were firing on automatic mode with AR-15 assault rifles. According to Hayden, and based on

20   his military training and hundreds of hours of shooting and teaching shooting skills with automatic

21   weapons, unless an individual is extremely competent with an automatic weapon he or she will miss

22   their target, thus putting others in danger. (*See* Decl. of Philip F. Hayden, ¶ 10).  The APD officers were

23   firing their weapons on full automatic and were missing Mr. Gonzales by several feet, even though they

24   were within a short distance from him. (*See* Decl. of Philip F. Hayden, ¶ 10).

25       The evidence suggests that Officers Hynes and Andelin thought they saw Mr. Gonzales raise the

26   weapon, which is clearly contradicted by the CHP Video. (Exh. A,  CHP Video of Incident) (*See also*

27   Decl. of Philip F. Hayden, ¶ 8). This prompted them to fire the first gunshots from across the street. This

28

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

in turn started the chain reaction for other officers to shoot even though they did not see Mr. Gonzales make any threatening moves toward them. Hayden stated that this would constitute a gross violation of any shooting policy by any police department in the United States. It appears that the APD's officers' own heightened anxiety overwhelmed them, and they made a conscious decision to become aggressive and use deadly force. (Decl. of Philip F. Hayden, ¶ 8).

The evidence which suggests that officers fired on Mr. Gonzales with automatic weapons and without perceiving firsthand that Mr. Gonzales was a threat to them directly, resulting in over 50 shots fired in the direction of Mr. Gonzales, illustrates a use of excessive and unreasonable force on the part of Defendant. Had Antioch Police Officers not fired in excess of 50 shots at Mr. Gonzales, there is the distinct possibility that Mr. Gonzales would not have been killed. A genuine dispute of fact exists.

### 4. There Is A Genuine Dispute Of Fact As To Whether Commands Were Given To Mr. Gonzales Prior to Antioch Police Officers Shooting At Mr. Gonzales

Defendant claims that Antioch Police Officers gave commands to Mr. Gonzales and he disobeyed those commands. Again, this is an attempt to oversimplify the issue. There are significant factual questions as to when the officers gave those commands, whether or not Mr. Gonzales had sufficient opportunity to comply with these commands, and whether Mr. Gonzales had already been fired upon by some officers when these commands were given.

The evidence strongly supports the fact that commands were, in fact, given after shots had been fired at Mr. Gonzales and perhaps when Mr. Gonzales had already been struck by these shots. This is best exemplified by the deposition testimony of Sergeant Anthony Morefield, the Antioch SWAT team leader who was at the scene. Sergeant Morefield states the following:

> Q. At some point you heard shots being fired?
>
> A. Yes I did.
>
> Q. Where were you when you heard this?
>
> A. I was back with Captain McConnell and Sergeant Bias as the command post.

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Q. Approximately how far away were you from the house at this point?

A. Hundreds of feet.

Q. What did you do once you heard shots being fired?

A. I rushed towards the Contact team.

Q. What did you hear, if anything, as you were rushing back to the Contact Team after you heard shots being fired?

A. I heard verbal commands being given.

Q. How many gunshots did you hear?

A. I heard a series of gunshots. I don't recall specifically how many I heard.

Q. Did you hear multiple volleys of gunshots?

A. I don't recall multiple volleys. I recall multiple gunshots.

Q. What did you see when you arrived in front of the house?

A. I saw the Contact Team fanned out around the vehicle into the driveway, all yelling commands into the garage. There was a large amount – I believe it was steam coming from the garage. And I could see that the suspect was down in the –inside the garage.

[Exh. E, Deposition on Anthony Morefield, pg. 102-103, lines, 16-25, 1-20)

Sergeant Morefield clearly states that commands were given after shots had already been fired at Mr. Gonzales. This is in contradiction with the statements of various other officers who claim they gave commands before they opened fire. See Declaration of Desmond Bittner (Defendant's Exh. H). Neither Bittner nor any other officer claims they gave commands after shots were fired at Mr. Gonzales. The discrepancy here creates another genuine dispute of fact.

There is a further dispute of fact when it comes to the correlation between officers' statements and testimony and the video. In his testimony before the Coroner's Inquest hearing, Officer John Fortner states he did not start yelling commands Mr. Gonzales until he had almost reached the sidewalk. Yet, the video never shows Mr. Gonzales approaching the sidewalk. (Exh. A) Then, he recites several

commands that he gave to Mr. Gonzales. Fortner also testifies that Mr. Gonzales appeared startled by the presence of the officers. (Exh. J, Decl. of David G. Yen, pg. 70) The video and Kelkar's analysis indicates that it was less than 2 seconds to when Mr. Gonzales was surprised and noticed something to his right to when he ran back into the garage. A question of fact is raised as to whether or not there was even sufficient time for these commands to have been given before shots were being fired at Mr. Gonzales from both the Perimeter team and Arrest/Contact team. Prior to the shooting of Mr. Gonzales, neither APD Officers Hynes nor Andelin, who were on the Perimeter team and who were the first to shoot at Mr. Gonzales, heard any commands because they were shooting prior to any commands being given. (*See* Decl. of Philip F. Hayden, ¶ 9).

Mr. Gonzales could not have complied with commands given to him by Antioch Police Officers if they were already shooting at him or had already shot him at the time the commands were given. The testimony of Sergeant Morefield is unambiguous in that commands were given after shots were fired. A genuine issue of fact exists on this issue.

### 5. There Is A Genuine Dispute Of Fact As To Whether Or Not Antioch Police Officers Acted Reasonably In The Events Leading Up To The Shooting Of Mr. Gonzales And In The Way They Handled The Situation Involving Mr. Gonzales

Much of the argument on both sides is premised on what transpired in the moment when Mr. Gonzales was shot and killed by Antioch Police Officers. However, Plaintiffs' Negligence claim is premised not only on the unreasonable use of force which resulted in Mr. Gonzales' death, but also on numerous unreasonable actions and tactics that led up to this fatal confrontation.

Claims of excessive force were established by the Supreme Court in *Graham v. Connor* (1989) 490 S.C. 386. The Supreme Court held that excessive force claims are to be analyzed under the Fourth Amendment's "objective reasonableness" standard. This "objective reasonableness" is measured from

the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight, and allows for the fact that "police officers are often forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving about the amount of force that is necessary in a particular situation."

The Court further held that relevant factors in the reasonableness inquiry include "(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." The principles are also thoroughly discussed by the International Association of the Chiefs of Police (IACP) and the National Law Enforcement Policy Center. The IACP has been a guiding organization for police departments for many years and is accepted as an organization that helps to define issues in law enforcement. In the IACP's "Model Policy, Responding to Persons Affected by Mental Illness or in Crisis," published in January 2014, and the "Concepts and Issues Paper, Responding to Persons Affected by Mental Illness or in Crisis," revised in January 2014, it conveys a recommendation that "law enforcement officers who face these complex situations must be as fully prepared as possible so that they can respond in ways that ensure their safety, the public's safety, and the safety of the person in a mental health crisis." When an officer is making this determination, it is essential that the three-prong test under *Graham v. Connor* be observed.

The first factor to determine is the severity of the crime. Mr. Gonzales had not committed any crime and was not a wanted fugitive. Det. McManus, a personal friend of Mr. Gonzales,' had received five calls from Mr. Gonzales and believed that Mr. Gonzales was feeling despondent and suicidal, that he was going to kill a police officer and that he wanted the police to come get him. Det. McManus reported these facts to his superiors, and it was decided that the SWAT team should be deployed. It should have been noted from the very beginning that they were dealing with an individual who had a

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

mental health issue. (*See* Decl. of Philip F. Hayden, ¶ 12 and ¶ 13). Instead, individuals within the APD were told that Mr. Gonzales was going to kill a police officer and he was outside an officer's house waiting for him to come home so he could kill him. This created a negative "mindset" for the officers responding to the scene. They were led to believe they were dealing with a potential "cop killer" and that he needed to be stopped instead of helped due to his emotional state. (Exh. E, Decl. Of David G. Yen, pg. 25-26)

There was time to establish communications which was critical to a peaceful resolution. Det. Krenz and McMurry were members of the hostage negotiation team and were on scene, but never used. (Exh. F, Decl. of David G. Yen, pg. 82) They were at the scene with Det. McManus when he was speaking with Mr. Gonzales, but never tried to enter into the conversation. These professionally trained negotiators, Det. Krenz and McMurry, never attempted to call back Mr. Gonzales even though they had his phone number and he was already speaking with one of their officers. Det. McManus himself never took it upon himself to inform Mr. Gonzales that the police were on their way, that he was a suspect, or that he needed to surrender. (Exh. F, Decl. of David G. Yen, pg. 115)  It appears that there was never a plan to negotiate or talk with Mr. Gonzales, even though they had plenty of time and negotiators were available. This was in violation of their own SWAT policies and procedures, as shown in Department Regulations, Policy #38. APD is very clear that an effort should be made to contact the suspect in an attempt to persuade the subject to voluntarily surrender before a SWAT operation is used.  Rather, the plan was to make immediate contact with him when he exited the garage even though they knew that he might have a weapon and that he had threatened to kill a police officer. Given the totality of the circumstances, there is a genuine issue of fact as to whether or not this was an appropriate and reasonable approach.

Another factor which contributed to the confusion at the scene was the fact that the officers and

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

the SWAT team on the perimeter never coordinated their proposed tactical actions. Officers on the perimeter were acting independently of the SWAT team. When Mr. Gonzales came out of the garage they perceived a threat and fired their weapons in the vicinity of the SWAT team. When the SWAT team was moving in they should have been in control of the immediate area and officers from the perimeter should not have been firing in their direction. (*See* Decl. of Philip F. Hayden, ¶ 12). This tactic needs to be coordinated and practiced with SWAT personnel if it is to be used. Hayden believes this confusion existed due to Sgt. Morefield leaving the scene to brief his captain. Sgt. Morefield was coordinating the entire tactical response before he left. However, when he left and put Det. Bittner in charge of SWAT that coordination ceased to exist and each tactical response acted independently. (*See* Decl. of Philip F. Hayden, ¶ 11).

In addition, the situation promptly became exacerbated when it could have been defused. When SWAT officers entered the scene, they rapidly accelerated the situation, and within just a couple of seconds after Mr. Gonzales appeared in the driveway, he was shot and killed. (*See* Decl. of Philip F. Hayden, ¶ 12). No time was given for Mr. Gonzales to calm down after it was known to him that police were present, and he was confronted with an explosion of emotions which created a deadly situation due to the Antioch Police Department failing to follow proper protocols and procedures. In the beginning, this was not a fast-moving situation where the officers had to make a split-second decisions as to their safety, they had plenty of time and manpower to maintain control over the situation and protect all individuals from any physical harm

The second factor is whether the suspect posed an immediate threat to the safety of the officers or others. As analyzed in section (2) and (3) above, there was nothing that justified any level of force to be used by any officer of the APD. The chain reaction analyzed in section (3) above, which was initiated by Officers Hynes and Andelin, was authorized by what the defendant asserts as the officers seeing Mr. Gonzales raise his arm. This is highly disputed, as Mr. Gonzales did not make any threatening moves toward them. (Exh. A) The SWAT team was closing on Mr. Gonzales when the first shots rang out and

because of their heightened anxiety and fear for their own lives, they began to fire and never saw Mr. Gonzales make a threatening move towards them as some officers have explained.

The third factor is whether the subject is actively resisting arrest or attempting to evade arrest by flight. There was no arrest warrant for Mr. Gonzales nor had he done anything illegal. Sergeant Morefield stated in his deposition that his intention was not to arrest Mr. Gonzales. (Exh. E, Decl. of David G. Yen, pg. 70) Mr. Gonzales did turn and run back into his garage which would have demonstrated he was trying to avoid the police. However, it was known by many, if not all, of the police on the scene that Mr. Gonzales was in a fragile mental state as several of the officers stated prior to the shooting. Crediting the officers' assessment that Mr. Gonzales was suffering in an unstable mental state, it is easy to appreciate that he could have made a conscious decision not to engage with the police and turned and ran back into the garage. When SWAT officers of the APD continued to approach him after he continued to display fear of the police, they could have backed off and given him his space and called in law enforcement professionals or contract professionals who are trained in psychological encounters to come in and attempt to defuse the situation and convince Mr. Gonzales to surrender to police so that he could be evaluated.

Again, the IACP in its Training Key #583 written in 2005, states that officers must consider the totality of the circumstances in every use-of-force situation to ensure that the best overall decision is made. One of the questions an officer needs to ask himself is whether there is a need to immediately incapacitate the subject. Officers of the APD had no time constraints on them. There were no other people in the area who were being negatively affected and there was no threat to anyone if they took their time to resolve the situation.

There is nothing in the evidence that showed Officers of the APD had any reason to aggressively approach Mr. Gonzales; and by physically approaching him, they created the hazardous situation in

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

which Mr. Gonzales was killed when many rounds from the different weapons of officers of the APD were fired at him in a matter of seconds. Mr. Gonzales at no time demonstrated he was a threat to the officers, and they were under no time constraints to remove him from the area. Escalating to a higher level in the use of force continuum was inappropriate in this situation

Instead of using force to apprehend Mr. Gonzales, Officers of the APD should have let their law enforcement professionals trained in psychological mental crisis issues to control the situation and be there for backup if needed. This would have tempered the situation and, in all likelihood, resulted in a circumstance that did not involve the use of unnecessary and unreasonable deadly force.

Since there is more than sufficient evidence to create triable issues of fact that Antioch Police Officers were unreasonable in their tactics, strategies, and overall approach with regard to Mr. Gonzales on June 28, 2012, Defendant's Motion for Summary Judgment must be denied.

**B.** **Plaintiffs Assert There Is Sufficient Grounds for the Court to Allow the Constitutional Claims Per §1983 in the Interests of the Fair Administration of Justice**

Plaintiffs do not disagree with Defendant's authorities that the individual officers must be named in order to state a claim for relief under 42 U.S.C. § 1983 (2012), absent a Monell claim, and Plaintifffs are not making a Monell claim in this case. And it is true that the deadline to amend pleadings has passed. Plaintiffs have represented and will not seek to amend the Complaint to add in the names of the individual officers given the lateness of the proceedings and a pending trial date of January 11, 2016.

However, Plaintiffs believe there exists grounds for the Court to take action to preserve the Constitutional claims in the fair administration of justice by adding in the names *of only the seven officers who fired their weapons* at Plaintiff Decedent Denny Gonzales on June 28, 2012. The Court has the inherent power to manage litigation and its docket. *Thomas v. Arn* (1985) 474 U.S. 140. Plaintiffs' argument is based on the fact that 1.) Defendant had notice all along of the names and identities of these

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

officers 2.) There is no prejudice that exists because Defendant had notice 3.) It is well established that Plaintiffs' entire case is based on the actions of the officers who fired their weapons and shot and killed Mr. Gonzales 4.) Allowing Defendant to prevail on these claims results in severe prejudice to Plaintiffs because Sakarie Denni-Nishele Gonzales, the 3 year old daughter of decedent Denny Gonzales, a plaintiff brought in only under the Constitutional claims, would not be entitled to recover for damages in this action and 5.) Such action would not materially affect this case. There are no governmental immunities that apply to officers who fired their weapons, as opposed to officers who may have made other decisions related to the shooting. Discovery is closed. Most significantly, Defendant would not have defended this case in any way different than if the individual shooting officers were included as defendants. Though Plaintiffs clearly bear responsibility for not including the individual shooting officers as Defendants, it would be a miscarriage of justice to allow Defendant to escape liability for this reason alone, especially since they had notice and there is no prejudice.

### III.   CONCLUSION

Plaintiff Decedent Denny Gonzales may have made threatening comments and behaved erratically on June 28, 2012. Nonetheless, the critical issue is whether or not Defendant was justified in using deadly force against Mr. Gonzales and the evidence strongly suggests they were not because Mr. Gonzales was not a deadly threat to them when Antioch Police Officers shot and killed him.

Plaintiffs have shown there is more than sufficient evidence to raise numerous genuine disputes of material fact as to whether or not there was unreasonable force used by Defendant against Mr. Gonzales. Therefore, Defendant's Motion for Summary Judgment should be denied.

DATED:   September 24, 2015

THE CARTWRIGHT LAW FIRM, INC.

By: _____
ROBERT E. CARTWRIGHT, JR.
DAVID G. YEN
*Attorneys for Plaintiff ANDREA GONZALES, THE ESTATE OF DENNY GONZALES, MICHELLE MAYERS, AS GUARDIAN AD LITEM FOR SAKARIE DENNI-NISHELE GONZALES,*

## PROOF OF SERVICE

I am, and was at all times herein mentioned, employed in the City and County of San Francisco, State of California. I am over the age of 18 years and not a party to the within entitled action. I am employed at the Cartwright Law Firm, 222 Front Street, Fifth Floor, San Francisco, California 94111.

On **September 24, 2015**, I served the attached  on the interested parties in this action as follows: **Plaintiff's Memorandum of Points and Authorities in Support of Plaintiff's Opposition to Motion for Summary Judgment/Partial Summary Judgment; Declaration of David G. Yen in Support of Motion for Support of Plaintiff's Opposition to Motion for Summary Judgment/Partial Summary Judgment; Declaration of Rajeev Kelkar in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment; Declaration of Philip F. Hayden in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment; Proposed Order**

> *Attorneys for Defendant CITY OF ANTIOCH*
> *James V. Fitzgerald, III*
> *McNamara, Ney, Beatty, Slattery, Borges &*
> *Ambacher LLP*
> *1211 Newell Avenue*
> *Walnut Creek, CA  94596*

☒ **BY MAIL:**  I placed  true and correct copies of the above documents in a sealed envelope (or envelopes) addressed to the addressee(s) with postage thereon fully prepaid in the United States mail in the City and County of San Francisco, California.

☐ **BY PERSONAL SERVICE:**  I caused true and correct copies of the above documents to be placed and sealed in an envelope (or envelopes) addressed to the addressee(s) and I caused such envelope(s) to be delivered by hand on the office(s) of the addressee(s).

☐ **BY FEDERAL EXPRESS:**  I caused true and correct copies of the above documents to be placed and sealed in an envelope (or envelopes) addressed to the addressee(s) and I used such envelope(s) to be delivered to Federal Express overnight courier service to the office(s) of the addressee(s).

☐ **BY FACSIMILE:**  I caused a copy (or copies) of such document(s) to be sent via facsimile transmission to the office(s) of the address(s).

I am "readily familiar" with the firm's practice of collecting and processing correspondence for mailing, that the correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business. I am aware that on motion of a party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in the affidavit.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed on **September 24, 2015**, at San Francisco, California.

LIGIA MCDONALD