UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREA GONZALES, et al.,<br><br>                    Plaintiffs,<br><br>          v.<br><br>THE CITY OF ANTIOCH,<br><br>                    Defendant. | Case No.  14-cv-04728-KAW<br><br>**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 37 |

Before the Court is the City of Antioch's motion for summary judgment, or in the alternative, partial summary judgment.  Plaintiffs oppose the motion.  The Court held a hearing on the motion on October 15, 2015.  Having considered the papers filed by the parties, the relevant legal authority, and the arguments advanced by counsel at the hearing, the Court GRANTS the motion for the reasons set forth below.

## I.        BACKGROUND

### A.        Factual background

1.        <u>Conversations between Mr. Gonzales and Det. McManus</u>

Det. Eric McManus is a detective for the Antioch Police Department ("APD").  (Blechman Decl., Ex. B, McManus Dep. 8:8-9:13.)  Denny Gonzales, the decedent in this case, was his barber, and he had been since about 2007/2008.  (*Id.* 20:23-21:14.)  Det. McManus considered Mr. Gonzales a friend.  (*Id.* 22:4-6.)

On June 28, 2012, Det. McManus was conducting surveillance with Det. Green in Pinole.  (*Id.* 26:25-28:11.)  While on that surveillance detail, Det. McManus received a call from Mr. Gonzales.  (*Id.* 32:2-21.)  When his phone rang, Det. McManus saw on his caller ID that it was Mr. Gonzales, and he answered the phone with a typical "What's up?"  (*Id.* 32:9-12.)  Mr.

United States District Court<br>Northern District of California

1   Gonzales said, "I don't want to be here anymore." (*Id.* 32:13-17.)  Det. McManus asked what he

2   meant by that, and Mr. Gonzales eventually repeated, "I don't want to be here." (*Id.* 32:22-33:11.)

3       Based on the tone of Mr. Gonzales' voice and the nature of conversation, Det. McManus

4   thought that Mr. Gonzales was depressed and despondent, and he considered Mr. Gonzales'

5   statements to be vague suicide threats. (*Id.* 33:12-34:1.)  Det. McManus tried to get Mr. Gonzales

6   to tell him what was bothering him, and he tried to convince Mr. Gonzales to give him time to get

7   back to Antioch. (*Id.* 34:2-11, 35:10-17.)  This conversation lasted 20 to 25 minutes, and after the

8   call ended, the two detectives immediately started driving from Pinole to Antioch so they could

9   help Mr. Gonzales. (*Id.* 35:10-12, 35:18-36:3.)

10      While en route to the freeway, Mr. Gonzales called Det. McManus a second time. (*Id.*

11  36:4-7.)  According to Det. McManus, the nature of this conservation was much angrier; it was

12  homicidal. (*Id.* 36:8-12.)  Because of this, Det. McManus had Det. Green pull out his cell phone

13  and record most of the call. (*Id.* 36:8-12, 38:17-19; Blechman Decl., Ex. C, Audio File Voice 005

14  (Second Call) & Transcript.)  Mr. Gonzales said he was angry at someone, that he was watching

15  this person, and that this person had done something to his brother. (*Id.* 36:14-19.)  He would not

16  elaborate on who this person was or what this person had done to his brother. (*Id.* 36:16-20;

17  Blechman Decl., Ex. C.)  Mr. Gonzales asked Det. McManus what he would do if someone

18  harmed his family. (*Id.* 36:20-22.)  Det. McManus kept trying to find out why Mr. Gonzales was

19  so angry, and who he was angry at, to see if he could help him through it. (*Id.* 37:5-8; Blechman

20  Decl., Ex. C.)  Mr. Gonzales asked Det. McManus if he could protect this person, and he asked

21  Det. McManus what he would do if someone were in front of his house "right now." (*Id.* 37:8-21.)

22  Det. McManus immediately feared that someone was at his home, but Mr. Gonzales clarified that

23  he was not at Det. McManus' house. (*Id.* 37:21-38:3; Blechman Decl., Ex. C.)

24      Once Det. McManus knew that Mr. Gonzales was not at his house, he tried to figure out

25  where he was and who he was targeting. (*Id.* 38:5-8.)  At one point, Mr. Gonzales mentioned that

26  a police car had driven by, and he said something to the effect of "if he got stopped, there would

27  be casualties." (*Id.* 38:4-11; Blechman Decl., Ex. C.)  Mr. Gonzales eventually told Det.

28  McManus "that he was after one of [his] own." (*Id.* 38:13-14.)  When Det. McManus asked Mr.

Gonzales to clarify what he meant, Mr. Gonzales "indicated that he was preparing to kill a police officer." (*Id.* 38:14-16; Blechman Decl., Ex. C.)  During this second telephone call, Det. McManus heard a sound that he "relate[s] to a gun -- the upper slide of a gun being dropped, meaning a round being chambered into a gun." (*Id.* 39:25-40:14).

After the second call, Det. McManus made a series of calls himself—to his wife, to APD Det. Wisecarver, who was home recovering from a work-related injury, and to his immediate supervisor, Sgt. Bias. (*Id.* 45:25-46:13.)  He told Sgt. Bias about his two conversations with Mr. Gonzales. (*Id.* 46:14-22.)  Det. McManus told Sgt. Bias what was said, he gave him his interpretation of the conversation, he explained his relationship with Mr. Gonzales, and he told him that Mr. Gonzales owned a firearm. (*Id.* 49:4-18.)

After driving to Mr. Gonzales' barbershop to obtain his last name and home address from his cosmetology license, and upon verifying that Mr. Gonzales' car was not parked in front of the police chief's nearby home, Det. Green and Det. McManus drove to Mr. Gonzales' neighborhood in their unmarked car. (*Id.* 47:9-20, 53:21-54:4.)  Det. McManus saw Mr. Gonzales' car in the driveway of Mr. Gonzales' house, located at 4849 Lefebvre Way. (*Id.* 47:21-48:5.)

Det. Green and Det. McManus stopped their car at the far north end of Lefebvre Way, geared up, and waited for responding officers. (*Id.* 48:2-5.)  When they parked, they maintained contact with dispatch and with Sgt. Morefield, occasionally updating him with their location and their observations. (*Id.* 58:23-59:5.)  Sgt. Morefield was the Patrol Sergeant at that time, and he was also the ranking S.W.A.T. team officer. (*Id.* 64:7-65:3.)  As such, he had tactical command at the scene unless relieved. (*Id.* 71:24-72:6.)

Det. McManus' intentions were to keep an eye on the residence and on Mr. Gonzales so that he could provide information to responding officers. (*Id.* 60:11-17.)  At one point, as they parked their vehicle down the street, Det. McManus and Det. Green got out on foot and moved south, towards Mr. Gonzales' home. (*Id.* 61:9-13.)  When other officers started to arrive, Det. McManus would alternate between the area just north of Mr. Gonzales' house and the area where he had parked his car so that he could speak with officers that arrived, including Sgt. Bias, Det. Krenz, and Det. McMurray. (*Id.* 62:13-24.)  Det. McManus spoke to Sgt. Morefield on the

telephone and at the scene.  (*Id.* 65:15-66:3.)  During their in-person conversation, Det. McManus informed Sgt. Morefield that he was with Det. Green, pointed out Mr. Gonzales' home, provided information about his residence, and provided a description of Mr. Gonzales and his vehicle.  (*Id.* 65:22-66:3.)

While at the scene, Det. McManus received a third telephone call from Mr. Gonzales.  (*Id.* 66:19-67:13.)  It was a short call.  (*Id.* 67:2-3.)  Mr. Gonzales "indicated that he was going to kill a police officer."  (*Id.* 67:14-68:2.)  Mr. Gonzales hung up.  (*Id.* 67:23.)  This call was also recorded by Det. Green.  (*Id.* 75:11-16; Blechman Decl., Ex. D, Audio File Voice 005 (Third Call) and Transcript.)  Det. McManus radioed that he had received another call from Mr. Gonzales.  (*Id.* 68:3-6.)  Det. McManus "wasn't going to put out the nature of it, but it wasn't good."  (*Id.*)

Det. McManus then received a fourth telephone call from Mr. Gonzales that only lasted a couple of minutes.  (*Id.* 74:17-19, 75:22-76:16.)  During this telephone call, Mr. Gonzales kept on asking Det. McManus where he was, and Det. McManus kept saying that he was still driving back from Pinole, trying to buy time for officers to get in place at the scene.  (*Id.* 75:22-76:3.)  Mr. Gonzales wanted Det. McManus to come to his house, and Det. McManus asked Mr. Gonzales whether he would harm him if he did.  (*Id.* 76:9-10.)  His answer was "you just come find out. Come see me.  Come get me . . . ."  (*Id.* 76:10-11.)  Mr. Gonzales hung up once more.  (*Id.* 117:5-7.)

Mr. Gonzales then called Det. McManus a fifth time.  (*Id.* 76:20-78:4.)  During this final conversation, Mr. Gonzales said something to the effect of "it was done," and Det. McManus inferred that Mr. Gonzales had killed a police officer or had acted upon his threat to harm someone.  (*Id.* 77:11-78:4.)  Mr. Gonzales hung up one last time.  (*Id.* 117:10-12.)

Det. McManus shared information with his fellow officers as he received Mr. Gonzales' calls.  (*Id.* 78:5-12.)  During one of their conversations, Mr. Gonzales referred to body bags, or a need for body bags, and Det. McManus also shared this information with other officers.  (*Id.* 107:12-24.)

At some point while at the scene, it was decided that Det. McManus should remain in contact with Mr. Gonzales and work with Det. Krenz and Det. McMurray, two members of the

APD's Hostage Negotiation Team ("HNT"), who were on scene. (*Id.* 79:12-24.) The HNT detectives told McManus that he would be the key person for remaining in contact with Mr. Gonzales, given their relationship and rapport. (*Id.* 81:1-6.) Sgt. Morefield instructed Det. McManus not to get involved in any of the tactical operation. (*Id.* 72:7-11.)

### 2. APD'S Tactical Response

Upon his arrival at the scene, Sgt. Morefield gathered all the available officers, briefed them on their approach, and made a slow, methodical, and covert approach towards Mr. Gonzales' house. (Blechman Decl., Ex. E, Morefield Dep. 33:3-7, 35:4-23.) He did not want officers to be seen in case Mr. Gonzales was lying in wait. (*Id.* 35:17-23.) Officers were going to move slowly on either side of the street to approach the house in case Mr. Gonzales was somewhere between his house and the officers' location. (*Id.* 36:2-12.) The plan was containment. (*Id.* 36:16-18.) Sgt. Morefield was concerned for public safety, officer safety, and suspect safety, so he wanted to covertly surround the house. (*Id.* 36:13-21.) Fearing that Mr. Gonzales would harm someone, he wanted officers there to at least make contact with Mr. Gonzales in case he came out of his house. (*Id.* 69:6-15.)

Sgt. Morefield did his best to get the officers that were available to him around Mr. Gonzales' home. (*Id.* 38:5-9.) He placed some officers, the Arrest-Contact team, a couple houses north of Mr. Gonzales' home and he placed some officers on Vinewood, directly across the street from Mr. Gonzales' home, so those officers could have a good visual of the house. (*Id.* 38:5-39:9, 41:19-42:13.) Sgt. Morefield instructed the Arrest-Contact team to take cover behind what was available to them. (*Id.* 41:8-13.) Once additional resources started to arrive on scene, he moved the Arrest-Contact team closer. (*Id.* 41:14-18.) Sgt. Morefield also positioned officers so that they could block off the nearby streets and keep traffic away from the area. (*Id.* 43:1-15.)

Sgt. Morefield continued to direct resources as they became available, including staging fire, ambulance, and medical personnel nearby. (*Id.* 45:7-24.) He also directed some Brentwood Police Department officers to take a position in the back of Mr. Gonzales' house. (*Id.* 45:25-46:5.) A very rough command post was also set up, consisting mainly of Sgt. Bias, Det. Krenz, Det. McMurray, and other command personnel. (*Id.* 46:9-21, 50:18-21.)

United States District Court
Northern District of California

APD Captain McConnell arrived at the scene at some point, and Sgt. Morefield began to confer with him, who had overall incident command, to put resources into place. (*Id.* 54:6-55:4.) Sgt. Morefield was trying to get all the key resources at the scene, including additional S.W.A.T. resources and officers, situated to deal with the evolving situation. (*Id.* 55:5-56:9.) At some point during this tactical preparation stage, Cpt. McConnell made the decision to "call out" the rest of the S.W.A.T. team, that is, call all off-site S.W.A.T. officers to respond to the scene to assist. (*Id.* 56:10-22.)

As S.W.A.T. officers arrived on the scene, Sgt. Morefield replaced the patrol members of the Arrest-Contact team with the arriving S.W.A.T. officers and positioned the Arrest-Contact team behind a vehicle in the neighboring driveway north of Mr. Gonzales' residence. (*Id.* 59:1-60:4.) The Arrest-Contact team consisted of Det. Bittner, Det. Vincelet, Ofc. Fortner, Det. Cook, and Det. Mortimer, all S.W.A.T team members. (*Id.* 60:5-25, 63:9-11.) He wanted S.W.A.T. officers to replace the patrol officers on that Arrest-Contact team, as S.W.A.T. officers are specifically equipped, trained, and experienced in high threat level situations, such as this developing situation. (*Id.* 61:4-10.) The members of the Arrest-Contact team were armed with a variety of weapons, including handguns, long guns (assault rifles), and Tasers. (*Id.* 61:11-62:1.)

Sgt. Morefield told the Arrest-Contact team that if Mr. Gonzales were to show himself, they were to use available cover, announce police presence, and give commands to try to gain his compliance. (*Id.* 65:5-14.) He also instructed them not to block Mr. Gonzales' vehicle in any way if he left in his car. (*Id.* 65:14-16.) Sgt. Morefield further advised officers that if Mr. Gonzales exited in a vehicle, they were to fan out around the vehicle that was parked on the street, use it as cover, and give Mr. Gonzales verbal commands to announce their presence and gain compliance. (*Id.* 76:14-77:19.) The use of a flash bang device, a light-sound diversionary device, was also discussed. (*Id.* 77:8-10, 78:24-79:7.) In the event Mr. Gonzales came out on foot, the plan was similar—the officers were to make contact, announce their presence, and try to gain compliance. (*Id.* 79:8-22, 84:17-23.) Sgt. Morefield discussed different scenarios with the Arrest-Contact team, and he was concerned that Mr. Gonzales could come out of the garage or house at any time while they were mobilizing at the scene. (*Id.* 74:13-24, 75:9-13.) Det. Bittner was the Arrest-

1    Contact team leader.  (*Id.* 96:8-24.)

2         Sgt. Morefield was aware that Mr. Gonzales was either armed or possibly armed and was

3    operating under that assumption.  (*Id.* 75:14-76:9.)  Knowing that Mr. Gonzales might be armed,

4    there was a discussion with the Arrest-Contact that there were no rules of engagement outside the

5    regular department policies.  (*Id.* 85:16-86:14, 115:13-18.)  Department policy allows an officer to

6    defend himself or another officer if he believes that his life, or another officer's life, is being

7    threatened.  (*Id.* 91:13-22.)

8         A Perimeter Team, consisting of Officers Hynes, McElroy, Dee, and Andelin, was also on

9    scene.  (*Id.* 62:1-17.)  Sgt. Morefield instructed them to keep eyes on the subject residence and to

10   advise on the radio as to what they could see from their vantage point, which was directly across

11   the street.  (*Id.* 65:17-22.)  The intention was not to arrest Mr. Gonzales, but to make contact with

12   him, figure out what his intentions were, and get resources in place in case he tried to hurt himself

13   or others.  (*Id.* 70:1-18.)

14        Approximately 45 minutes after he arrived on scene, Sgt. Morefield was back at the

15   command post with Cpt. McConnell and Sgt. Bias, when he heard gunshots.  (*Id.* 69:21-25,

16   102:16-20.)

17             3.    The Shooting

18                  a.    *Ofc. Hynes' Testimony*

19        On the day of the incident, Ofc. Hynes was working as a patrol officer for APD, wearing a

20   uniform, and driving a marked patrol car.  (Blechman Decl., Ex. F, Coroner's Inquest, Hynes

21   Testimony 44:21-45:9.)  He was dispatched to the scene, where he and the other officers were

22   briefed by Sgt. Morefield.  (*Id.* 45:10-46:2.)  They then began to approach Mr. Gonzales' home on

23   either side of the street to notify or evacuate residents and to see if they could get into a position to

24   clearly see the house.  (*Id.* 46:14-19.)

25        As the officers approached the house, Sgt. Morefield decided that he wanted the S.W.A.T.

26   team members closest to it, so he asked the patrol officers to go around the block and try to take

27   up a position directly across from the house, where they would have a clear view into the garage.

28   (*Id.* 46:20-47:6.)  Officers Hynes, Andelin, and McElroy then entered the backyard of a house that

United States District Court
Northern District of California

7

was directly across the street from Mr. Gonzales', positioned themselves behind some trees and a fence, and kept watch on the garage to see what was happening.  (*Id.* 47:7-14.)  From their position, they saw the garage door partially opened, a yellow Corvette in the garage, and the lower legs of a person who was moving around in the garage.  (*Id.* 47:15-48:6.)

The garage door opened and closed several times.  (*Id.* 48:7-10.)  At one point, when the garage fully opened, Ofc. Hynes saw Mr. Gonzales walk from the back of the garage and onto the driveway.  (*Id.* 48:10-12.)  Mr. Gonzales had a pistol in his right hand.  (*Id.* 48:13.)  Ofc. Hynes then informed all offices via radio that Mr. Gonzales was exiting the garage with a gun.  (*Id.* 48:13-15.)  Mr. Gonzales looked left and right as he walked down the driveway.  (*Id.* 48:16-18)  Initially the gun was visible, but Mr. Gonzales put it in his pocket, then removed it.  (*Id.* 48:16-25.)  When Mr. Gonzales removed the gun from his pocket, he began to turn to his right, which is where S.W.A.T. team members were located.  (*Id.* 49:1-4.)  Ofc. Hynes was not fully concealed across the street, even though he was behind a fence.  (*Id.* 49:5-11, 53:13-18.)

According to Ofc. Hynes, when Mr. Gonzales took the gun from his pocket, raised it up, and began to turn towards the S.W.A.T. team members, he fired at Mr. Gonzales with a long rifle.  (*Id.* 49:23-51:5.)  Mr. Gonzales then continued to turn to his right and began to move back towards the garage.  (*Id.* 51:15-17.)  Ofc. Hynes saw S.W.A.T. team members had started to move up the driveway towards Mr. Gonzales.  (*Id.* 51:17-23.)  Ofc. Hynes continued to shoot at Mr. Gonzales as he moved up the driveway and eventually saw him go down.  (*Id.* 53:23-54:12.)

### b.   Ofc. Fortner's Testimony

Ofc. Fortner was also dispatched to the scene.  (*Id.* 59:3-60:1.)  When he arrived, he responded north of the Gonzales residence.  (*Id.* 60:2-6.)  Ofc. Fortner took his ballistic helmet and S.W.A.T. issued rifle from his patrol car.  (*Id.* 60:13-15.)  Other officers in the area were responding to set up a perimeter to contain the situation and evacuate civilians in the neighborhood.  (*Id.* 60:2-10.)

Ofc. Fortner then obtained basic information from Det. McManus and Det. Green, and Sgt. Morefield tasked him with taking other officers to try to approach the residence from an inner perimeter on the east side of the street.  (*Id.* 60:16-61:7.)  Officers had quickly established traffic

blocks with their patrol cars, and after they established that outer perimeter, they wanted to set-up an inner perimeter so that officers could focus on observing what was happening, who was involved, whether children or civilians were involved or in harm's way, providing intelligence, containing the scene, and reacting to any threats of violence or danger to anyone in the area. (*Id.* 61:8-23.)

Once officers started to approach the residence, they made contact with other neighbors and told them to either shelter in place or evacuate. (*Id.* 62:3-8) As they got closer to Mr. Gonzales' residence, Sgt. Morefield tasked Officers Hynes, McElroy and Andelin to an observation center so they could provide officers with information about Mr. Gonzales and the residence. (*Id.* 61:24-62:19.) Ofc. Fortner, with the Arrest-Contact team, got in position behind a Suburban parked in the driveway of a house next door to Mr. Gonzales' home. (*Id.* 63:17-21.) They received information that the garage door was up and got a physical description of Mr. Gonzales. (*Id.* 63:9-15.)

Ofc. Fortner had his weapon at the ready. (*Id.* 63:22-23.) There were some high bushes or trees obstructing the team's view to Mr. Gonzales' house. (*Id.* 64:18-24.) Ofc. Fortner saw the garage door go up a couple of feet, he could hear Mr. Gonzales moving around inside, and he could see a yellow Corvette, then the garage door closed. (*Id.* 65:3-15.) Sometime after that, other S.W.A.T. officers switched places with patrol officers on the Arrest-Contact team. (*Id.* 65:14-19.) Several minutes later, the garage door opened again, halfway, and Ofc. Fortner heard loud music playing on the car stereo. (*Id.* 65:14-17.) Mr. Gonzales turned it up, then turned it down, then turned it back up. (*Id.* 65:16-18.) The car started then shut off, and the garage door went back down. (*Id.* 65:20-22.) Ofc. Fortner also heard the sound of glass hitting concrete emanating from the garage, so he informed officers to get ready since it appeared things were escalating. (*Id.* 66:11- 67:18.)

At that point, the garage door opened all the way, and Ofc. Fortner notified officers. (*Id.* 67:19-22.) Ofc. Fortner saw Mr. Gonzales exit the garage and walk down the driveway. (*Id.* 67:23-24.) Ofc. Fortner testified that he could see Mr. Gonzales' hand, which was wrapped around something very similar to what Ofc. Fortner assumed was a pistol, on his right hip. (*Id.* 68:2-12.)

1    Mr. Gonzales was looking left and right as he walked down the driveway, and after Mr. Gonzales

2    cleared the bushes, Ofc. Fortner could clearly see that Mr. Gonzales had his hand on the black

3    handle of a gun with the barrel running down his leg.  (*Id.* 68:13-20.)

4          Mr. Gonzales appeared to be peering across the street like he was looking for something or

5    someone.  (*Id.* 69:8-10.)  According to Ofc. Fortner, at that point in time, Mr. Gonzales would

6    have been able to see the team hiding behind the Suburban, so he informed the officers that he was

7    going to challenge Mr. Gonzales, and he stepped out a bit.  (*Id.* 69:11-69:18.)  Ofc. Fortner

8    testified that he then pointed his rifle at Mr. Gonzales and shouted, at the top of his lungs, "I see

9    the gun.  Take your hand off the gun.  Put your hands up."  (*Id.* 69:18-21.)  He yelled it over and

10   over again as he approached Mr. Gonzales.  (*Id.* 69:21-22.)  Mr. Gonzales looked to his right, in

11   Ofc. Fortner's direction, and as Ofc. Fortner started to approach him, Mr. Gonzales started to back

12   pedal.  (*Id.* 70:7-9.)  That is when Ofc. Fortner saw that Mr. Gonzales' hand came off his hip with

13   the gun, which was now pointed at him.  (*Id.* 70:8-9.)  As the gun came up to Ofc. Fortner's chest

14   while he was screaming commands, he started to fire his rifle at Mr. Gonzales.  (*Id.* 70:11-14.)

15   Mr. Gonzales continued to back pedal with the gun pointed at Ofc. Fortner, so Ofc. Fortner

16   continued to shoot until Mr. Gonzales went down near his yellow Corvette in the garage.  (*Id.*

17   71:12-16.)  Ofc. Fortner heard some additional shots being fired near him and across the street,

18   where Officers Hynes, Andelin and McElroy were located. (*Id.* 70:17-20.)  Only seconds had

19   elapsed between the time Ofc. Fortner first started giving commands to the time when Mr.

20   Gonzales turned and pointed his weapon at him.  (*Id.* 77:10-18.)

21          Ofc. Fortner also testified that as the smoke from the flash bang device subsided and the

22   gunfire stopped, he announced to the other officers that they were going to approach and contact

23   Mr. Gonzales.  (*Id.* 72:5-8.)  As they approached, Mr. Gonzales was face down in the garage.

24   (*Id.* 72:14-16.)  Ofc. Fortner kicked the gun away and handcuffed Mr. Gonzales.  (*Id.* 72:16-20.)

25   The officers announced that shots had been fired and requested emergency medical treatment.  (*Id.*

26   73:7-10.)

27                    *c.      Det. Bittner's Testimony*

28          Det. Bittner was also called to the scene, and he put on his S.W.A.T gear and helmet.

United States District Court
Northern District of California

10

1    (Blechman Decl., Ex. G, Bittner Decl. ¶¶ 3, 4.)  He and the other S.W.A.T. team members,

2    Officers Koch, Vincelet, Mortimer, and Fortner, met their Patrol Sergeant and S.W.A.T Team

3    Leader, Sgt. Morefield, and they were assigned to be the Arrest-Contact team.  (*Id.* ¶ 6.)  They

4    were responsible for moving as close as they could to Mr. Gonzales' residence and getting into a

5    position that would allow them to be available in case they were needed for immediate action.

6    (*Id.*)  Sgt. Morefield assigned Det. Bittner as the Arrest-Contact team leader.  (*Id.* ¶ 7.)  They were

7    informed that Mr. Gonzales might have a firearm and that he had one or two firearms registered in

8    his name.  (*Id.* ¶ 8.)

9        "Sgt. Morefield then directed [Det. Bittner] as to the various plans that [they] were going to

10   challenge the Decedent if he attempted to leave the house via car or on foot, including the use of a

11   flash bang device."  (*Id.* ¶ 9.)  Det. Bittner then shared this information with the other Arrest-

12   Contact team members.  (*Id.*)  The Arrest-Contact team was then staged behind a SUV in the

13   driveway next door and north of Mr. Gonzales' house so officers could observe what was

14   happening at Mr. Gonzales' house and be prepared to make contact or challenge him.  (*Id.* ¶ 10.)

15   During this time period, officers were getting updates from other officers via radio as to their view

16   of Mr. Gonzales' house.  (*Id.* ¶ 9.)  Det. Bittner also heard sounds of breaking glass coming from

17   the residence.  (*Id.* ¶ 11.)

18       The garage door then came all the way up, and Det. Bittner saw Mr. Gonzales walk out

19   onto his driveway.  (*Id.* ¶ 13.)  Det. Bittner then heard an officer, or officers, advise several times

20   that Mr. Gonzales had a gun.  (*Id.*)  Det. Bittner and the Arrest-Contact team started to move over

21   towards the nearby covered car in the street to confront Mr. Gonzales, and Det. Bittner saw that

22   Mr. Gonzales had a black handgun in his right hand.  (*Id.* ¶ 14.)  Officers were yelling at Mr.

23   Gonzales to "drop the gun" numerous times.  (*Id.* ¶ 15.)  Mr. Gonzales made eye contact with the

24   officers, and Det. Bittner believed Mr. Gonzales knew they were police officers.  (*Id.* ¶ 16.)

25   According to Det. Bittner, Mr. Gonzales then raised the handgun up and pointed it at him and his

26   fellow officers, he believed Mr. Gonzales fired at them, and he believed Mr. Gonzales was a

27   deadly threat to himself and other officers in the vicinity, so he fired at Mr. Gonzales

28   approximately two times.  (*Id.* ¶¶ 17, 18.)  Det. Bittner also heard other gunfire at that time, which

United States District Court
Northern District of California

11

1    he believed to be coming from other officers firing at Mr. Gonzales as well.  (*Id.*)

2          At the time he fired his weapon at Mr. Gonzales, Det. Bittner believed he was a deadly

3    threat to himself and to other officers in the vicinity.  (*Id.* ¶ 18.)  According to Det. Bittner, Mr.

4    Gonzales did not drop the firearm when commanded to do so.  (*Id.*)  Instead, he pointed it at

5    officers.  (*Id.*)  Det. Bittner estimates that only three to five seconds had elapsed between the time

6    he saw Mr. Gonzales with the gun and the moment when shots were fired.  (*Id.* ¶ 19.)

7          Officers then tactically approached the garage area.  (*Id.* ¶ 20.)  Det. Bittner saw Mr.

8    Gonzales on the ground in the garage with a black handgun next to him.  (*Id.*)  Ofc. Fortner kicked

9    the gun away from Mr. Gonzales and handcuffed him.  (*Id.*)  Officers then cleared the residence,

10   and Det. Bittner was sequestered along with other police officers.  (*Id.* ¶ 21.)

                          d.        Sgt. Morefield's Testimony

12         After hearing gunshots fired, Sgt. Morefield rushed towards the Arrest-Contact team, heard

13   verbal commands being given, heard reports of gunfire, and saw the Arrest-Contact team fanned

14   out in the driveway yelling commands into the garage.  (Morefield Dep. 102:24-103:25.)  There

15   was a large amount of steam coming from the garage, and Mr. Gonzales was face down in the

16   garage.  (*Id.* 103:17-23.)  There was a handgun next to him, which an officer kicked away.  (*Id.*

17   105:10-13.)  Sgt. Morefield directed someone to detain Mr. Gonzales, then he assembled a team to

18   do a security sweep of the home.  (*Id.* 105:8-16.)  Medical personnel tended to Mr. Gonzales in the

19   garage.  (*Id.* 106:7-13.)

20         Mr. Gonzales died on that day from two fatal gunshot wounds to the left side of his upper

21   back.  (Blechman Decl., Ex. F 20:8-21:18.)  Blood taken during the autopsy for toxicological

22   purposes was tested and showed that Mr. Gonzales had a blood alcohol level of 0.24% at the time

23   of his death, more than three times the legal driving limit.  (*Id.* 21:19-22:10; Blechman Decl., Ex.

24   R, Pls.' Responses to City's Request for Admission, Set One, Request No. 4.)

25                    4.     Neighbors' Testimony

26         Mr. Gonzales' next door neighbors, Earnest and Frances Quinonez, observed parts of the

27   incident.  (Blechman Decl., Ex. I., E. Quinonez Dep.; Blechman Decl., Ex. K, F. Quinonez Dep.)

28   On that day, Mrs. Quinonez told her husband about the police, who had told her to go back inside.

United States District Court
Northern District of California

(E. Quinonez Dep. 20:5-25.)  Mr. Quinonez looked outside his window and saw police officers stooping down by the driver's side of his Suburban.  (*Id.* 21:10-22:2.)  At some point, Mrs. Quinonez saw officers move from the Suburban to the covered car area, on the street side of the covered car.  (F. Quinonez Dep. 26:2-5.)

At his deposition, Mr. Quinonez testified that he saw Mr. Gonzales walk out of his garage with a semiautomatic in his right hand and raise the gun "like if he was going to fire, and simultaneously he turned around like he was going to run back into the garage."  (E. Quinonez 23:22-25:22.)[1]  Mr. Quinonez saw that the gun in Mr. Gonzales' right hand was pointed towards the street area, away from the direction in which he was attempting to move, and was pointed, but not aimed, in the direction of the neighbor's yard across the street/the direction of the covered car parked on the street.  (*Id.* 26:1-19, 27:18-24, 28:3-30:8, 32:18-33:18.)

When officers were over by the covered car, Mrs. Quinonez heard officers yell "drop the gun" two, maybe three, times.  (F. Quinonez Dep. 27:18-28:7.)  After hearing the "drop the gun" commands, Frances heard one gunshot, then a burst of additional gunshots which were different than the sound of the first gunshot.  (*Id.* 29:3-31:23, 32:19-33:2.)  Mr. Quinonez believes that Mr. Gonzales fired the first shot at officers.  (E. Quinonez Dep. 30:12-32:2, 35:15-36:1.)  He heard the first gunshot, which apparently had a lower caliber sound, then heard a burst of higher caliber gunshots which he believes were gunshots from the police.  (*Id.* 31:4-20.)

        5.     Video Evidence

The investigation of the incident revealed a video of the shooting taken by a CHP fixed wing plane that captured key moments of the incident.  (Blechman Decl., Ex. L, Stenger Decl. ¶¶ 2-4.)  Michael Schott, a video expert, prepared a slow motion video of the key moments, as well as two PDF demonstratives from the video.  (Blechman Decl., Ex. M, Schott Decl., Ex. M-1, Curriculum Vitae, Ex. M-2, Real Time CHP Video, Ex. M-3, Slow Motion CHP Video, Exs. M-4 & M-5, PDF Demonstratives.)

---

[1] Plaintiffs highlight that during a police interview that purportedly occurred sometime prior to Mr. Quinonez's deposition, he stated that he neither saw Mr. Gonzales fire any shots at the officers nor raise his weapon.  Pls.' Opp'n at 11, 12.  The admissibility of that statement is addressed *infra* Part III.D.

United States District Court
Northern District of California

**B.     Procedural background**

On July 29, 2013, Plaintiffs Andrea Gonzales, the decedent's spouse and the representative of his estate, Sakarie Denni-Nishele Gonzales, the decedent's daughter, and Michelle Mayers, acting as the child's guardian ad litem, filed their complaint against the City in Contra Costa County Superior Court.  (Notice of Removal, Ex. B, Dkt. No. 1.)  Plaintiffs filed an amended complaint on September 19, 2014.  (Notice of Removal, Ex. D.)  The City was served with the amended complaint, which contained newly-added federal claims, on October 10, 2014.  (*Id.*)  It timely removed the action to this Court on October 24, 2014.  (*Id.*)

On June 5, 2015, the parties stipulated to the filing of a second amended complaint.  (Stip., Dkt. No. 29.)  The Court approved the stipulation, and Plaintiffs filed their second amended complaint on July 17, 2015.  (Order, Dkt. No. 30; 2d. Am. Compl. ("SAC"), Dkt. No. 32.)  In that complaint, Plaintiffs assert claims for (1) negligence, (2) battery, (3) unlawful and excessive force in violation of the Fourth Amendment, (4) deprivation of familial relationship in violation of the Fourteenth Amendment, and (5) punitive damages pursuant to California Civil Code section 3294.  (SAC ¶¶ 15-26, ¶¶ 27-33, ¶¶ 34-40, ¶¶ 41-43, ¶¶44- 46.)  The City and Didra Barnes-Gonzales are the sole named defendants.  (*Id.* ¶¶ 3, 4.)  Barnes-Gonzales is included as a nominal defendant only, as she is one of the decedent's heirs but has elected not to participate in this action.  (*Id.* ¶ 3.)

On September 10, 2015, the City moved for summary judgment, or in the alternative, partial summary judgment.  (Def.'s Mot. Summ. J. ("Def.'s Mot."), Dkt. No. 37.)  Plaintiffs filed an opposition to the motion on September 24, 2015.  (Pls.' Opp'n to Def.'s Mot. Summ. J. ("Pls.' Opp'n"), Dkt. No. 39.)  Defendant filed its reply on October 1, 2015.  (Def.'s Reply in Support of Mot. Summ. J. ("Def.'s Reply"), Dkt. No. 47.)  The Court held a hearing on the motion on October 15, 2015.

## II.     LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense - or the part of each claim or defense--on which summary judgment is sought."  Fed. R. Civ. P. 56(a).  Summary judgment is appropriate when, after adequate discovery, there is no genuine issue as to material facts and the moving party is entitled to judgment as a matter of law.  *Id.*; *see Celotex*

14

*Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Material facts are those that might affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  *Id.*

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.  *S. Cal. Gas. Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003).

On an issue where the nonmoving party will bear the burden of proof at trial, the moving party may discharge its burden of production by either by (1) "produc[ing] evidence negating an essential element of the nonmoving party's case" or (2) after suitable discovery, "show[ing] that the nonmoving party does not have enough evidence of an essential element of its claim or defense to discharge its ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc.*, 210 F.3d 1099, 1106 (9th Cir. 2000); *see also Celotex*, 477 U.S. 324-25.

Once the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion.  *See* Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 250.  "A party opposing summary judgment may not simply question the credibility of the movant to foreclose summary judgment."  *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001).  "Instead, the non-moving party must go beyond the pleadings and by its own evidence set forth specific facts showing that there is a genuine issue for trial."  *Id.* (citations and quotations omitted).  The non-moving party must produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists."  *Bhan v. NMS Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991).  Conclusory or speculative testimony in affidavits and moving papers is insufficient to raise a genuine issue of material fact to defeat summary judgment.  *Thornhill Publ'g Co., Inc. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

1    In deciding a motion for summary judgment, a court must view the evidence in the light

2    most favorable to the nonmoving party and draw all justifiable inferences in its favor.  *Anderson*,

3    477 U.S. at 255; *Hunt v. City of Los Angeles*, 638 F.3d 703, 709 (9th Cir. 2011).

**III.    DISCUSSION**

4
5    **A.    Federal claims**

6    "Section 1983 provides a cause of action against any person who, under the color of state

7    law, abridges rights unambiguously created by the Constitution or laws of the United States."

8    *Crowley v. Nevada*, 678 F.3d 730, 734 (9th Cir. 2012) (internal quotations and citations omitted).

9    It "is not itself a source of substantive rights, but merely provides a method for vindicating federal

10   rights elsewhere conferred."  *Id.* (internal quotations and citations omitted).  Thus, to state a claim

11   under § 1983, a plaintiff must allege two elements:  (1) that a right secured by the Constitution or

12   laws of the United States was violated, and (2) that the alleged violation was committed by a

13   person acting under the color of state law.  *West v. Atkins*, 487 U.S. 42, 48 (1988).

14   Here, Plaintiffs assert a § 1983 claim for violation of Mr. Gonzales' Fourth Amendment

15   right to be free from excessive force and a § 1983 claim for violation of Plaintiffs' Fourteenth

16   Amendment right to familial relationships.  (SAC ¶¶ 34-40, ¶¶ 41-43.)  As the City argues,

17   Plaintiffs' failure to name individual officers as defendants in this action is fatal to these claims,

18   unless Plaintiffs can establish a basis for *Monell* liability.  (Def.'s Mot. at 24.)  In their opposition,

19   Plaintiffs write:  "Plaintiffs do not disagree with Defendant's authorities that the individual officers

20   must be named in order to state a claim for relief under 42 U.S.C. § 1983 (2012), absent a Monell

21   [*sic*] claim, and Plaintiffs are not making a Monell [*sic*] claim in this case."  (Pls.' Opp'n at 23.)

22   On these grounds, summary judgment as to Plaintiffs' § 1983 claims is GRANTED.

23   Plaintiffs' appeal to this Court's inherent power to manage litigation and its docket does not

24   convince the Court otherwise.  "Plaintiffs have represented [*sic*] and will not seek to amend the

25   Complaint to add in the names of the individual officers given the lateness of the proceedings and

26   a pending trial date of January 11, 2016."  (*Id.*)  Yet, they ask that the Court "take action to

27   preserve the Constitutional claims in the fair administration of justice by adding in the names *of

28   only the seven officers who fired their weapons* at Plaintiff Decedent Denny Gonzales on June 28,

2012."  (*Id.* (emphasis in original.)  Had Plaintiffs' counsel been concerned with the preservation

*United States District Court*
*Northern District of California*

16

of their clients' constitutional claims, they would have considered that when they decided not to name the individual officers in the original complaint, the first amended complaint, or the second amended complaint and when they elected not to seek leave to amend the complaint other than to add a nominal defendant.  Any resulting unfairness or injustice, then, is the fault of Plaintiffs' counsel, not this Court.

### B.       State law claims

In order to prevail on a negligence claim, a plaintiff must establish "(1) a legal duty to use due care; (2) a breach of that duty; and (3) injury that was proximately caused by the breach." *Knapps v. City of Oakland*, 647 F. Supp. 2d 1129, 1164 (N.D. Cal. 2009) (citing *Ladd v. Cty. of San Mateo*, 12 Cal. 4th 913, 917 (1996)).

The California Supreme Court "has long recognized that peace officers have a duty to act reasonably when using deadly force."  *Hayes v. Cty. of San Diego,* 57 Cal. 4th 622, 629 (2013). Claims of excessive force under California law are analyzed under the same objective reasonableness standard that applies to Fourth Amendment claims.  *Hayes v. Cty. of San Diego*, 736 F.3d 1223, 1232 (9th Cir. 2013).

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Graham v. Connor*, 490 U.S. 386, 396 (1989).  To do so, a court must pay "careful attention to the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id.*

Of these three factors, the most important is whether the suspect posed an immediate threat to the safety of the officers or others at the time force was applied.  *Graham*, 490 U.S. at 396.  The *Graham* factors, however, are not exhaustive.  *George v. Morris*, 736 F.3d 829, 837-38 (9th Cir. 2013).  Courts must "examine the totality of the circumstances and consider whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*."  *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (citation and quotation omitted).  For example, courts may look at "the availability of less intrusive alternatives to the force employed, whether proper warnings were given[,] and whether it should have been apparent to officers that the person

they used force against was emotionally disturbed." *Glenn v. Washington Cty.*, 673 F.3d 864, 872 (9th Cir. 2011) (citations omitted).

All determinations of unreasonable force, however, "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.

The California Supreme Court has also explained that, "[t]he reasonableness of an officer's conduct is determined in light of the totality of circumstances," which includes preshooting circumstances. *Hayes*, 57 Cal. 4th at 629-30. Preshooting circumstances might show that an otherwise reasonable use of deadly force was in fact unreasonable, such as where officers negligently provoke a dangerous situation in which the subsequent use of deadly force was justified. *Id.* at 630. Nonetheless, "[a]s long as an officer's conduct falls within the range of conduct that is reasonable under the circumstances, there is no requirement that he or she choose the 'most reasonable' action or the conduct that is the least likely to cause harm and at the same time the most likely to result in the successful apprehension of a violent suspect, in order to avoid liability for negligence." *Id.* at 632.

According to the City, the evidence shows that Mr. Gonzales walked out onto his driveway with a gun, and upon receiving commands, he moved his body, pointed his gun at the officers, "and/or fired one shot at officers." (Defs.' Mot. at 29.) It claims the officers acted reasonably in shooting Mr. Gonzales to protect themselves and their fellow officers. (*Id.*) The City also maintains that the officers acted appropriately in getting in a position to provide surveillance and intelligence to their superiors and to make contact with Mr. Gonzales in the event he tried to leave the house on foot or by car. (*Id.*)

In opposition, Plaintiffs contend that the following disputes of material fact preclude summary judgment in this case: (1) whether Mr. Gonzales pointed his weapon at officers, (2) the timing of the officers' first gunshots in relation to when Mr. Gonzales allegedly pointed his weapon, (3) whether or not commands were given to Mr. Gonzales before the officers fired at him, (4) whether or not the amount of shots fired at him was reasonable, and (5) whether the officers' actions and tactics leading up to the shooting were reasonable under the circumstances known to

them.  (Pls.' Opp'n at 7.)  Plaintiffs' arguments fail to raise a genuine dispute of material fact.

       1.     Whether Mr. Gonzales pointed his weapon in the officers' direction

In advancing the argument that Mr. Gonzales never pointed his weapon at officers, Plaintiffs rely on the CHP helicopter video, the declarations of Rajeev Kelkar, an accident reconstruction and biomechanics expert, and Philip F. Hayden, a SWAT and police policies and procedures, expert, and the statements Ernest Quinonez during a police interview.

According to Plaintiffs, the CHP helicopter video never shows Mr. Gonzales pointing or raising the gun in the officers' direction.[2]  (Pls.' Opp'n at 2.)  It is undisputed, however, that as Mr. Gonzales made his way back towards his garage, he raised his arm.  Though Plaintiffs' reconstruction and biomechanics consultant makes a conclusory statement that Mr. Gonzales never pointed or aimed the gun at the officers, he does confirm that Mr. Gonzales raised his arm:

> Based on my review of the APD Video, it is my further opinion that at the moment Mr. Gonzales' [*sic*] rotated his body from a forwards direction back towards the garage, both his knees were flexed, his left leg was loaded, and *his right arm raised slightly*, which all occurred within approximately a quarter of a second (CHP Video time stamp 16:42:12), and are all likely related to the initiation of a drop-step and sideways shuffle-step/jump. Moreover, *Mr. Gonzales' right arm does not stay raised but instead raises and lowers in less than a half a second, abducts away from his body towards the garage and adducts across his body* in two roughly continuous arced movements as Mr. Gonzales proceeds through the sequence of sideways shuffle steps/jumps.

(Kelkar Decl. ¶ 12 (emphasis added).)  This is consistent with the movement seen on the videos the parties played during the hearing on the motion—Mr. Gonzales' right arm goes down as he turns toward the garage then it came back up in a counter-clockwise motion directed away from the garage and in the direction of the officers.  An officer, then, could have perceived him pointing the gun at either point in time.

Plaintiffs characterize Mr. Gonzales' movement as "a natural function of him turning and moving back into the garage."  (Pls.' Opp'n at 9.)  The law does not require the officers to divine such a biomechanical explanation as an incident unfolds in a matter of seconds.  *See George*, 736 F.3d at 838 (Though the mere fact that a suspect is armed does not justify deadly force, "[t]his is

---

[2] Plaintiffs also argue that the video never shows that that Mr. Gonzales fired the weapon.  That, however, is not material, as the officers' use of deadly force was justified irrespective of whether Mr. Gonzales discharged his firearm.  For this reason, the Court need not reach the parties' arguments on this issue.

not to say that the Fourth Amendment always requires officers to delay their fire until a suspect

turns his weapon on them.  If the person is armed—or reasonably suspected of being armed—a

furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat.");

*Monroe v. City of Phoenix*, 248 F.3d 851, 862 (9th Cir. 2001) ("Surely [an officer is] not required

to wait and be seriously injured or killed before exercising his judgment and bringing the situation

under control."), overruled on other grounds by *Acosta v. Hill*, 504 F.3d 1323 (9th Cir. 2007);

*Reynolds v. Cty. of San Diego*, 858 F. Supp. 1064, 1072 (S.D. Cal.) ("The Courts cannot ask an

officer to hold fire in order to ascertain whether the suspect will, in fact, injure or murder the

officer. The high numbers of officer mortalities in recent years illustrate the unreasonableness of

such a notion."), aff'd in part and remanded in part by 84 F.3d 1162 (9th Cir. 1996), overruled in

part by *Acri v. Varian Assoc.*, 114 F.3d 999 (9th Cir. 1997).

Here, the officers testified that they observed Mr. Gonzales point the gun.  In his

declaration, Det. Bittner stated, "At the time I fired my weapon at Decedent, I believed Decedent

was a deadly threat to myself and other officers in the vicinity.  Decedent did not drop the firearm

when commanded to do so, instead he pointed it at officers."  (Bittner Decl. ¶ 18.)  During the

Coroner's Inquest, Ofc. Fortner testified that as he started to approach Mr. Gonzales, "he started to

back pedal, and that's when his hands, [*sic*] with the gun, came up off his hip and he started to

point the gun at me."  (Coroner's Inquest, Fortner Testimony 70:7-9.)  Ofc. Hynes also testified at

the Coroner's Inquest, describing his observations as follows:

> Initially his gun was raised like this (indicating) as he came down the driveway.
> He looked left and right.  Then he brought the gun down and placed it in his pocket.
> Then he removed the gun from his pocket. He removed the gun from his pocket, and
> he began to turn to his right, which was where the S.W.A.T. team members, or
> the other police officers, were lined up behind a bush or some vehicles.

(Coroner's Inquest, Hynes Testimony 48:22-49:4.)

However natural Mr. Gonzales' arm movement may have been, it was reasonable for the

officers to believe that when Mr. Gonzales, who had threatened to kill a police officer multiple

times, and who exited his garage unannounced with a gun in hand, raised his arm, he posed an

immediate threat to the officers' safety.  Plaintiffs cannot now rebut the officers' testimony by

offering an after-the-fact scientific explanation that Mr. Gonzales' arm movement, which the

United States District Court
Northern District of California

officers viewed as him raising the gun, was simply a function of his changing direction.[3]  That

would improperly give Plaintiffs the benefit of 20/20 hindsight.

Mr. Hayden's timing analysis, on which Plaintiffs rely in anticipation of the City's

argument that the officers interpreted this movement as a deadly threat, does not rebut the officers'

testimony on this point.  (*Id.*)  Mr. Hayden states in his declaration that he "**believe[s] an officer**

**confronted with the circumstances of the subject incident would not have had time to**

**register a threat of harm between the time Mr. Gonzales began his motion of turning**

**around, consistent with the timing officers allege his weapon was raised** (CHP Video

timestamp 16:42:11), to the time the first bullet struck Mr. Gonzales (CHP timestamp 16:42:12)."

(Hayden Decl. ¶ 5 (emphasis in original).)  His suggestion that Mr. Gonzales' arm movement

would not have been perceivable to an officer is far too speculative to create a genuine dispute of

material fact.  *See Clouthier v. Cty. of Contra Costa*, 591 F.3d 1232, 1252 (9th Cir. 2010) (citing

*Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) ("Conclusory, speculative

testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat

summary judgment.")).   Indeed, Mr. Hayden himself believes that "Officers Hynes and Andelin

thought they saw Mr. Gonzales raise his arm, so they fired first from across the street."  (Hayden

Decl. ¶ 8.)  As a matter of undisputed fact, Mr. Gonzales raised his arm, and that is consistent with

the officers' testimony that they perceived it.

Plaintiffs also rely on the statements Earnest Quinonez made during a post-incident

interview that are inconsistent with his subsequent deposition testimony.  According to Plaintiffs,

Mr. Quinonez's first account of the incident was that he neither saw Mr. Gonzales fire any shots at

the officers nor raise his weapon.  He later testified at his deposition that Mr. Gonzales "looked

down and he kind of looked forward.  And then I saw him -- I saw him raise his weapon, like if he

was going to fire, and simultaneously he turned around like he was going to run back into the

garage."  (Quinonez Dep. 25:17-20.)  Plaintiffs suggest that Mr. Quinonez might have changed his

testimony because, as Mrs. Quinonez testified, officers followed-up with Mr. and Mrs. Quinonez

---

[3] It certainly does not explain why Mr. Gonzales continued to point the gun away from the garage
even though he was moving towards it.  Nor does it rebut Ofc. Forner's testimony that as Mr.
Gonzales "was back pedaling away from me and [*sic*] the gun was up pointing directly at me."
Coroner's Inquest, Fortner Testimony 71:12-16.

United States District Court
Northern District of California

at their home following the incident.  (Pls.' Opp'n at 11-12.)  As Plaintiffs acknowledge, Mr. Quinonez's prior inconsistent statement is admissible impeachment evidence.  Here, though, it does not create a genuine dispute of material fact as it does not rebut the evidence in the record, including that offered by Plaintiffs' experts,[4] that establishes Mr. Gonzales did raise his arm during the incident, which the officers reasonably interpreted as a threat of serious physical harm.

>  2.  The timing of the officers' first gunshots in relation to when Mr. Gonzales allegedly pointed the weapon

Plaintiffs contend that a genuine dispute of material fact exists based on the evidence that suggests the officers began shooting at Mr. Gonzales before he pointed or raised his firearm.  (Pls.' Opp'n at 13.)  They also argue that even if Mr. Gonzales had done so and the officers perceived it, the evidence shows that the officers shot at Mr. Gonzales prior to that moment.  (Id.)  Plaintiffs base this contention on Mr. Kelkar's opinion, the correlation between the video and statements of various officers, and Mr. Quinonez's deposition testimony.   (Id. at 13, 14.)

It is Mr. Kelkar's opinion "that the first gunshots were fired at Mr. Gonzales when he was still facing forward, prior to Mr. Gonzales turning around to retreat into the garage **without any indication of his arms being raised from the side of his hips**."[5]  (Id. ¶ 15 (emphasis in original).)  The following facts apparently serve as the basis for his conclusion:

- Officer Andelin stated that he fired his AR-15 when he saw that Mr. Gonzales

---

[4] The Ninth Circuit has acknowledged "that cases in which the victim of alleged excessive force has died pose a particularly difficult problem in assessing whether the police acted reasonably, because the witness most likely to contradict the officers' story is unable to testify."  *Gregory v. Cty. of Maui*, 523 F.3d 1103, 1107 (9th Cir. 2008) (internal citation, quotations, and modifications omitted).  Accordingly, courts must carefully examine all the evidence in the record to determine if the officers' account of the events is credible."  *Id.*  As is discussed throughout this order, much of the evidence Plaintiff offers to oppose the motion, especially the declarations of their own experts and the video evidence, is consistent with the officers' account of the events.  This, then, is not a case "where a jury might find the officers' testimony that they were restrained in their use of force not credible, and draw the inference from the medical and other circumstantial evidence that the plaintiff's injuries were inflicted on him by the officers' use of excessive force."  *See id.* (citation and quotations omitted).

[5] Mr. Kelkar's opinion conflicts with that of Plaintiffs' other expert, Mr. Hayden, who states that Mr. Gonzales was struck with the first bullet at 16:42:12.  Although, there is no evidence in the record to indicate how to determine exactly when the first bullet hit Mr. Gonzales, both videos in the record show that at this time, Mr. Gonzales was not facing forward.

United States District Court
Northern District of California

"kind of crouched, started to raise the gun;"

- Officer Hynes believes he was the first one to fire at Mr. Gonzales, suggesting he shot at a slightly earlier point in time than Officer Andelin;
- Officer Hynes describes firing three separate volleys of bullets, with three of four rounds each, and states that he stopped firing because SWAT officers were crossing into his field of fire[;]
- Detective Vincelet's description of the SWAT team being out in the middle of the driveway at that time Mr. Gonzales was turning back towards the garage, and the fact that he (Det. Vincelet) fired two shots when Mr. Gonzales was 2-3 feet from the Garage;
- It took Mr. Gonzales approximately 2 seconds from the time he started moving back towards the garage to the time he re-entered the garage.

(*Id.*)  As Mr. Kelkar does not specifically address how or why these facts support his conclusion,

the Court finds that his speculative opinion does not create a genuine dispute of material fact.

Indeed, Mr. Kelkar once again appears to contradict himself when he states, "My analysis, based

on my professional experience, indicates that at CHP Video timestamp 16:42:12[,] Mr. Gonzales

was in his second sideways shuffle-step/jump, with his shoulders continuing to rotate towards the

garage, and at this very point he flinched, consistent with being shot in the upper portion of the left

side of his back/shoulder."[6]  (Kelkar Decl. ¶ 8.)

The purported correlation between the video and the officers' statements[7] also fails to raise

such a dispute.  On this point, Plaintiffs argue:

> The correlation between the video and statements of various Antioch police officers also calls into question when shots were first fired.  For example, the alleged 'pointing the weapon' motion Defendant alludes to occurs when Mr. Gonzales is already retreating from police and running back into the garage (See Declaration of Michael G. Schott, ¶ 7 Defendant's Exhibit M.)  However, Officer Marty Hynes, states in his testimony before the Coroner's Inquest hearing that he fired at Mr. Gonzales as Mr. Gonzales was turning toward the officers positioned to his right and before he began his retreat (Blechman Decl., Ex. I., Declaration of David G. Yen, pg. 50.)

(Pls.' Opp'n at 14.)

---

[6]  Plaintiffs further contradicted Mr. Kelkar's opinion when, at the hearing, they argued that certain flashes that appear on the CHP real-time video, which are better captured on the CHP slow motion video to which they have objected, are the first gunshots that were fired.  Even when assuming that Plaintiffs have properly established that these flashes correspond to the officers' gunfire, they are visible only when Mr. Gonzales' has turned to his right, not when he is facing forward.  CHP Slow Motion Video 16:42:12.

[7] While Plaintiffs refer to the statements of various officers, they only cite to Ofc. Hynes testimony.  *See* Pls.' Opp'n at 14.  That is the testimony the Court has considered here.

United States District Court
Northern District of California

Paragraph 7 to Mr. Schott's declaration states:

Attached as Exhibit 4 is photo exhibit COMP-l.pdf, which shows a series of three (odd line scan) frames, RFN 662, 665, 677 from the CHP aerial surveillance video. Mr. Gonzales is in the process of turning to his right toward the garage. In RFN 662 and 665 there is visible extending from the right hand of Mr. Gonzales an oblong object which is proportionally consistent with a handgun. The oblong object is pointed downward. As Mr. Gonzales continues moving to the garage (toward image right), he raises his right hand/forearm in a counter-clockwise motion. In RFN 677 the axis of the oblong object in Mr. Gonzales' right hand is pointing north/northwest (toward image left).

Ofc. Hynes testified, "To be honest, at that point I was completely focused on Mr. Gonzales and the gun that he had.  As he began to make that turn toward the officers and the pistol, then I opened fire with my rifle."  (Yen Decl. ¶ 11, Ex. I, Coroner's Inquest, Hynes Testimony 50:5-8.)  The testimony Plaintiffs cite to, then, is not inconsistent with Mr. Schott's declaration, which only confirms that Mr. Gonzales was in the process of turning to his right toward the garage, and as he continued to move, he raised his right hand/forearm in a counter-clockwise motion.

Mr. Quinonez's testimony is equally unhelpful to Plaintiffs.  When asked if he heard any gunfire prior to Mr. Gonzales "raising the weapon up as if he was going to fire, Mr. Quinonez's responded, "I can't say.  I don't know."  (Quinonez Dep. 25:23-25.)  This does not rebut the officers' testimony that they observed Mr. Gonzales do so prior to shooting him.

3.      Whether or not the amount of shots fired at him was reasonable

Plaintiffs assert that "[a]nother issue in the case is whether or not the amount of force used against Mr. Gonzales was reasonable under the circumstances."  (Pls.' Opp'n at 15.)  They claim that the number of shots fired at Mr. Gonzales, 50-52, was grossly excessive and unjustified and that if the officers had not fired "in excess of 50 shots at Mr. Gonzales, there is a distinct possibility that Mr. Gonzales would not have been killed."  (*Id.*)

Plaintiffs do not cite a single case in support of their position, and absent any such authority, this Court adheres to the objective inquiry that governs here—whether the officers' use of force was reasonable under the totality of the circumstances and without the "20/20 vision of hindsight." *Graham*, 490 U.S. at 396.  The number of shots fired, then, is not by itself dispositive. Nor does it, by default, make the reasonableness inquiry one for the jury.  Here, Plaintiffs have not

1    pointed to anything in the record that raises a genuine issue about the reasonableness of the

2    number of shots fired.

3           Mr. Hayden's speculative opinion does not help Plaintiffs meet their burden.  Mr. Hayden

4    states that "Mr. Gonzales posed no immediate threat to the safety of the officers or others" and

5    "that he made no aggressive move toward the officers."  (Hayden Decl. ¶ 4.)  He holds the "belief

6    that Officers Hynes and Andelin thought they saw Mr. Gonzales raise his arm, so they fired first

7    from across the street.  This started the chain reaction for other officers to shoot even though they

8    did not see Mr. Gonzales make any threatening moves toward them." (*Id.* ¶ 8.)  He describes this

9    action as a "gross violation of any shooting policy by any police department in the United States."

10   (*Id.*)  He states that "[i]t appears that the APD's officers' own heightened anxiety overwhelmed

11   them, and they made a conscious decision to become aggressive and use deadly force." (*Id.* ¶ 8.)

12   A plaintiff, however, cannot "avoid[] summary judgment by simply producing an expert's report

13   that an officer's conduct leading up to a deadly confrontation was imprudent, inappropriate, or

14   even reckless." *See Billington v. Smith*, 292 F.3d 1177, 1189 (9th Cir. 2002).

15          Plaintiffs do not otherwise point to any evidence that suggests the officers continued to fire

16   on Mr. Gonzales after they knew that he was incapacitated or that they continued to fire after they

17   had otherwise neutralized the threat he posed.  *Cf. Hopkins v. Andaya*, 958 F.2d 881, 887 (9th Cir.

18   1992) (shooting not reasonable as a matter of law when officer fired fatal shots when suspect was

19   unarmed, some distance away from the officer, and had already been shot six times).  *But see*

20   *Gregory*, 523 F.3d at 1109 (officers did not use unreasonable force where, among other things,

21   "they ceased such force once the threat was neutralized.") (citations omitted).  It is undisputed that

22   Mr. Gonzales did not drop the gun—either on his way out of, or back into, the garage, at the time

23   he saw the officers, was being shot at, or when the officers yelled commands, and it is undisputed

24   that only two bullets struck Mr. Gonzales.  The forensic pathologist who conducted Mr. Gonzales'

25   autopsy testified at the Coroner's Inquest that either gunshot would have, by itself, been fatal.

26   (Blechman Decl., Ex. F, Josselson Testimony 19:10-12, 20:15-21:3.)  Plaintiffs have offered no

27   evidence whatsoever that would demonstrate the point in time at which either of fatal gunshots

28   were fired.  Plaintiffs' argument that the two rounds would not have killed him if the officers had

     not fired 50-52 shots is thus unsupported by the record and does not create a genuine dispute of

United States District Court
Northern District of California

25

material fact.

           4.   <u>Whether or not commands were given to Mr. Gonzales before the officers fired at him</u>

Plaintiffs next attempt to raise a genuine dispute of material fact based on whether the officers gave commands, whether Mr. Gonzales had a sufficient opportunity to respond to their commands, and whether Mr. Gonzales had already been fired upon by the time any commands had been given.  (Pls.' Opp'n at 16.)  They assert that "[t]he evidence strongly supports the fact that commands were, in fact, given <u>after shots had been fired at Mr. Gonzales and perhaps when Mr. Gonzales had already been struck by these shots.</u>"  (*Id.* (emphasis in original).)  According to Plaintiffs, Sgt. Morefield's testimony "best exemplifies" this.  (*Id.*)  He testified as follows:

> Q. At some point you heard shots being fired?
> A. Yes, I did.
> Q. Where were you when you heard this?
> A. I was back with Captain McConnell and Sergeant
> Bias at the Command Post.
> Q. Approximately how far away were you from the
> house at this point?
> A. Hundreds of feet.
> Q. What did you do once you heard shots being fired?
> A. I rushed towards the Contact Team.
> Q. What did you hear, if anything, as you were
> rushing back to the Contact Team after you heard shots
> being fired?
> A. I heard verbal commands being given. I heard
> the reports of gunfire as well.
> Q. How many gunshots did you hear?
> A. I heard a series of gunshots. I don't recall
> specifically how many I heard .
> Q. Did you hear multiple volleys of gunshots?
> A. I don't recall multiple volleys. I recall
> multiple gunshots.
> Q. What did you see when you arrived in front of
> the house?
> A. I saw the Contact Team fanned out around the
> vehicle into the driveway, all yelling commands into
> the garage. There was a large amount of -- I believe
> it was steam coming out of the garage. And I could see
> that the suspect was down in the -- inside the garage.

(Yen Decl., Ex. E, Morefield Dep. 102:16-103:19.)

Plaintiffs claim that "[t]his is in contradiction with the statements of various other officers

who claim they gave commands before they opened fire.  See Declaration of Desmond Bittner (Defendant's Exh. H.)  Neither Bittner nor any other officer claims they gave commands after shots were fired at Mr. Gonzales."  Though Plaintiffs cite to Defendants' Exhibit H, to refer to Det. Bittner's declaration, that is not a correct citation.  Exhibit H consists of copies of the photographs depicting the scene.  (*See* Blechman Decl. ¶ 9, Ex. H.)  In any event, in the declaration, which is Defendant's Exhibit G, Det. Bittner states, "Officers were yelling commands at Decedent to 'drop the gun' numerous times."  (Bitter Decl. ¶ 15.)

Plaintiffs also argue that "[t]here is a further dispute of fact when it comes to the correlation between officers' statements and testimony and the video." [8]  (Pls.' Opp'n at 17.)  Specifically, Plaintiffs argue that the video shows Mr. Gonzales never approached the sidewalk, which undermines Ofc. Fortner's testimony that he did not start yelling commands until Mr. Gonzales had almost reached the sidewalk.  (*Id.*)  Plaintiffs once again fail to provide a citation to this testimony, and it appears Plaintiffs misrepresent Ofc. Fortner's testimony.  He testified:  "As I started to approach him, he started to back pedal, and that's when his hands, with the gun, came up off his hip and he started to point the gun at me . . . .  The gun came up.  It was on my lower body, had come up to my knees.  As it approached my chest as I was screaming commands, I started to fire my rifle at Mr. Gonzales."  (Coroner's Inquest, Fortner Testimony 70:7-14.)

Finally, Plaintiffs assert that it took Mr. Gonzales less than 2 seconds to turn back into the garage once he noticed the police officers.  (Pls.' Opp'n at 18.)  They contend that this creates a question of fact as to whether or not there was even sufficient time for these commands to have been given before shots were fired.  (*Id.*)

Plaintiffs various arguments notwithstanding, the timing of the officers' commands, or whether they were given at all, does not raise a genuine dispute of material fact.  Whether commands were given or given timely is immaterial given that it is undisputed that Mr. Gonzales never dropped the gun.  He held the weapon in his hand as he exited his garage, he held it in his hands even after he was "startled" by the officers' presence, and he held it in his hands as he made

---

[8] In advancing this argument, Plaintiffs also cite Mr. Hayden's declaration for the proposition that neither Ofc. Hynes nor Ofc. Andelin heard any commands.  Mr. Hayden, however, does not have personal knowledge of the events that occurred at the time of the incident.

United States District Court
Northern District of California

his way back into the garage.

Moreover, "[t]he absence of a warning does not necessarily mean that [the officers'] use of deadly force was unreasonable." *Gonzales v. City of Anaheim*, 747 F.3d 789, 798 (9th Cir. 2014) (citation omitted). Plaintiffs' experts testified that only seconds had elapsed between the time Mr. Gonzales exited the garage and the time he re-entered it. 9*See* Kelkar Decl. ¶ 8 (It "took approximately 6 3/4 seconds from the time he stepped onto the driveway. . . . It took approximately 2 seconds from the moment Mr. Gonzales started to retreat towards the garage to the time he re-enters the garage (See attached CHP Video, at 16:42:10 -16:42:13)."); Hayden Decl. ¶ 5 ("From the time he began his turn until he ran back into the garage as approximately 1 1/2 seconds.").) When viewing this evidence in the light most favorable to the Plaintiff, no reasonable jury could find that the timing of the officers' commands, or that the failure to give them altogether, undercuts the reasonableness of the officers' conduct under the totality of the circumstances.

> 5. <u>Whether the officers' actions and tactics leading up to the shooting were reasonable under the circumstances known to them</u>

Plaintiffs argue that summary judgment is inappropriate here because a genuine dispute exists as to the reasonableness of the officers' actions and tactics leading up to the shooting.[9] (Pls.' Opp'n at 18.) They argue, among other things, that the officers "could have backed off and given him his space and called in law enforcement professionals or contract professionals who are trained in psychological encounters to come in and attempt to defuse the situation and convince Mr. Gonzales to surrender to police so that could be evaluated." (Pls.' Opp'n at 22.) Plaintiffs also argue that "by physically approaching [Mr. Gonzales] [the officers] created the hazardous situation in which Mr. Gonzales was killed." (*Id.*)

Arguments based on what the officers' could have done do not create a genuine dispute of material fact. *See, e.g.*, *Scott v. Harris*, 550 U.S. 372, 385 (2007) (police car chase case where the

---

[9] Plaintiffs assert that their negligence claim "is premised not only on the unreasonable use of force which resulted in Mr. Gonzales' death, but also on numerous unreasonable actions and tactics that led up to this fatal confrontation." Pls.' Opp'n at 18. The California Supreme Court has made clear that the reasonableness of preshooting conduct "should not be considered in isolation, however; rather, it should be considered as *part of the totality of circumstances* surrounding the fatal shooting . . . " *Hayes*, 57 Cal. 4th at 638. The Court has followed that framework here.

United States District Court
Northern District of California

Court rejected the argument that a tragic accident could have been avoided had the police ceased their pursuit and stated, "We think the police need not have taken that chance and hoped for the best."); *see also Pickard v. Holton*, No. 12-cv-01489, 2015 WL 576717, at * 5 (N.D. Cal. Feb. 11, 2015 (rejecting arguments that deputy could have waited for back up or stopped behind the plaintiff's vehicle because "[t]hese arguments impose . . . a burden the law does not require [the deputy] to bear"). The reasonableness analysis proceeds without the benefit of 20/20 hindsight. *Graham*, 490 U.S. at 396. Plaintiffs' contention that the officers created the hazardous situation in which Mr. Gonzales was killed also belies the record. It is undisputed at the time of the incident, Mr. Gonzales emerged from his garage with a gun and on his own, as he was unaware of the officers' presence. (*See* Coroner's Inquest, Fortner Testimony 70:5-6 ("I knew he had no clue that we were there."); Morefield Dep. 70:21-22 ("We hadn't had an opportunity to develop a specific plan for contact."); Kelkar Decl. ¶ 5 ("Mr. Gonzales walked out of the garage at a pace much slower than regular walking speed, consistent with the APD Officers descriptions of Mr. Gonzales not knowing where the police officers were located prior to the fatal shooting, as Mr. Gonzales walked 'nonchalantly' out of his garage.").)

A police officer may use deadly force where he "has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Billington*, 292 F.3d at 1184. While "the governmental interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual[,]" the undisputed facts here, even when viewed in the light most favorable to Plaintiffs, show that the officers were justified in using deadly force. *See Gregory*, 523 F.3d at 1109 (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001)).

It is undisputed that Mr. Gonzales was carrying a handgun when he emerged from his garage. (*See* Pls.' Opp'n at 4 ("He was carrying a handgun in his right hand.").) It is undisputed that he did so after he repeatedly threatened to kill a police officer—a very serious crime. It is also undisputed that Mr. Gonzales raised the arm that he was holding a gun in towards the officers and that even after he began moving back towards the garage, he continued to hold the gun in a direction opposite to that in which he was moving. Thus, even if, as Plaintiffs contend, Mr. Gonzales was retreating, a reasonable officer at the scene would have reasonably believed that Mr.

United States District Court
Northern District of California

29

Gonzales posed a threat of serious physical harm to him or his fellow officers, justifying the use of deadly force. *See Tennessee v. Garner*, 417 U.S. 1, 11-12 (1985) ("[If the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given"). No reasonable jury could find that this belief was unreasonable.

Additionally, both sides concede that the incident occurred very quickly. (*See* Kelkar Decl. ¶ 6, Dkt. No. 43 ("In analyzing the CHP Video, I analyzed that Mr. Gonzales's entire forward motion took approximately 6 3/4 seconds from the time he stepped onto the driveway. . . . It took approximately 2 seconds from the moment Mr. Gonzales started to retreat towards the garage to the time he re-enters the garage.); Bittner Decl. ¶ 19 ("From the time I saw Decedent with the gun to the time when shots were fired was only an estimated period of three to five seconds.").) Under these tense, uncertain, and rapidly evolving circumstances, which transpired over the course of mere seconds, the officers were justified in using deadly force against Mr. Gonzales. *See Smith v. City of Hemet*, 394 F.3d 689, 704 (9th Cir. 2013) (noting that "where a suspect threatens an officer with a weapon such as a gun or a knife, the officer is justified in using deadly force").

While Plaintiffs assert that the officers were unreasonable in the actions and tactics that led up to the shooting, the California Supreme Court has also cautioned:

> Although preshooting conduct is included in the totality of circumstances, we do not want to suggest that a particular preshooting protocol (such as a background check or consultation with psychiatric experts) is always required. Law enforcement personnel have a degree of discretion as to how they choose to address a particular situation. Summary judgment is appropriate when the trial court determines that, viewing the facts most favorably to the plaintiff, no reasonable juror could find negligence.

*Id.* So it is here. Viewing all of the evidence, especially the experts' declarations, in the light most favorable to Plaintiffs, the undisputed evidence shows that the officers acted reasonably under the totality of the circumstances, and the City, therefore, faces no liability for the officers' conduct.

Accordingly, the Court GRANTS summary judgment for the City on Plaintiffs' claims for negligence and battery.

30

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### C.    Punitive damages

In their complaint, Plaintiffs seek an award of punitive damages in this action pursuant to California Civil Code section 3294.  (Compl. ¶¶ 44-46.)  Such damages are unavailable here.  The City is the sole named defendant.  As a municipality, it is immune from an award of punitive damages.  Cal. Gov't Code § 818 ("Notwithstanding any other provision of law, a public entity is not liable for damages awarded under Section 3294 of the Civil Code or other damages imposed primarily for the sake of example and by way of punishing the defendant."); *see United Nat'l Maint., Inc. v. San Diego Convention Center, Inc.*, 766 F.3d 1002, (9th Cir. 2014) ("In California, a public entity is not liable for punitive damages.") (citing Cal. Gov't Code § 818.)  The City is, therefore, entitled to summary judgment on this claim.

### D.    Objections to evidence

Plaintiffs object to the slow motion video evidence the City submitted in connection with its motion.  (Pls.' Opp'n at 8.)  They argue that the evidence is misleading, prejudicial, and lacks foundation.  (*Id.*)  These objections are OVERRULED.  Michael G. Schott, the City's forensic image analyst and litigation support consultant, has stated in his declaration that the video "plays at 1/6 slow motion speed and covers the 38 second segment from 16:41:49 to 16:42:27.  The methodology to produce this exhibit involves processing the video images for clarity and visibility by increasing luminance within specific tonal ranges, as well as enlarging the images."  (Schott Decl. ¶ 6.)  The slow motion video is not misleading given that the City has also provided a copy of the real-time video.  The slow motion video is not unduly prejudicial to Plaintiffs, as it is highly probative.  Indeed, Plaintiffs themselves wished to rely on the City's slow motion video during oral argument.

The City also objects to certain evidence offered by Plaintiffs, and it moves to strike certain portions of Plaintiffs' opposition brief for failure to properly cite to the record.  Its objections to evidence concern exhibits B, C and I, and the declarations of Plaintiffs' experts, Rajeev Kelkar and Philip Hayden.  (Def.'s Reply at 17-20.)

Exhibit B is a Field Services Report authored by Tuan Nguyen.  (Yen Decl. ¶ 4, Ex. B.)  The City argues that the report is not properly authenticated, not based on personal knowledge, not

relevant, constitutes inadmissible hearsay, and is subject to exclusion because its probative value is substantially outweighed by the risk of prejudice and confusion.  (Def.'s Reply at 18.)  Plaintiffs cite this exhibit to support their assertion that the safety was on the gun Mr. Gonzales was carrying at the time of the incident.  (*See* Pls.' Opp'n at 5.)  As the Court has disposed of the instant motion without addressing the City's argument that Mr. Gonzales may have fired the gun, these objections are OVERRULED as moot.

Exhibit C is an audio recording of the Antioch Police Department interview with Mr. Quinonez.  (Yen Decl. ¶ 5, Ex. C.)  The City asserts that this recording lacks foundation, is not properly authenticated, not relevant, constitutes hearsay without an exception, and is subject to exclusion because its probative value is substantially outweighed by the risk of prejudice and confusion.  (Def.'s Reply at 9, 18.)  The Court agrees that the recording lacks foundation and SUSTAINS that objection.  Plaintiffs submit the recording through its counsel, who states that the recording is a "true and correct copy of the audio recording of the Antioch Police Department interview with Ernest Quinonez." (Yen Decl. ¶ 5.)  Counsel does not point to any facts, either in his declaration or in Mr. Quinonez's deposition testimony, that indicate how counsel knows that this recording is a true and correct copy of the recording.  Nor does he provide facts indicating when the recording took place, who made the recording, or whether it was kept in the ordinary course of business by someone.

Exhibit I is a copy of certain portions of Ofc. Hynes' testimony from the Coroner's Inquest Hearing.  (Yen Decl. ¶ 11, Ex. I.)  Exhibit J is a copy of certain portions of Ofc. Fortner's testimony from that hearing.  (Yen Decl. ¶ 12, Ex. J.)  The City objects to these exhibits on the grounds that they are not properly authenticated and that they lack any reference as to who is testifying in the exhibits.  (Def.'s Reply at 18.)  These objections are SUSTAINED.  While Plaintiffs' counsel's declaration clearly identifies each exhibit as a copy of each officer's deposition testimony, Plaintiff has not included a certification page for either transcript, and the cover page for each document does not indicate who was giving the testimony, only that it was given during the Coroner's Inquest.

The City objects to Kelkar's declaration because it is not based on personal knowledge, is

United States District Court
Northern District of California

1    irrelevant, is subject to exclusion because its probative value is substantially outweighed by the

2    risk of prejudice and confusion, and constitutes improper expert testimony.  (Def.'s Reply at 18.)

3    The Court finds that Mr. Kelkar's declaration is conclusory and highly speculative, *see, e.g.,*

4    Kelkar Decl. ¶ 15 ("[I]t is my professional opinion, based on my education and experience, that

5    the first gunshots were fired at Mr. Gonzales when he was still facing forward, prior to Mr.

6    Gonzales turning around to retreat into the garage without any indication of his arms being raised

7    from the side of his hips.").  Mr. Kelkar fails to support his conclusion with any proper citations to

8    admissible evidence in the record.  *See supra* Part III.B.2.  The Court, therefore, SUSTAINS the

9    City's objections to that extent.

10          The City objects to Hayden's declaration because it is not based on personal knowledge, is

11   irrelevant, constitutes improper expert testimony, and is subject to exclusion because its probative

12   value is substantially outweighed by the risk of prejudice and confusion.  (Def.'s Reply at 18.)

13   The Court finds that Mr. Hayden's declaration lacks foundation, contradicts the evidence in the

14   record acknowledged by Hayden, and is conclusory, *see, e.g.*, Hayden Decl. ¶ 3 ("Mr. Gonzales

15   posed no immediate threat to the safety of the officers or others."), *id.* ¶ 4 ("[Hayden] never once

16   saw Mr. Gonzales raise his handgun toward any officer.").  It also constitutes improper expert

17   testimony, *id.* ¶ 6 ("[T]he deadly force used to 'detain' Mr. Gonzales was not justified to be used

18   by any officer of the Antioch Police Department."), and is irrelevant to the extent it merely

19   second-guesses the officers' actions on the day of the incident, *see id.* ¶ 12 ("In addition, the

20   situation promptly became exacerbated when it could have been defused.").  On these grounds, the

21   City's objections are SUSTAINED.

22          The City also moves to strike a substantial portion of Plaintiffs' statement of facts for lack

23   of specific citations to the record or incorrect citations to the record.  (Def.'s Reply at 18, 19.)  The

24   Court agrees that the bulk of Plaintiffs' statement of facts lacks any citation to the record, and for

25   that reason, any parts lacking a citation to the record are hereby STRICKEN.  *See* Fed. R. Civ. P.

26   56(c)(1), (e)(4).

27          The Court has also reviewed the specific sections that lack a correct citation to the record.

28   On page two of Plaintiffs' opposition, they write:  "Mr. Gonzales also made the statement that

1   'whoever came across him today there was going to be casualties.'  (Exh. F, Deposition of Eric

2   McManus, pg. 38.)."  Det. McManus' testimony is as follows:  "He said something to the effect

3   that if he got stopped, there would be casualties, which promoted [*sic*] me to ask if he was

4   intended on harming an innocent person."  (McManus Dep. 38:9-12.)  These lines of Plaintiffs'

5   opposition are STRICKEN to the extent they misrepresent Det. McManus' testimony.

6          The City asks that the Court strike material beginning on line 22 of page 2 and ending on

7   line 1 of page 3 of Plaintiffs' opposition.  (Def.'s Reply at 19.)  With the exception of single

8   sentence in that section that has a corresponding citation to the record, the remaining material in

9   that part of the statement of facts has already been stricken for lack of any such citation.

10         On page 3, lines 4-7, Plaintiffs write: "Mr. Gonzales terminated each of the phone calls.

11  Det. McManus testified that he never called Mr. Gonzales back after any of the five phone calls

12  and never tried to keep Mr. Gonzales on the phone."  (Pls.' Opp'n at 3 (citing Exh. F, Deposition of

13  Eric McManus, pg. 115-116.)  The cited deposition testimony contains no such statement.  For this

14  reason, page 3, lines 4-7 are STRICKEN for lack of a correct citation to the record.

15         On page 3, lines 9-11, Plaintiffs write:  "Sgt. Morefield confirms that no member of the

16  Antioch Police Department made any attempt to communicate with Mr. Gonzales prior to him

17  coming out of his garage right before he was shot and killed."  (Pls.' Opp'n at 3 (citing Exh. E,

18  Deposition of Anthony Morefield, pg. 70.)  Sgt. Morefield, however, testified as follows:  "It was

19  our intent to make contact with Gonzales.  I think more specifically to find out what his intentions

20  were." (Morefield Dep. 70:16-17.)  When asked what his plan was for achieving that, he

21  responded, "We hadn't had an opportunity to develop a specific plan for contact.  I know Detective

22  McManus was on the phone with him from time to time, and he established some communication

23  with him, but we had not had time to develop an actual contact plan . . . . "  (*Id.* 70:19-25.)  Thus,

24  to the extent Plaintiffs' statement of facts is inconsistent with this testimony, it is STRICKEN.

///

25  ///

26  ///

27  ///

28  ///

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

## IV.     CONCLUSION

For the reasons set forth above, the City's motion for summary judgment is GRANTED.

IT IS SO ORDERED.

Dated: 10/20/15

_____
KANDIS A. WESTMORE
United States Magistrate Judge